# Exhibit C

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION, CRIMINAL PART
ESSEX COUNTY
INDICTMENT NO. 03-05-1830
APP. DIV. NO.

| | | |
|---|---|---|
| STATE OF NEW JERSEY, | ) | |
| | ) | |
| Plaintiff, | ) | TRANSCRIPT |
| | ) | of |
| vs. | ) | JURY TRIAL |
| | ) | |
| NAEEM MILLER, | ) | |
| | ) | |
| Defendant. | ) | |

Place: Essex Co. Courthouse
       50 West Market St.
       Newark, N.J.  07102

Date:  March 23, 2005

BEFORE:

    HONORABLE THOMAS R. VENA, J.S.C. and JURY

TRANSCRIPT ORDERED BY:

    LOUIS G. GONNELLA, ESQ. (Office of the Public Defender,
    Appellate Section, 9th Floor, 31 Clinton St., Box 46003,
    Newark, N.J.  07101)

APPEARANCES:

    GREGORY DeMATTIA, ESQ., Assistant Prosecutor
    Attorney for the State

    JONATHAN D. GORDON, ESQ.
    Attorney for Defendant

Transcriber Catherine Weigel
ELITE TRANSCRIPTS, INC.
14 Boonton Avenue
Butler, New Jersey  07405
(973) 283-0196
Video Recorded
Operator, Kathy Fagan

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 2

2

I N D E X

| Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| FOR THE STATE | | | | |
| Murad Muhammad | 13,168 | 18,177 | 198,211 | 199,211 |
| George Ramos | 74 | | | |
| Kevin Phillips | 80 | | | |
| Felicia Wright | 96 | 123 | 162,166 | 165 |

| Exhibits | | Ident. | Evid. |
|---|---|---|---|
| S-21 | Six photographs | 13 | |
| S-2 | Det. Muhammad report | 26 | |
| S-23 | Photo display instruction | 37 | |
| S-1 | Incident report | 77 | |
| S-20 | Photograph | 119 | |
| S-3 | Wanted poster | 174 | |
| D-1 | Crime bulletin | 184 | |
| D-2 | Statement | 194 | |
| D-3 | Statement | 201 | |
| D-4 | Unidentified document | 215 | |

MOTION TO SUPPRESS
ARGUMENT

|  |  |  |
|---|---|---|
| BY:  MR. DeMATTIA | | 39 |
| BY:  MR. GORDON | | 41 |

DECISION                                     43

JURY INSTRUCTIONS                            48

OPENING STATEMENT
BY:  MR. DeMATTIA                            60
BY:  MR. GORDON                             68

Colloquy                          3

1         (Jurors not present in the courtroom)
2         THE COURT:  STATE OF NEW JERSEY VS. NAEEM
3    MILLER, Indictment 3-5-1830.  We have present in court
4    Mr. Miller as well as Mr. DeMattia for the State and
5    Mr. Gordon for Mr. Miller.  We have two issues to
6    resolve prior to having the jury sworn.  First is we
7    need to discuss and take testimony, if necessary, with
8    regard to the fact that I've been made aware of,
9    brought to my attention by both parties -- apparently
10   it had been something that had been brought to my
11   attention in the past, but if not I don't recall and I
12   don't believe I did any investigation or research at
13   the time -- and we need to make sure that it's on the
14   record before we -- before we proceed any further.
15        The alleged victim in this case is an
16   individual by the name of Timothy Phillips.  At a
17   certain point in time apparently Mr. Gordon represented
18   Mr. Phillips and apparently this took place at some
19   time prior to Mr. Phillips' death and, in fact, the
20   representation of Mr. Phillips by Mr. Gordon ended at
21   some period of time prior to Mr. Phillips' death.
22   First I think we need to find out specifically on the
23   record under oath what those facts are and, Mr. Gordon,
24   if you don't have any objection, could we put you under
25   oath?

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 3

|       | Colloquy                                                      | 4 |
|-------|---------------------------------------------------------------|---|

```
                           Colloquy                    4
 1          MR. GORDON:  No objection, Your Honor.
 2     J O N A T H A N   G O R D O N,   SWORN
 3          THE COURT:  All right.  Why don't you tell us
 4     about the representation of Mr. Phillips?
 5          MR. GORDON:  Fine, Your Honor.  Your Honor, I
 6     don't recall when my representation of Mr. Phillips
 7     commenced.  I know that I represented him in two or
 8     three drug cases that were all pending in Superior
 9     Court here in Newark.  I believe it was before Judge
10     Kemp.  I engaged in a plea negotiation with the
11     prosecutor at that time Tina Amendola.  Mr. Phillips
12     ultimately pled guilty to multiple CDS indictments.  He
13     was sentenced to a State prison term.  I want to say,
14     Judge, it was something like four years with 12 months
15     parole ineligibility, or something in that range.  He
16     was sentenced, according to the Promis/Gavel record
17     that I have in front of me on April 24th of 1998.
18     That's consistent with my recollection, Judge.
19          THE COURT:  So the time to appeal would
20     approximately be 45 days from April 24th, 1998?
21          MR. GORDON:  That's correct, Your Honor.  To
22     the best of my knowledge on that date Mr. Phillips went
23     into the custody of the Department of Corrections on
24     April 24th.  I was not asked to file a notice of appeal
25     or follow up on an appeal for him.  I did not, so from
```

```
                           Colloquy                    5
 1     my point of view and my understanding of Mr. Phillips'
 2     point of view at that time was that my representation
 3     for him concluded on April 24th of 1998.  I didn't
 4     represent him at any time after that, and it's my
 5     understanding that he was killed in Newark on December
 6     16th of 2001.
 7          Now, I should also say, Your Honor, that at
 8     the time that I was retained on behalf of my client
 9     Naeem Miller, when I first met Mr. Miller he was
10     incarcerated here in Essex County Jail, having been
11     extradited from Scranton, Pennsylvania.  When I met
12     with him it was -- I don't remember exactly when I met
13     with him, Your Honor.  It was sometime I want to say
14     late last summer of 2004.  At that time we discussed
15     the case in detail.  I did tell him at that time that I
16     had represented the victim in the case, Mr. Phillips.
17     I discussed all that with him fully.  I told him that I
18     would tell that to The Court and --
19          THE COURT:  When was that?
20          MR. GORDON:  I'm sorry?
21          THE COURT:  When was that?
22          MR. GORDON:  Judge, I'm giving an
23     approximation, but I believe it was sometime in late
24     summer of 2004 when I first met Naeem Miller.  I
25     disclosed all that to him, I discussed it with him, the
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 4

```
                        Colloquy                      6
 1   fact that at some point it might be put on the record
 2   and he might be asked if he understood that and if, in
 3   fact, he was willing to waive any potential conflict or
 4   any issue with regard to an appeal, should he be
 5   convicted, that it would be based upon the fact that I
 6   represented Mr. Phillips in the past.  He indicated to
 7   me that he understood that, that he didn't see that it
 8   was a problem based upon his knowledge of my reputation
 9   and the facts that I was giving him, and he indicated
10   to me that he would have no problem stating on the
11   record that he was fully aware and advised of this fact
12   and he did not view it as a problem with me defending
13   him in this case and that he wanted me to continue to
14   defend him in the case at trial.
15            THE COURT:  Thank you, Mr. Gordon.  Mr.
16   DeMattia, do you have any questions for Mr. Gordon
17   under oath?
18            MR. DeMATTIA:  No, sir.  I believe it was an
19   appropriate representation that he just made with
20   regard to the facts.
21            THE COURT:  Thank you.  Would you --
22   Officer, would you swear Mr. Miller, please.
23   N A E E M   M I L L E R,  DEFENDANT, SWORN
24            COURT OFFICER:  State your name.
25            THE DEFENDANT:  Naeem Miller.
```

```
                        Colloquy                      7
 1            THE COURT:  Mr. Miller, you just heard
 2   everything that Mr. Gordon said, right?
 3            THE DEFENDANT:  Yes.
 4            THE COURT:  Anything that he just said that
 5   to your knowledge is not accurate?
 6            THE DEFENDANT:  He said it exactly.
 7            THE COURT:  Okay.  You understand that Mr.
 8   Gordon at one time represented Mr. Phillips, who is the
 9   man that it is alleged in the indictment that you
10   murdered.  That is what is alleged in the indictment.
11   You understand that Mr. Gordon, who now represents you
12   in this case involving the alleged murder of Mr.
13   Phillips actually represented Mr. Phillips at one point
14   in time.  You understand that, right?  Now, you
15   understand that it is at least arguable that somebody
16   could at some point or another say that for some reason
17   or another Mr. Gordon's -- Mr. Gordon has conflicting
18   interests, that is does he have -- does he have more
19   loyalty because he once represented the individual who
20   allegedly you murdered, does he hold more loyalty to
21   him or does he hold more loyalty to you.  You
22   understand that somebody could arguably look at it that
23   way?  Do you understand that?
24            THE DEFENDANT:  Yes.
25            THE COURT:  Okay.  Do you feel that way?
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 5

Colloquy                                                          8

1     THE DEFENDANT:  No.
2     THE COURT:  Is there any question in your
3  mind that -- that Mr. Gordon's representation of you
4  and his interest and loyalty is to you 100 percent?
5     THE DEFENDANT:  Yes.
6     THE COURT:  And that there is no doubt in
7  your mind and you are fully confident that -- that Mr.
8  Gordon has no conflicting interest and his interest is
9  only in providing zealous representation and defense to
10  you?
11     THE DEFENDANT:  Yes.
12     THE COURT:  Mr. Gordon, any questions you
13  want to ask Mr. Miller in order to make sure the record
14  is clear?
15     MR. GORDON:  I don't, Your Honor.  I mean, if
16  Your Honor feels more questions are necessary go ahead.
17     THE COURT:  If I did I'd ask them.  I can't.
18     MR. GORDON:  I think the record is complete,
19  Your Honor.  I think Mr. Miller is making a -- based
20  upon my discussion with him -- making a knowing and
21  voluntary statement to Your Honor about what he knows
22  and what he believes.
23     THE COURT:  Mr. DeMattia, for just this
24  limited purpose any questions for Mr. Miller?
25     MR. DeMATTIA:  No questions for Mr. Miller.

Colloquy                                                          9

1     THE COURT:  Fine.  Thank you, Mr. Miller.
2  You can sit down.
3     Mr. DeMattia?
4     MR. DeMATTIA:  The only comment I have, Your
5  Honor, is I believe at this time The Court should feel
6  comfortable.  My comfort here is here, also, with
7  regard to the fact that there is no actual conflict
8  because his representation of the victim ended years
9  before the victim was actually killed.  I don't think
10  there's any actual conflict, or any perceived, or
11  appearance of any conflict or impropriety here.
12     THE COURT:  Mr. Gordon, do you want to say
13  anything further?
14     MR. GORDON:  I have nothing further, Your
15  Honor.
16     THE COURT:  All right.  I've had the
17  opportunity following receipt of that information to
18  review STATE VS. PIERREVIL - P-I-E-R-R-E-V-I-L, 341
19  N.J. Super. 266, a 2001 Appellate Division case rising
20  out of Essex County, and I've also read STATE EX REL
21  S.G., 175 N.J. 132, a 2003 Supreme Court case.  In both
22  of these cases the facts are similar, and in both cases
23  it appears that the defense counsel at one point
24  represented -- well, in the Supreme Court case, in
25  S.G., the defense counsel represented the decedent, or

**STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005**

SHEET 6

```
                          Colloquy                        10
 1    at least his law firm, prior to -- well, the key really
 2    in the case is that there was a period of weeks
 3    apparently when the defense counsel's firm represented
 4    the -- hang on -- apparently represented the victim at
 5    time simultaneous to representing the defendant.  In
 6    the particular proceeding -- that is the murder
 7    indictment against the defendant for having allegedly
 8    murdered the victim.  Now, that doesn't sound like it's
 9    particularly logical that you could represent the
10    defendant after he died while -- representing the
11    victim after he died while simultaneously representing
12    the defendant, but apparently in S.G. that was, in
13    fact, the case for a period of at least three weeks
14    after his death, and during that three weeks was
15    representing -- the interests of the defendant were
16    being represented by one individual in the firm with
17    regard -- specifically with regard to the allegation
18    that he murdered the victim while simultaneously still
19    representing the victim, because of the pendency at the
20    time of the indictment.  The indictment had still --
21    the indictment against the victim had apparently still
22    -- still was pending at the time of -- at the time the
23    firm undertook the representation of the defendant.
24    That, the Supreme Court case said, was an actual
25    conflict, and the fact that the representation still
```

```
                          Colloquy                        11
 1    occurred was what caused the actual conflict, and
 2    that's where the Supreme Court's opinion rested.  And
 3    that's only because it appears to me the indictment
 4    still was outstanding at the time of the victim's
 5    death, and what the court made absolutely and
 6    abundantly clear is that the duty of representation on
 7    the part of defense counsel didn't end upon the -- upon
 8    the victim's death, so that there was simultaneous
 9    representation that occurred.
10              Here the major distinction between the two is
11    that Mr. Gordon's representation of Mr. Phillips ended
12    45 days after the date of his sentencing in the drug
13    cases that Mr. Gordon represented Mr. Phillips on.  The
14    sentence took place on April 24th, 1998 and that -- and
15    that representation ended, or the duty to represent him
16    ended 45 days thereafter, so sometime in June of 1998.
17              The events that bring us here today didn't
18    occur until December of 2001, a number of years, more
19    than three years later, and Mr. Gordon's representation
20    of Mr. Miller in this matter did not occur until the
21    summer of 2004, approximately six years after the
22    termination of the representation of Mr. Phillips.
23    Therefore I perceive no actual or appearance of any
24    conflict, but to the extent to which anybody would
25    believe that there could be a conflict in the exercise
```

**Elite Transcripts, Inc.**
14 Boonton Avenue, Butler, New Jersey 07405
973-283-0196 FAX 973-492-2927

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 7

|   | Colloquy                                                      | 12 |

```
 1    of caution as, in fact, mandated by the PIERREVIL case,
 2    we have conducted the appropriate hearing with no
 3    objection on the part of the State, and the State
 4    indicating it is now satisfied that no actual or
 5    perceived conflict exists, Mr. Miller under oath
 6    waiving any conflict and expressing his understanding
 7    and belief that -- that no conflict, in fact, exists
 8    and expressing his full confidence in Mr. Gordon, I
 9    believe, as he does, that his representation is as --
10    without conflict, and that Mr. -- if there is any
11    perceived conflict Mr. Miller had undertaken the waiver
12    of that conflict knowingly, intelligently, with full
13    understanding of the -- of the nature of the alleged
14    conflict and has undertaken that waiver with full
15    understanding of that.
16            So we now move into our WADE proceeding.
17            MR. DeMATTIA:  Detective Murad Muhammad, Your
18    Honor, is outside.
19            THE COURT:  Okay.  If you could bring him in.
20    M U R A D   M U H A M M A D,  STATE'S WITNESS, SWORN
21            COURT OFFICER:  State your name of The Court,
22    please.
23            THE WITNESS:  Murad Muhammad.
24            THE COURT:  Please be seated.
25            THE WITNESS:  Good morning, Your Honor.
```

|   | Muhammad - Direct                                             | 13 |

```
 1            THE COURT:  Good morning.  Mr. DeMattia?
 2            MR. DeMATTIA:  Thank you, Judge.  Your Honor,
 3    there is a sheet I made up last night marking exhibits.
 4    I gave one to Your Honor, I gave one to Mr. Gordon, and
 5    I have one to save time, so --
 6            THE COURT:  Okay.
 7            MR. DeMATTIA:  I gave it to --
 8            THE CLERK:  Yes, you did.
 9            MR. DeMATTIA:  Oh, I'm sorry.  I gave it to
10    your court clerk.  I lied.  I'm sorry.
11            THE CLERK:  Do you have one, Judge?
12            THE COURT:  No, I don't.
13            THE CLERK:  Do you want to use this one for
14    now?
15            THE COURT:  Yes.
16            THE CLERK:  And I'll make a copy.
17            THE COURT:  Okay.  Thank you.
18    DIRECT EXAMINATION BY MR. DeMATTIA:
19        Q    Detective Muhammad, who do you work for?
20    A    City of Newark Homicide Squad.
21        Q    In what capacity?
22    A    I'm a Homicide Investigator.
23        Q    And what are some of your duties?
24    A    Investigate deaths, auto fatals and other crimes.
25        Q    Did you get involved in the investigation
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 8

|   | Muhammad - Direct                                    14 |
|---|---------------------------------------------------------|

```
 1   into the death of Mr. Timothy Phillips that occurred on
 2   December 16th of 2001 in front of Toby's Lounge, 966
 3   Bergen Street, City of Newark?
 4   A    Yes, that's correct.
 5        Q    I want to bring your attention to a couple of
 6   days afterwards, on December 18th, 2001.  We've
 7   established you were investigating the death of Timothy
 8   Phillips.  Was there anyone else injured during the
 9   course of that episode in front of Toby's Lounge?
10   A    Yes.
11        Q    Who was that?
12   A    Stacy Davis.
13        Q    All right.  Now, jumping two days ahead from
14   December 16th to December 18th, did you come into
15   contact with Mr. Stacy Davis?
16   A    Yes.
17        Q    Who were you with?
18   A    Investigator Ben Powell.
19        Q    All right.  And where is -- where is Ben
20   Powell today?
21   A    He expired.  He died.
22        Q    He was involved in a motorcycle accident last
23   year.  He's no longer available.
24   A    That's correct.
25        Q    What was your purpose of going to see Mr.
```

|   | Muhammad - Direct                                    15 |
|---|---------------------------------------------------------|

```
 1   Davis?
 2   A    To hear his version of what occurred and to see if
 3   he could make identification of the suspect.
 4        Q    Where was Mr. Davis located at the time on
 5   December 18th of 2001?
 6   A    University Hospital.  I believe it was E Yellow
 7   Side.
 8        Q    Do you know what type of injury he did have?
 9   A    Yes.
10        Q    What was --
11   A    He had sustained a gunshot wound to the left leg.
12        Q    When you approached Mr. Davis in the company
13   of Investigator Powell that day what was the condition
14   of Mr. Davis?
15   A    He was in pain and appeared to be under some
16   medication.
17        Q    What did you have with you when you went to
18   the hospital to see Mr. Davis?
19   A    We had a photo display.
20        MR. DeMATTIA:  Your Honor, the envelope has
21   been previously marked for identification and inside is
22   the contents, approximately six photographs.
23   BY MR. DeMATTIA:
24        Q    Can you take out the photographs, review
25   them, and indicate if you recognize the contents of the
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 9

```
                     Muhammad - Direct                    16
 1    envelope S-1 for identification.
 2    A    Yes, it's the photos -- the photos, the six
 3    photographs that we had.
 4    Q    And in the photo -- the six photographs that
 5    you have is there any one particular person that was
 6    let's called the target of the investigation at that
 7    time?
 8    A    Yes.
 9    Q    And who was that?
10    A    Naeem Miller.
11    Q    All right.  Do you see Mr. Naeem Miller in
12    court today?
13    A    Yes.  He's over there to the right of me in the
14    black sweater.
15         THE COURT:  Indicating the defendant
16    BY MR. DeMATTIA:
17    Q    By the way, does he look the same today as
18    he did in that photograph back in 2001?
19    A    No.  Similar.
20    Q    Okay.  What happened when you attempted to
21    show these photographs to Mr. Davis?
22    A    Well, when he viewed the photographs when he came
23    upon Naeem Miller's photograph he became -- he started
24    to cry uncontrollably.
25         THE COURT:  Let's take it a step back.  How
```

```
                     Muhammad - Direct                    17
 1    did you show him the photos first?
 2         THE WITNESS:  He was shown photos one at a
 3    time.
 4         THE COURT:  And what pictures do you recall
 5    at what point you reached when you -- when he viewed
 6    the defendant's picture?
 7         THE WITNESS:  No. 3.
 8         THE COURT:  Continue.
 9    BY MR. DeMATTIA:
10    Q    And what happened?
11    A    At the view of the photograph of Naeem Miller he
12    started to cry.
13    Q    Did you continue at that point?
14    A    Well, we -- we talked to him a little bit, and we
15    asked him what was wrong, and he wouldn't speak.  He
16    just continued to cry, and we decided --  We told him
17    that we would be back.  We retreated and we told him
18    we'd come back at another time.
19    Q    Okay.  So no identification was made.
20    A    No.
21    Q    How did you construct that particular
22    array/sequential display?
23    A    Well, it was six photos and they were shown in
24    sequence of order from 1 to 6, and he viewed them one
25    at a time.
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 10

Muhammad - Direct / Cross                    18

```
 1        Q      And in constructing that photo array did you
 2   attempt to do anything in terms of continuity or
 3   descriptions of actors?
 4   A     Yes, we put everybody of similar characteristics.
 5        Q      Such as?
 6   A     Hair, beard, complexion.
 7        Q      And what photograph in that six-photograph
 8   array is Naeem Miller's photograph marked anything for
 9   identification on the back of it?
10   A     Yes.
11        Q      And what is that?
12   A     It's No. 3.
13        Q      And does it have an identification sticker
14   for today's purposes?
15   A     Yes, it does.
16        Q      And that is S-21A for identification?
17   A     Yes, that's correct.
18             MR. DeMATTIA:  I have no further questions,
19   Judge.
20             THE COURT:  Mr. Gordon?
21             MR. GORDON:  Thank you, Your Honor.
22   CROSS-EXAMINATION BY MR. GORDON:
23        Q      Detective, you just testified that Naeem
24   Miller was the target of this procedure that you
25   undertook when you went to see Stacy Davis that day,
```

Muhammad - Cross                    19

```
 1   December 18th, 2001?
 2   A     Yes.
 3        Q      And when you say target what do you mean?
 4   A     He was a suspect.
 5        Q      And how long at that point in time when you
 6   went to see Mr. Davis had you been assigned to this
 7   case?
 8   A     I received this case on I believe it was the 17th.
 9        Q      Of December of 2001?
10   A     Yes.
11        Q      And you say you received it.  Did someone
12   assign it to you?
13   A     Yes.
14        Q      Who was that?
15   A     A supervisor.
16        Q      Who was that?
17             MR. DeMATTIA:  Objection, Judge, with regard
18   to limited purposes of a WADE hearing?
19             MR. GORDON:  Judge, I'd like to be heard
20   outside the presence of the witness at sidebar, if I
21   may, if The Court's entertaining the objection at this
22   point.
23             THE COURT:  Objection is overruled but, you
24   know, I'll give you a little bit of liberty here, Mr.
25   Gordon, but let's wrap it up, okay?
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 11

```
                        Muhammad - Cross                    20
 1              MR. GORDON:  Just some -- just some
 2    background so we --
 3              THE COURT:  I understand.
 4              MR. GORDON:  -- get to the issues at hand.
 5              THE COURT:  Yes.
 6    BY MR. GORDON:
 7        Q    And again, who was it who assigned you the
 8    case?
 9        A    My supervisor.
10        Q    Who was that?
11        A    I can't recall.
12        Q    And were you to work in conjunction with any
13    particular person on this assignment of this case or
14    no?
15        A    Repeat the question.
16        Q    Were you to work with any particular person
17    or persons on this investigation after you were
18    assigned it?
19        A    Yes.
20        Q    Who was that?
21        A    Investigator Ben Powell.
22        Q    And prior to going to the hospital on
23    December 18th of 2001 did you do anything to
24    familiarize yourself with the circumstances surrounding
25    the death of the decedent in this case?
```

```
                  Muhammad - Cross / Sidebar              21
 1              MR. DeMATTIA:  Your Honor, I object as to
 2    the, again, limited scope of the actual identification
 3    or attempted identification procedure.
 4              MR. GORDON:  Judge, I'd like to be heard at
 5    sidebar.
 6              THE COURT:  I think I understand what's going
 7    on.
 8              MR. GORDON:  May I be heard?
 9              THE COURT:  Okay.  Let's make it quick.
10                   (Sidebar)
11              MR. GORDON:  Judge, the issue in a WADE
12    hearing is to determine if any impermissible
13    suggestiveness occurred in the presentation of the
14    evidence to the witness who was making the
15    identification.  All I'm doing now is establishing a
16    very brief background and foundation of the knowledge
17    of the witness so that I can then question him about
18    what was in his mind when he attempted to make the
19    identification, otherwise I can't even get to meet my
20    burden.
21              THE COURT:  I understand.  Just don't turn it
22    into discovery.
23              MR. GORDON:  Absolutely not.
24              THE COURT:  Let's go.
25              MR. GORDON:  Thank you, Your Honor.
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

Muhammad - Cross                    22
(Sidebar concluded)
1
2          THE COURT:   The objection is overruled.
3    Please continue, Mr. Gordon.
4          MR. GORDON:   Thank you, Your Honor.
5    BY MR. GORDON:
6          Q    Detective, after you were assigned the case
7    on December 17th did you do anything at all to
8    familiarize yourself with the details of the case?
9    A    Yes.
10         Q    And can you tell us just briefly what you
11   did?
12   A    Read reports.
13         Q    Anything else?
14   A    And I spoke with Investigator Powell.
15         Q    Were there any statements that had been taken
16   at that time when you were assigned the case that you
17   reviewed?
18         MR. DeMATTIA:   Objection as to the scope of
19   again the investigation?
20         THE COURT:   Overruled, but let's speed it up.
21   BY MR. GORDON:
22         Q    You may answer, Detective.
23   A    Did I review statements?
24         Q    Yes.
25   A    Yes.

Muhammad - Cross                    23
1          Q    And to the best of your knowledge at the time
2    that you went to see Mr. Davis had you reviewed all of
3    the statements that you were aware of existed at that
4    time?
5    A    I believe so.
6          Q    And had you reviewed all of the reports that
7    you believed had been generated and were in existence
8    at that time?
9    A    Yes.
10         Q    When you went --  I'm sorry.  So on December
11   17th, after you were assigned, did you in fact go to
12   the scene of the shooting?
13   A    I believe so.
14         Q    Were you in the company of Investigator
15   Powell?
16   A    Yes.
17         Q    While you were there did you, in fact, speak
18   to several people in the area about the shooting?
19   A    Yes.
20         Q    You -- you canvassed the area and attempted
21   to get further information, correct?
22   A    Yes.
23         Q    And at that time did you obtain any further
24   information that you felt was important to develop a
25   target of the investigation?

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 13

Muhammad - Cross                                    24

```
 1    A     On that day?
 2          Q     on December 17th of 2001?
 3    A     I can't recall.
 4          Q     Did you generate a report in this case?
 5    A     Yes.
 6          Q     Do you have a copy of it in front of you?
 7    A     No, I do not.
 8          Q     Did you review it prior to testifying today
 9    and any time in the recent past?
10    A     Yes.
11          Q     Approximately when was that that you reviewed
12    your report?
13    A     Maybe last week.
14          Q     Last week?
15          MR. GORDON:  Counsel, has this been marked?
16          MR. DeMATTIA:  It's been marked, Your Honor,
17    but I object to him confronting him with the report
18    again for the limited purpose of the identification
19    process itself.  I know Your Honor said you would give
20    him leeway into background, but I object to the
21    extensive background investigation.
22          MR. GORDON:  Judge, if I may now, the witness
23    has indicated he doesn't -- he indicated earlier he had
24    a target in the investigation when he saw Mr. Davis,
25    which was one day later than we're discussing now,
```

Muhammad - Cross                                    25

```
 1    December 17th, 2001.  Obviously at some point he
 2    developed information which in his mind made Naeem
 3    Miller a target.  I've asked him now if he recalls when
 4    he went to the scene if he got information that led him
 5    to believing that there was a viable target.  He
 6    indicated he doesn't remember.  Now he's authored a
 7    report in this case.  I'm going to ask him if viewing
 8    it will refresh his recollection about that question.
 9          THE COURT:  Except I don't see what the
10    relevance is.  It seems to me that he has already
11    indicated that he -- for the purpose of this proceeding
12    he's indicated that he -- he knew who Mr. Miller was,
13    he had made a determination that Mr. Miller was a
14    suspect.  Even further, from at least my understanding
15    of the terms, that Mr. Miller was a target.  Now,
16    you've established that and you've established that
17    that's what is in his mind.  I don't know what all this
18    is going to add to the conclusion that Mr. Miller was a
19    target.  Clearly that's relevant to this proceeding
20    that he had a determination that he was a target.  How
21    he came about developing the information to determine
22    he was a target I don't see the relevance.
23          MR. GORDON:  Well, Your Honor, if I may --
24    and, again, I'll answer in limited fashion in front of
25    the witness, but -- and it's brief, Your Honor.  It
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 14

```
                        Muhammad - Cross                    26
 1   would have been done in --
 2              THE COURT:  Well, then do it.  Let's go.  I
 3   don't see the relevance but I'll give you the leeway.
 4              MR. GORDON:  Thank you, Your Honor.
 5              THE COURT:  But you're taking advantage of
 6   that, Mr. Gordon.
 7              MR. GORDON:  I'm not trying to, Your Honor,
 8   at all.
 9              THE COURT:  Let's -- let's --
10              MR. GORDON:  I'm simply trying to establish a
11   pattern for a foundation of an argument that I'm going
12   to make at the conclusion of the hearing.
13              THE COURT:  Okay.  We're arguing about it
14   more than -- in more time than it would take to
15   actually do it.
16              MR. GORDON:  I couldn't agree more, Your
17   Honor.
18              THE COURT:  So let's do it.
19              MR. GORDON:  Let's see.  If this document has
20   already been marked we won't take time to mark it
21   again.
22              THE COURT:  Can you give us some help here,
23   Mr. DeMattia?  Do you have a marked -- what number it's
24   been marked?
25   BY MR. GORDON:
```

```
                        Muhammad - Cross                    27
 1       Q       Detective, I'm going to show you what's been
 2   marked S-2 for identification and ask you to take a
 3   look at that.  Let me know when you're finished looking
 4   at it, please?
 5       A    I'm done.
 6       Q       All right.  Do you recognize what that is?
 7       A    Yes.
 8       Q       What is that?
 9       A    Is the report that I submitted.
10       Q       Is the report that you generated in this --
11   in this investigation, am I correct?
12       A    That's correct.
13       Q       And I want to direct your attention to Page 2
14   of the report where you indicated some activity that
15   you and Investigator Powell engaged in on December
16   17th, 2001.  Can you read this paragraph that I'm
17   pointing to and let me know when you're finished?
18       A    Yes.
19       Q       Does reading that refresh your recollection
20   as to what, if anything, happened that led you to think
21   of Naeem Miller as a target in this investigation?
22       A    As to what, what the paragraph says?
23       Q       I'm asking you if reading that refreshes your
24   memory about what it was that led you to find Naeem
25   Miller to be a target of this investigation?
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 15

Muhammad - Cross                                        28

1  A    Talked to witnesses, information from witnesses.
2  We talked to several people in the area.
3        Q    And based upon that you then considered Naeem
4  Miller to be a target, correct?
5  A    Yes.
6        Q    And did you make any notation of the identity
7  of any of the witnesses that you spoke to that led you
8  to that important information?
9  A    Well, they weren't witnesses.  They were people
10 who gave me information who the target was.
11       Q    And did you know at that time what the source
12 of any of their information was?
13       MR. DeMATTIA:  Objection, Judge, as to the
14 inquiry, again for the limited purposes of this
15 hearing.
16       THE COURT:  Sustained.
17 BY MR. GORDON:
18       Q    Once you became armed with that information
19 you then went and obtained a photograph of Naeem
20 Miller, correct?
21 A    Yes.
22       Q    By the way, at that time had you learned
23 whether or not anyone else had spoken to Stacy Davis
24 about the events of December 16th of 2001?
25       MR. DeMATTIA:  Objection to that question,

Muhammad - Cross                                        29

1  again, for the limited purpose of this hearing, Your
2  Honor.
3        THE COURT:  Sustained.
4  BY MR. GORDON:
5        Q    Once you spoke to these people that day,
6  December 17th, based upon the information that they
7  gave you, you felt that Naeem Miller was a target,
8  right?  Correct?
9  A    With the information, yes.
10       Q    When you came to that conclusion did you have
11 any information about anything -- any investigation
12 that had been done prior to that so put together with
13 that information that made you personally believe that
14 Naeem Miller was a target?
15       MR. DeMATTIA:  Objection, Judge.  He's again
16 fishing for discovery.
17       THE COURT:  Overruled.  Answer -- just answer
18 the question yes or no.
19       THE WITNESS:  No.
20 BY MR. GORDON:
21       Q    You obtained a photograph of Mr. Miller --
22 By the way, where did you obtain that photograph from?
23 A    From the BCI, Sheriff's Department.
24       Q    And when you went on December 18th, 2001 to
25 visit Mr. Davis you had also brought with you the five

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 16

Muhammad - Cross                                              30

1   other photographs which you identified earlier,
2   correct?
3   A    That's correct.
4        Q    Did you personally make the decision to place
5   those five photographs in front of Mr. Davis along with
6   Naeem Miller's photo?
7   A    Repeat the question?
8        Q    Did you personally make the decision to
9   construct the photo array with those specific other
10  five photos that you joined with Mr. Miller's photo?
11  A    No, me and Investigator Powell.
12       Q    So you did along with Investigator Powell.
13  A    That's correct.
14       Q    Is that fair to say?  Now, when you went to
15  the hospital and you confronted Mr. Davis you indicated
16  earlier that he appeared to be in some pretty
17  significant pain from the gunshot wound, right?
18  A    Yes.
19       Q    And you indicated that he appeared to be
20  under some medication, is that correct?
21  A    Yes.
22       Q    Do you know what medication he was under?
23  A    No, I do not.
24       Q    What was it about what happened that made you
25  believe he was under medication?

Muhammad - Cross                                              31

1   A    I believe he had an IV bag run into him.
2        Q    And did you make any notation of that in your
3   report?  You -- you didn't, did you?
4   A    That's correct.
5        Q    Did you ask him any questions about the
6   medication specifically?
7   A    I don't recall.
8        Q    Did you know what effect, if any, the
9   medication was having on his ability to recollect or
10  understand what you were saying to him at that time?
11  A    He understood what I was saying.
12       Q    He was able to understand you, is that
13  correct?
14  A    That's correct.
15       Q    Now, you indicated at that time that you
16  believe Naeem Miller was a suspect.  What, if anything,
17  did you tell Stacy Davis about Naeem Miller at that
18  time?
19  A    Nothing.
20       Q    Did you indicate that you had done some
21  investigation prior to going there?
22  A    No, I did not.
23       Q    Did you ask him if he had spoken to anybody
24  else about whether or not he recognized the shooter or
25  could identify the shooter?

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 17

Muhammad - Cross                                    32

1  A    I could have.  I'm not sure.
2        Q    So it's fair to say that when you went to see
3  Naeem Miller you didn't know if he had told anyone else
4  whether or not he could identify the shooter, is that
5  correct?
6  A    You mean Stacy Davis, not Naeem Miller.
7        Q    Stacy Davis.  When you went to see him you
8  weren't sure if he had told anyone previous to that he
9  could or couldn't make an identification, is that
10 correct?
11 A    No, that's not correct.
12       Q    Well, did you believe that he had told
13 somebody that he could make an identification?
14 A    That's not what you're saying.  You asked me prior
15 to that did he indicate to somebody else that he could
16 not I.D.
17       Q    To the best of your knowledge had he done
18 that?
19 A    In a report, yes.
20       Q    What report was that?
21 A    It wasn't my report.  I believe it was Detective
22 -- another detective's report.
23       Q    So is it -- is it fair to tell the judge then
24 that when you approached Mr. Davis to begin this
25 identification procedure in the hospital you already

Muhammad - Cross                                    33

1  were aware of the fact that he had told somebody else
2  in law enforcement, and whomever that was, that he
3  hadn't seen the shooter or could not make an
4  identification, is that correct?
5  A    Yes.
6        Q    And when you went there you indicated you did
7  not say anything to him about Naeem Miller.  Did you
8  indicate to him that you had learned from the street
9  that Naeem was a possible shooter in the case?
10 A    No, I did not.
11       Q    When you saw him in the hospital you began
12 showing photos one at a time, am I correct?
13 A    That's correct.
14       Q    And he never made an identification at that
15 time, is that correct?  He became too upset.
16 A    When he viewed Naeem Miller's photo, that's
17 correct.
18       Q    And I believe you indicated he started to
19 cry, is that correct?
20 A    Yes.
21       Q    All right.  And at any point in time that day
22 did you ask him to complete any photo identification
23 instruction form?
24 A    No.
25       Q    Do you know what that is, a photo

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 18

Muhammad - Cross                                              34

1    identification instruction form?
2    A      A form that goes with the photo I.D.'s.
3    Q      You're aware of that based on your
4    experience, correct?
5    A      Yes.
6    Q      I mean, that's a document that you sometimes
7    at your discretion might use when you go to someone and
8    ask them to do an identification, is that correct?
9    A      To the best of my knowledge I believe that the
10   display photo identification has been changed.
11   Q      Well, I'm not asking you now if it's been
12   changed.  I'm not asking you about any guidelines.  I'm
13   just asking you if at the time you went on December
14   18th of 2001 to Stacy Davis if you were familiar with
15   what that form was, a photo display instruction form.
16   A      Yes.
17   Q      Okay.  And is that something that you in your
18   experience sometimes at your discretion would use when
19   you went to a potential identifier, a person who you
20   were asking to identify someone from a photo array,
21   would you use that form?
22   A      The form that you're referring to is a form where
23   you would use six windows.  You do it with six windows
24   or you could do it with six photographs.  And with the
25   six windows the form is on the back of the display, and

Muhammad - Cross                                              35

1    with the six photos --
2    THE COURT:  That's not responsive, Detective.
3    The question is are you aware of a form that you
4    sometimes use at your discretion for purposes of
5    conducting a photo identification procedure?
6    THE WITNESS:  Not with that.
7    THE COURT:  Any form.
8    THE WITNESS:  Yes.
9    THE COURT:  Next question.
10   BY MR. GORDON:
11   Q      And are you telling us now that that
12   identification form that I'm referring to -- and I
13   believe you're indicating you understand what that is
14   -- are you telling us that that's not used in a
15   situation where you present sequential photos one at a
16   time to a witness?
17   A      No, that's not what I'm saying.
18   Q      Okay.  Well, let's -- Maybe I confused you.
19   Let me start again and say you are familiar with the
20   form that I'm talking about, the photo display
21   instructions, correct?
22   A      I have to refer to the form, please.
23   Q      Okay.  Well, let me ask you this.
24   MR. GORDON:  I'll withdraw that question
25   then, Your Honor, and ask you --

**Elite Transcripts, Inc.**
14 Boonton Avenue, Butler, New Jersey 07405
973-283-0196 FAX 973-492-2927

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 19

```
                       Muhammad - Cross                36
 1            THE COURT:    Thank you.
 2   BY MR. GORDON:
 3        Q    -- and ask you this, Mr. Davis (sic).  Have
 4   you ever seen a photo display report form?
 5   A    I'm Detective Muhammad.  That's correct.
 6        Q    Detective Muhammad, have you seen that?
 7   A    Yes.
 8        Q    And is that something that prior to December
 9   18, 2001 you had utilized when going to a witness to
10   see if they can make an identification from some
11   photographs?
12   A    I have to refer to the form.
13            MR. GORDON:    Judge, I'm going to ask that
14   these be marked --  Well, have they been marked
15   already?  Once again, Your Honor --  I apologize, Your
16   Honor.  I didn't have an opportunity to review Mr.
17   DeMattia's list prior to the hearing, only just having
18   been handed it.  Mr. DeMattia may have kindly already
19   marked these items.
20            MR. DeMATTIA:    S-23.
21            MR. GORDON:    All together or separately?
22            MR. DeMATTIA:    All together, three pages.
23   BY MR. GORDON:
24        Q    I'm going to show you now, Detective
25   Muhammad, what's been marked S-23 for identification
```

```
                       Muhammad - Cross                37
 1   and ask you to take a look at that and tell us when
 2   you're through looking at it.
 3   A    Okay.
 4        Q    What's in front of you are three pages,
 5   correct?
 6   A    That's correct.
 7        Q    And the first one is headed Essex County
 8   Prosecutor's Office Photo Display Instructions,
 9   correct?
10   A    That's correct.
11        Q    Without regard to what's been printed about a
12   specific case in there do you recognize the printed or
13   the typed information on that form as being a form you
14   had seen prior to December 18, 2001?
15   A    Yes.
16        Q    And in fact the first line of that form
17   indicates, quote:  "In a moment I will show you a
18   number of photographs one at a time."  End quote.  Is
19   that correct?
20   A    Yes.
21            MR. DeMATTIA:    Your Honor, I object at this
22   point to going over these three forms, again unless
23   it's relevant to suggestiveness or suggestivity at the
24   particular time he showed them to the witness and there
25   was no identification made.
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 20

Muhammad - Cross                                    38

```
 1              THE COURT:  It is relevant but we're going a
 2   long way around getting to the point.  There are those
 3   forms, he was aware of the forms and he didn't use
 4   them, right?  Isn't that the point you're trying to
 5   make?
 6              MR. GORDON:  To some degree, yes, Your Honor.
 7              THE COURT:  Please can we move on?
 8              MR. GORDON:  I'm doing the best I can.
 9              THE COURT:  I mean, I didn't just fall off
10   the turnip truck.  I understand.
11              MR. GORDON:  Thank you, Judge.
12              THE COURT:  Thank you.
13   BY MR. GORDON:
14        Q    So, again, you've seen that form.  That's a
15   form that's used with sequential photo presentations to
16   witnesses, correct?
17   A    Yes.
18        Q    And, in fact, on December 18th, 2001 when you
19   went to Mr. Davis you never showed him photo display
20   instructions and have him fill out that form, correct?
21   A    That's correct.
22        Q    And, in fact, you never noted in any report
23   which photographs, including Mr. Miller's, were
24   actually shown to Mr. Davis at that time, is that
25   correct?
```

Muhammad - Cross / Argument - DeMattia         39

```
 1   A    Correct.
 2              MR. GORDON:  Thank you.  I have nothing
 3   further, Your Honor.
 4              THE COURT:  Mr. DeMattia?
 5              MR. DeMATTIA:  I have nothing further, Your
 6   Honor.
 7              THE COURT:  Thank you, Detective.  For the
 8   moment you're excused.
 9              THE WITNESS:  Okay.  Thank you.
10              THE COURT:  You'll be back.
11              THE WITNESS:  Yes.
12              THE COURT:  Okay.  Mr. DeMattia, it's your
13   burden.  Do you have anything to add?
14              MR. DeMATTIA:  Just based on the testimony
15   from Detective Muhammad with regard to the attempted
16   identification with Mr. Stacy Davis, the witness, on
17   December 18th, 2001 he attempted to show the
18   photographs to Mr. Davis.  Based on his perception --
19   and he was in the company of Ben Powell -- who we have
20   established is no longer available, went ahead, showed
21   him photographs, was aware of his condition, saw what
22   was occurring during the presentation of the
23   photographs, determined that it was not the appropriate
24   time to continue the identification, had given him no
25   prior instructions with regard to who's a target or
```

**STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005**

Argument - DeMattia                    40

1   what his investigation uncovered because that may have
2   been a future problem if he had done so.  Since he did
3   not do so it is not a problem.  He retreated when he
4   saw that it was not the appropriate time to continue
5   and left it at that, and then there was another
6   identification time a couple of days later which, of
7   course, there's no testimony to, but with regard to the
8   suggestiveness or taint from this one, the facts, in
9   the State's position, reveal none because no
10  identification was made by the witness and there was
11  nothing improper.
12          THE COURT:  That being the case then you'll
13  concede that this identification procedure is not one
14  that would be offered to the jury as a process under
15  which the defendant was identified?
16          MR. DeMATTIA:  No, Your Honor, the most I
17  would do is just ask him if he had contact with Mr.
18  Davis on December 18th and if any identification was
19  made, and there was no identification.  I would not go
20  through the process that it's tainted, he started
21  crying before the picture, at the picture of Naeem
22  Miller, or after the picture of Naeem Miller, because I
23  don't think it's relevant because no identification and
24  no inferences.  It would be prejudicial.  No inferences
25  should be made from that type of information.  But I do

Argument - DeMattia / Gordon          41

1   intend to indicate to Detective Muhammad if he had
2   talked to Mr. Davis on the 18th and if any
3   identifications were made, which none were, and I will
4   not go into the specifics of it.
5           THE COURT:  Okay.  So you're not going to ask
6   the jury to -- to --
7           MR. DeMATTIA:  Infer that that was some type
8   of identification, no, sir.
9           THE COURT:  Mr. Gordon?
10          MR. GORDON:  Thank you, Your Honor.  Your
11  Honor, I'm going to rely on the papers that I submitted
12  and just simply say that the chain of events from Mr.
13  Davis indicating that at least this detective has
14  indicated for the record, he was aware of the fact that
15  Mr. Davis had indicated earlier to one of the
16  detectives in the case that he didn't see the shooter
17  and couldn't make an identification, and then they go
18  to the street on December -- That was on December
19  16th.  On December 17th this -- this detective goes to
20  the street, hears apparent hearsay information, or
21  street talk, which led him to for the first time hear
22  about Naeem Miller, leads him then to go get a
23  photograph.  He goes to Mr. Davis, he sees Mr. Davis is
24  in pain and apparently under medication, he doesn't
25  make inquiry about, you know, whether that's affecting

**STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005**

SHEET 22

Argument - Gordon                                    42

1  the witness or not.  He makes assumptions about it,
2  knowing that Mr. Davis already said he can't make an
3  identification.  I think there's suggestibility in the
4  fact that he's now coming to him with photographs and
5  showing them to him.  He indicated for the record that
6  he did not give any information to Mr. Davis prior to
7  him viewing the photographs.  I think the issue of not
8  using the forms raises the question.  My argument has
9  nothing to do with guidelines or anything -- what a
10  guideline was at that time or not, whether he deviated
11  from the guidelines.  But I think the State will
12  concede that three days later when they go to make the
13  identification or ask Mr. Davis to make another
14  identification, or attempt to, they go through a whole
15  different procedure where they give him instructions,
16  they show him a form, they have him fill out the form.
17  There's notations on which photos are shown to him, and
18  I think -- I think it's suspect that on the first day
19  there's no notations as to that fact, and the only
20  information they have now is that the street says Naeem
21  Miller is the shooter, and I think you can draw
22  inferences from that in that there's some question of
23  credibility with this witness as in his demeanor and
24  the way he responded to some of my questions as to
25  whether or not he undertook the procedures that we

Argument - Gordon / Decision                          43

1  would hope he would undertake, not by way of any
2  guidelines but just to ensure The Court and the
3  integrity of the process that he, in fact, did not give
4  any form of suggestiveness.  Other than that I'll rely
5  on the papers and submit to The Court.
6          THE COURT:  Thank you.  In addition, you
7  know, there -- there are -- The manner by which this
8  detective undertook this identification procedure left
9  a substantial amount to be desired.  He didn't use the
10  forms.  It wasn't a detective unconnected with the case
11  that -- that conducted the identification procedure.
12  He did -- I need to see the pictures, if somebody
13  would give them to me.  But wisely, I think, the State
14  is not offering that quote-unquote "identification"
15  procedure as an identification procedure.  The process
16  is such that --  I don't know any law that says that
17  simply because at some point in time a victim indicates
18  that he can't make an identification doesn't mean that
19  investigators can't show him a series of photographs.
20  That being the case there is nothing that prevents them
21  from approaching a witness and seeking to determine at
22  that point whether an identification is made.  It goes
23  to weight, not to admissibility.
24          But that really isn't even the point in this
25  case at this point in time.  The question is whether or

**STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005**

SHEET 23

Decision / Colloquy                                    44

1  not the actual identification procedure that is being
2  offered by the State is, in fact, a proper one pursuant
3  to WADE.  And there are no indication to me that there
4  was any improper suggestiveness with regard to the
5  interview that was conducted by Detective Muhammad with
6  Mr. Davis in the hospital that in any way impugned, or
7  impaired, or tainted the -- the subsequent
8  identification procedure.
9          I have reviewed the pictures that are
10  contained in S-21 for identification.  There's nothing
11  about the photographs that are unduly suggestive and I
12  would not -- and there's nothing in the testimony that
13  I heard that I find to be totally and completely
14  credible that indicates that there was any
15  suggestiveness in the procedure itself.  That being
16  said, however, there were --  The appropriate
17  protections were not provided and, as such, happily the
18  State is not seeking to introduce that procedure as a
19  matter by which the defendant was identified.  And I
20  don't find any improper taint or suggestiveness that
21  arose from that procedure that impairs the State's
22  ability to introduce the subsequent identification
23  procedure that was conducted.
24          MR. GORDON:  Thank you for that ruling, Your
25  Honor.  I would just ask then that in light of the fact

---

Colloquy                                    45

1  that the State is not going to seek to elicit testimony
2  about the first identification procedure that the
3  witness Stacy Davis be instructed prior to taking the
4  stand of The Court's ruling in that matter or the
5  State's offer so that he doesn't mistakenly confuse the
6  two or begin to refer to the earlier interview by
7  detectives when -- when we're apparently all in
8  agreement that that would be inappropriate.
9          THE COURT:  So noted, Mr. Gordon.  Mr.
10  DeMattia I'm sure was planning on doing that anyway,
11  but please do so.
12          MR. DeMATTIA:  Quite frankly, upon my
13  interview he had no recollection of it at all.
14          THE COURT:  Which is no -- no surprise.
15  Let's --  We've left the jury out in the hall much too
16  long.  I'm going to step off.  Let's bring them all in.
17  Put them where they originally -- originally were.
18          MR. GORDON:  Judge, there's that one other
19  issue, too, about reciting to them the name of the one
20  police officer.
21          THE COURT:  Yes.  Okay.
22              (Tape off.  Tape on.)
23          (Jurors present in the courtroom)
24          THE COURT:  Please be seated.  I apologize
25  for the delay.  As I told you, we had a couple of

**Elite Transcripts, Inc.**
14 Boonton Avenue, Butler, New Jersey 07405
973-283-0196  FAX 973-492-2927

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 24

Colloquy / Sidebar                                    46

1   things that we had to do before the jury was sworn in
2   this case.  It took us a little bit longer than we
3   anticipated so I apologize.  You'll see that from time
4   to time that will happen.  Our goals aren't always met.
5   Things go longer than they are supposed to or expected,
6   and sometimes, believe it or not, things actually go
7   more quickly than we anticipate, so sometimes we get to
8   start on time, sometimes we don't.  Sometimes we finish
9   on time, sometimes we don't.  Sometimes we finish early
10  on a given day depending upon what's happening at any
11  given time, so I apologize.
12          One more time, however, before -- before
13  you're sworn, is there anybody who would like to speak
14  to me at sidebar before taking the oath?  Juror No. 13,
15  Ms. Little, please step up to sidebar.
16                  (Jury Selection)
17                      (Sidebar)
18          MR. GORDON:  Judge, just another friendly
19  reminder about the name of the witness.
20          THE COURT:  All right.  Thank you.
21          MR. GORDON:  If I'm not mistaken there may be
22  at least one witness in the trial who is currently in
23  the courtroom.  I know we're not on the testimonial
24  phase now but maybe in an abundance of caution the
25  witness should not be in the courtroom.

Sidebar / Colloquy                                    47

1           THE COURT:  You're requesting standard
2   sequestration.
3           MR. GORDON:  Yes, Judge.  We didn't discuss
4   that, but I do -- we would request a mutual
5   sequestration order.
6           MR. DeMATTIA:  Okay.
7           THE COURT:  Now that's in effect, sure.  It's
8   in effect now.  I'll do the name right now.  Just for
9   the record, is anybody requesting that as a result of
10  that comment from that juror is anybody asking that
11  their challenges be reopened?
12          MR. GORDON:  No.
13          THE COURT:  Okay.
14                  (Sidebar concluded)
15          THE COURT:  One other thing, ladies and
16  gentlemen.  There is an individual whose name wasn't
17  mentioned originally when we gave you the list of
18  people who might be mentioned during the course of the
19  trial, who now I gather his name may be mentioned at
20  some point, from the Newark Police Department a Michael
21  DeFabio.  Is there anybody here who knows Michael
22  DeFabio.  Seeing none may we have the jury sworn?
23                  (Jury sworn)
24          THE COURT:  Please be seated.  Ladies and
25  gentlemen, those of you who are in the remainder of the

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 25

Colloquy / Jury Instructions                    48

1   jury pool I apologize for having to drag you in here
2   this morning but it was something that I was required
3   to do in the event it became necessary to continue the
4   process of jury selection.  We now have a jury sworn to
5   hear this case and you are therefore excused from this
6   proceeding.  Now, remember, I have no authority to
7   excuse you from jury duty, but you may now return to
8   Jury Control on the 4th floor for further instruction.
9   Thank you very much.
10          Ladies and gentlemen of the jury, you've been
11  selected as the jury in this case.  As you know, it's a
12  criminal case and to assist you in better understanding
13  your functions and duties I'll tell you how the case
14  will proceed.  You are the sole judges of the facts.
15  Your determination of the facts is to be based solely
16  upon the evidence submitted during the course of the
17  trial.  When I use the term evidence I mean the
18  testimony of witnesses who will testify and any
19  exhibits which may be marked into evidence and which
20  will be taken into the jury room for your review at the
21  end of the case.
22          The first order of business will be the
23  prosecutor's opening statement.  In the opening
24  statement the prosecutor will present the State's
25  contentions and will outline what he expects to prove.

Jury Instructions                    49

1   Following that the defense counsel, if he chooses, will
2   make an opening statement.  What is said in an opening
3   statement is not evidence.  The evidence will come from
4   the witnesses who will testify and from whatever
5   documents or tangible items that are received in
6   evidence.  During the trial the attorneys may make
7   objections as evidence is offered, or they may address
8   motions to me.  They have a right and indeed a duty to
9   make objections and motions when it seems to them to be
10  proper to do so.  I have a duty to rule upon any
11  objections and motions based upon the law.  If you hear
12  me say that an objection is overruled that means I'm
13  ruling against the attorney making the objection.  If I
14  say the objection is sustained I'm ruling in favor of
15  the attorney making the objection.  Anything excluded
16  by me is not evidence and must not be considered by you
17  in your deliberations.
18          Sometimes these evidence questions or legal
19  questions will be heard in your presence in open court,
20  other times at sidebar, or you may be excused to go
21  into the jury room so we can discuss the issue in open
22  court.
23          I realize that being confined in the jury
24  room for any length of time is not very pleasant, but I
25  ask your indulgence and patience.  I'm sure you realize

**Elite Transcripts, Inc.**
14 Boonton Avenue, Butler, New Jersey 07405
973-283-0196  FAX 973-492-2927

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 26

```
                        Jury Instructions                    50
 1    that these legal arguments must be heard outside your
 2    presence.  You should not conclude that because I rule
 3    one way or another that I have any feelings about the
 4    outcome of the case.  I do not.  But even if I did you
 5    would have to disregard them since it is you who will
 6    be the sole judges of the facts.
 7           During the trial from time to time there
 8    shall be recesses.  During any of the recesses I direct
 9    that you not discuss the case among yourselves, and
10    when we recess overnight you must not discuss the case
11    or the testimony with any members of your family or
12    with any other persons.  The reason, of course, is that
13    you should not begin any deliberations until the entire
14    case has been concluded, that is until you've heard all
15    the witnesses, the final arguments of counsel, and my
16    instructions as to the law.  It would be improper for
17    any outside influence to intrude upon your thinking.
18    If anyone should attempt to discuss the case with you
19    you should report the fact to me or my staff
20    immediately.  If you have a cell phone, pager or other
21    communication device you must turn that device off
22    while in the courtroom.  Similarly, you must turn off
23    cell phones, pagers, and other communication devices
24    and cannot use them for any purpose while in the jury
25    deliberation room.  You'll be given a telephone number
```

```
                        Jury Instructions                    51
 1    at which you can be contacted during the trial.  Unless
 2    I otherwise instruct you may only use cell phones,
 3    pagers and other communication devices when you are
 4    outside the jury deliberation room during recesses.
 5    Please be mindful of these instructions at all times.
 6           During the trial you are not to speak to or
 7    associate with any of the attorneys, the witnesses, or
 8    the defendant, nor are they permitted to speak or
 9    associate with you.  This separation should not be
10    regarded as rudeness, but rather a proper precaution to
11    ensure fairness to both sides.  If anyone connected
12    with this case, or any other person, approaches you or
13    attempts to influence you in any way, do not discuss it
14    with your fellow jurors.  Simply tell the sheriff's
15    officer and i will be notified immediately.  Your
16    deliberations should be based on the testimony in this
17    case without any outside influence or opinions of
18    relatives or friends.
19           Additionally I must instruct you not to read
20    any newspaper articles pertaining to this case.  I do
21    not know if there will be any newspaper or media
22    coverage of this trial, but you are instructed to
23    completely avoiding reading or listening to any
24    newspaper or media accounts, or listening to anyone
25    else discuss them.  I'm sure you can understand why
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 27

Jury Instructions                                    52

1   this instruction is so important.  Newspaper and media
2   accounts are not evidence.  They are often based upon
3   second- or third-hand information, purely hearsay, not
4   always accurate, and not subject to examination by the
5   attorneys.  I have no way to monitor you in this area
6   but must rely upon your good faith and the fact that
7   you have been sworn or affirmed to comply with the
8   instructions of this court so that both sides may
9   receive a fair trial.
10          Because this instruction is so important it
11  is my duty to remind you of it at the end of each day's
12  proceedings.  Since you are the sold judges of the
13  facts you must pay close attention to the testimony.
14  It is important that you carry with you to the jury
15  room not only a clear recollection of what the
16  testimony was but also a recollection of the manner in
17  which it was given.  It will be your duty to pay
18  careful attention to all the testimony.  If you are
19  unable to hear any witness I ask you indicate this to
20  me by raising your hand so I may instruct the witness
21  to speak louder or more clearly.  As jurors you will be
22  required to pass upon all questions of fact, including
23  the credibility or believability of the witnesses.
24          You are not permitted to visit the alleged
25  incident -- the scene of the alleged incident, do your

Jury Instructions                                    53

1   own research, or otherwise conduct your own
2   investigation.  Your verdict must be based solely on
3   the evidence introduced in this courtroom.  Jurors are
4   not permitted to take notes.  Experience has shown that
5   note taking is distracting.  It's better to depend upon
6   the combined recollection of all the jurors than upon
7   notes taken by one or more of them.
8           At the conclusion of the testimony the
9   attorneys will speak to you once again in summation.
10  At that time they will present to you their final
11  arguments based upon their respective recollections of
12  the evidence.  Again, this is not evidence but their
13  recollection as to the evidence.  It's your
14  recollection as to the evidence presented that is
15  controlling.  Following summations you will receive
16  your final instructions on the law from me and you will
17  then retire to consider your verdict.  You're not to
18  form or express an opinion on this case but are to keep
19  an open mind until you've heard all the testimony, have
20  heard summations, have had the benefit of my
21  instructions as to the applicable law and have been
22  instructed to begin your deliberations.
23          It is your duty to weigh the evidence calmly
24  and without bias, passion, prejudice or sympathy, and
25  to decide the issues upon the merits.  You as jurors

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 28

Jury Instructions                                            54

1   should find your facts from the evidence adduced during
2   the trial.  Evidence may be either direct or
3   circumstantial.  Direct evidence means evidence that
4   directly proves a fact without an inference and which
5   in itself, if true, conclusively establishes that fact.
6   On the other hand, circumstantial evidence means
7   evidence that proves a fact from which the inference or
8   the existence -- an inference or the existence of
9   another fact may be drawn.  An inference is a deduction
10  of fact that may logically and reasonably be drawn from
11  another fact or group of facts established by the
12  evidence.  It's not necessary that facts be proven by
13  direct evidence.  They may be proven by circumstantial
14  evidence or by a combination of direct and
15  circumstantial evidence.
16          Both direct and circumstantial evidence are
17  acceptable as a means of proof.  Indeed, in many
18  circumstances circumstantial evidence may be more
19  certain, satisfying and persuasive than direct
20  evidence.  In any event, both circumstantial and direct
21  evidence should be scrutinized and evaluated carefully.
22  A conviction may be based on circumstantial evidence
23  alone or in combination with direct evidence provided,
24  of course, that it convinces you of a defendant's guilt
25  beyond a reasonable doubt.

Jury Instructions                                            55

1           Conversely, if the evidence, whether direct
2   or circumstantial, gives rise to a reasonable doubt in
3   your mind as to the defendant's guilt, then the
4   defendant must be found not guilty.  Perhaps a simple
5   illustration of the difference between direct and
6   circumstantial evidence may prove to you be helpful.
7   Let's assume the proposition to be proved is whether or
8   not it snowed during the night.  Witness A gets on the
9   stand and says I had trouble sleeping last night.  I
10  got up in the middle of the night, opened the drapes,
11  looked out the window, and I saw the snow falling from
12  the sky.  Direct evidence of the fact that it snowed
13  during the night.  Witness B, on the other hand, had no
14  trouble whatsoever sleeping during the night.  Before
15  she went to bed she got up to close the drapes, looked
16  out the window, no snow falling from the sky, no snow
17  on the ground, no snow anywhere.  Closed the drapes,
18  went to bed, slept through the night, got up in the
19  morning to open the drapes.  Got up, opened the drapes,
20  looked out the window, no snow falling from the sky,
21  but she looked down on the ground and the ground was
22  snow-covered.  Circumstantial evidence of the fact that
23  it snowed during the night.
24          As judges of the facts you are to determine
25  the credibility of the witnesses, and in determining of

**STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005**

SHEET 29

Jury Instructions                                                56

1   whether a witness is worthy of belief and, therefore,
2   credible you may take into consideration various
3   criteria.  Among the criteria customarily considered
4   are the appearance and demeanor of a witness; the
5   manner in which the witness may testify; the witness's
6   interest in the outcome of the trial, if any; the
7   witness's means of obtaining knowledge of the facts;
8   the witness's power of discernment, meaning the
9   witness's judgment and understanding; the witness's
10  ability to reason, observe, recollect and relate; the
11  possible bias, if any, in favor of the side for whom
12  the witness testifies; the extent to which, if at all,
13  each witness is either corroborated or contradicted,
14  supported or discredited by other evidence; whether the
15  witness testifies with an intent to deceive you; the
16  reasonableness or unreasonableness of the testimony the
17  witness has given, whether a witness made any
18  inconsistent or contradictory statements; any and all
19  other matters and evidence which serve to support or
20  discredit the witness's testimony to you.
21          During your deliberations you may ask what is
22  the more reasonable, the more probable, or the more
23  logical version.  Inconsistencies or discrepancies in
24  the testimony of a witness, or between the testimony of
25  different witnesses, may or may not cause you to

Jury Instructions                                                57

1   discredit such testimony.  Two or more persons
2   witnessing an incident may see or hear it differently.
3   An innocent misrecollection, like failure of
4   recollection, is not an uncommon experience.  In
5   weighing the effect of a discrepancy consider whether
6   it pertains to a matter of importance or an unimportant
7   detail, and whether the discrepancy results from
8   innocent error or a wilful falsehood.
9           Now, Naeem Miller stands before you on an
10  indictment found by the grand jury charging him with
11  committing the crimes of murder, aggravated assault,
12  unlawful possession of a weapon, and possession of a
13  weapon for an unlawful purpose.  As I said before, the
14  indictment itself is not evidence of the defendant's
15  guilt on the charges.  The indictment is but a step in
16  the procedure to bring the matter before The Court and
17  jury for the jury's ultimate determination as to
18  whether the defendant is guilty or not guilty of the
19  charges stated in it.  The defendant has pled not
20  guilty to the charges.  The defendant on trial is
21  presumed to be innocent, and unless each and every
22  essential element of the offense charged in a
23  particular count of the indictment is proved beyond a
24  reasonable doubt, the defendant must be found not
25  guilty of the offense charged in that particular count.

**STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005**

SHEET 30

```
                        Jury Instructions                58
 1            The reverse is also true.  If each element of
 2    the offense charged in a particular count of the
 3    indictment is proved beyond a reasonable doubt the
 4    defendant must be found guilty of the offense charged
 5    in that particular count.  The burden of proving each
 6    element of the offenses charged beyond a reasonable
 7    doubt rests upon the State and that burden never shifts
 8    to the defendant.  It is not the obligation or the duty
 9    of a defendant in a criminal case to prove his
10    innocence or offer any proof relating to his innocence.
11    The State has the burden of proving the defendant
12    guilty beyond a reasonable doubt.
13            Some of you may have served as jurors in
14    civil cases where you were told that it's necessary to
15    prove only that a fact is more likely true than not
16    true.  In criminal cases the State's proof must be more
17    powerful than that.  It must be beyond a reasonable
18    doubt.  The prosecution must prove its case by more
19    than a mere preponderance of the evidence, yet not
20    necessarily to an absolute certainty.  A reasonable
21    doubt is an honest and reasonable uncertainty in your
22    mind about the guilt of the defendant after you've
23    given full and impartial consideration to all the
24    evidence.  A reasonable doubt may arise from the
25    evidence itself or from a lack of evidence.  It's a
```

```
                        Jury Instructions                59
 1    doubt that a reasonable person hearing the same
 2    evidence would have.  Proof beyond a reasonable doubt
 3    is proof, for example, that leaves you firmly convinced
 4    of the defendant's guilt.  In this world we know very
 5    few things with absolute certainly.  In criminal cases
 6    the law does not require proof that overcomes every
 7    possible doubt.  If based on your consideration the
 8    evidence leaves you firmly convinced that the defendant
 9    is guilty of the crime charged in the particular count
10    of the indictment you must find him guilty of the crime
11    charged in that particular count.
12            If, on the other hand, you're not firmly
13    convinced of the defendant's guilt of the crime charged
14    in the particular count in the indictment you must give
15    the defendant the benefit of the doubt and find him not
16    guilty of the crime charged in that particular count.
17            You'll note that a jury of 14 has been drawn
18    in this case.  At the conclusion of the evidence and
19    the charge of The Court there will be a random
20    selection in which two jurors will be selected to act
21    as alternates.  The 12 remaining jurors will then
22    deliberate and return a verdict.  At this point we do
23    not know who the alternates will be and whether or not
24    their services will be utilized.  Thus I direct that
25    all jurors should pay equal attention to the evidence
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 31

```
                    Jury Instructions / Opening Statement - DeMattia 60
 1    as it is presented and to The Court's ruling which are
 2    applicable to the case.  With that, ladies and
 3    gentlemen, are we prepared for opening statements?
 4              MR. DeMATTIA:  Yes, Judge.
 5              MR. GORDON:  Yes, Your Honor.
 6              THE COURT:  Okay.  We will begin with the
 7    opening statement, as I indicated, from the State
 8    delivered to you on behalf of the State by Assistant
 9    Prosecutor Gregory DeMattia.  Mr. DeMattia.
10              MR. DeMATTIA:  Your Honor, Judge Vena, thank
11    you, Mr. Gordon.  Good morning, ladies and gentlemen of
12    the jury.  My name is Gregory DeMattia.  I'm Assistant
13    Prosecutor here in the Homicide Squad of the Essex
14    County Prosecutor's Office.  I'm the Assistant
15    Prosecutor obviously responsible for the presentation
16    of this matter before the jury.
17              Before we begin, as is always in my opening
18    statements, I would like to once again read to you a
19    little bit more slowly and more precisely the wording
20    of the indictment that we have here.  It's Indictment
21    No. 2003-05-1830.  It charges Naeem Miller -- the STATE
22    VS. NAEEM MILLER -- Count 1, that the grand jurors of
23    the State of New Jersey for the County of Essex, upon
24    their oath, present that Naeem Miller, on the 16th day
25    of December of 2001 in the City of Newark, in the
```

```
                    Opening Statement - DeMattia          61
 1    County of Essex, aforesaid and within the jurisdiction
 2    of this court, did purposely, knowingly murder Timothy
 3    Phillips by his own conduct by shooting him, which is
 4    contrary to the provisions of 2C:11-3, a crime of the
 5    first degree, against the peace of this State, the
 6    government, and dignity of the same.
 7              That Count 2, the grand jurors of the State
 8    of New Jersey for the County of Essex, upon their oath,
 9    present that Naeem Miller, on the 16th day of December
10    of 2001 in the City of Newark, in the County of Essex,
11    and within the jurisdiction of this court, did
12    purposely, knowingly or recklessly, under circumstances
13    manifesting extreme indifference to the value of human
14    life, caused or attempted to cause serious bodily
15    injury to Stacy Davis by shooting him, contrary to the
16    provisions of 2C:12-1B, a crime of the second degree,
17    against the peace of the State, the government and the
18    dignity of the same.
19              Count 3, the grand jurors of the State of New
20    Jersey for the County of Essex, upon their oath,
21    present that Naeem Miller, on the 16th day of December
22    of 2001 in the City of Newark, in the County of Essex,
23    and within the jurisdiction of this court, knowingly
24    and unlawfully did possess a certain firearm, a
25    handgun, without first having obtained a permit to
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 32

Opening Statement - DeMattia                    62

1  carry the same, contrary to 2C:39-5, a crime of the
2  third degree, against the peace of this State, the
3  government and dignity of the same.
4        And then the final count, Count 4, states
5  that the grand jurors of the State of New Jersey for
6  the County of Essex, upon their oath, present that
7  Naeem Miller on the 16th day of December, 2001 in the
8  City of Newark, County of Essex, and within the
9  jurisdiction of this court, knowingly and unlawfully
10 did possess a certain weapon, a handgun, with the
11 purpose to use it unlawfully against the person or the
12 property of another, contrary to 2C:39-4, a crime of
13 the second degree against the peace of this State, the
14 government, and dignity of the same.
15       As Judge Vena has appropriately told you, the
16 grand jury indictment is not proof of anyone's guilt
17 but the grand jury indictment accomplishes one, maybe
18 two, things.  It names a particular person, in this
19 case Naeem Miller, who we have in court today, Naeem
20 Miller charged with particular crimes, four crimes that
21 the State alleges he committed on December 16th, 2001.
22 And although this is no proof of guilt the State is
23 required through its assistant prosecutor, who is me,
24 to prove the elements to a petit jury of each of the
25 crimes beyond a reasonable doubt and I welcome the

Opening Statement - DeMattia                    63

1  burden in this particular case.  And quite frankly, the
2  only way that a state or any attorney who has a burden
3  of proof in any type of case can do his or her job is
4  by presenting witnesses, which I intend to do on the
5  witness stand, who were there.  I can assure you on
6  December 16th, 2001 I was not there, but people were
7  there -- the police officers who investigated the
8  crime, with the medical testimony in terms of Dr. Lila
9  Perez, the County Coroner, coming in to --
10 unfortunately in every homicide you have to have an
11 autopsy cause of death and what not.  There will be
12 witnesses, my point, to be brought before you.
13       Now, Judge Vena briefly went over the job of
14 the jurors, which I consider in any type of trial --
15 well, criminal trial -- the most important people here
16 are the 12 or 14 judges that we have in the box.  Even
17 though you don't have the black robe on you are the
18 judges here, the judges of the facts of this case, that
19 ultimately determine the outcome of the matter.
20       Now, how did you prepare to become these
21 judges or the jurors in this matter?  I'm sure that no
22 one here took maybe Jury Duty 101 in high school or
23 advanced jury duty, or advanced techniques of jury
24 duty, because obviously there weren't any courses so no
25 one took them.  But you really you don't need those

**Elite Transcripts, Inc.**
14 Boonton Avenue, Butler, New Jersey 07405
973-283-0196 FAX 973-492-2927

**STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005**

Opening Statement - DeMattia                    64

```
 1   type of courses because, first of all, there are none.
 2   What you need is to bring into this courtroom what
 3   you've had since you were born and since you've
 4   developed into the person you are, the age you are,
 5   your ordinary common sense.  That's all it is.  There's
 6   nothing magical that when you walk through those doors
 7   all of a sudden someone snapped a finger and sprinkled
 8   special dust on you and you became a juror.  Okay?  It
 9   doesn't work like that because there's nothing magical
10   about it.  I'll tell you what you did leave out there
11   -- we hope you left because we did do a pretty good job
12   at picking our jury pool -- what you did leave is any
13   preconceived notions, any prejudices, any biases
14   against any particular individual, or any particular
15   thoughts you had about the system, you did leave them
16   outside the door, if you even had them, because there's
17   no place for those type of preconceived biases or
18   notions.  You have to have an open mind and you have to
19   be able to do your job fearlessly and impartially, so I
20   know that you left because, if you even had them, on the
21   other side of the door out there.  That's one of the
22   things that myself, and I'm sure even Mr. Gordon and
23   the judge, has asked, to be fair and impartial.
24           So when you listen to the testimony, and the
25   testimony is -- I'm not -- I'm not giving testimony
```

Opening Statement - DeMattia                    65

```
 1   right now.  I'm giving you my opening statement, which
 2   is I guess coming attractions, a preview, of what I
 3   expect to happen and I comment on the functions of the
 4   jurors.  But what you do is you judge people as you
 5   would ordinarily judge people, judge the testimony, in
 6   your everyday life at work, at home, with any spouse,
 7   with younger children, with siblings, with your bosses.
 8   Again, nothing magical, the way you've been conducting
 9   your everyday life you've taken it and brought it with
10   you as you sit here in the jury in your seats, judging
11   credibility, judging if someone makes sense, if
12   something they say makes sense, if something they say
13   doesn't make sense, or if what they're saying is said
14   because of certain prejudices or biases that they may
15   have, if they do have.  If they don't then you can
16   judge them for whatever you think it's worth.  And that
17   -- that is all I'm asking you to do, is to keep an open
18   mind during the course of the presentation of the
19   witnesses in this matter.
20           Now, enough being said about that, what is
21   this case about?  And, again, what I say today at this
22   particular point is not evidence because, again, I
23   wasn't there but this is what I expect to develop
24   during the course of the trial.
25           As you've heard the date, December 16th, 2001
```

**STATE OF NEW JERSEY v NAEEM MILLER — March 23, 2005**

SHEET 34

Opening Statement - DeMattia                              66

```
 1   is the target date here.  At approximately 2:30 in the
 2   evening at a location at 966 Bergen Street, City of
 3   Newark, there's a particular establishment located
 4   there.  I believe at one time it was called Roland's
 5   Tavern, it might be at the time of the incident I think
 6   it was referred to as Toby's Lounge, but there were
 7   people in the place -- patrons, workers there -- and
 8   you will find that during the course of the evening
 9   there was a couple of people in particular, a Mr. Kevin
10   Phillips and his brother Timothy Phillips, among other
11   people in the -- in the establishment.  It was crowded.
12   But at sometime during the evening, and I submit to you
13   the testimony should show, toward the closing hours it
14   seems that there developed some type of dispute between
15   a Mr. Kevin Phillips, the brother of Timothy, who is
16   our victim, but this Mr. Kevin Phillips had some type
17   of dispute with as to this date unknown person, unknown
18   persons, who may have been friends with this person,
19   but some type of dispute which became a fist-fight,
20   some type of dispute over dancing with a particular
21   young lady, if I'm not mistaken.  A fist-fight
22   developed and Mr. Kevin Phillips was punched numerous
23   times.  He may have punched someone numerous times.
24   But what had happened is the fight did come to an end,
25   they were escorted out and, as I said, I think it was
```

Opening Statement - DeMattia                              67

```
 1   about closing time anyway, everyone was coming out of
 2   the tavern or lounge at that particular time, including
 3   now Mr. Timothy Phillips, who eventually was our
 4   deceased victim in this matter.  And upon Mr. Timothy
 5   Phillips realizing what had happened to his brother --
 6   I don't know if it's younger brother or older brother
 7   -- but his brother Kevin Phillips, he became irritated
 8   and while outside argued, yelled at unknown persons,
 9   whether these persons were part of a fight or not,
10   because Mr. Kevin Phillips, who was actually in the
11   fist-fight, has never been able to determine who, if
12   anybody, he could recognize who he fought with, they
13   had friends.  But what we can determine is that once
14   Mr. Timothy Phillips and Kevin Phillips was out there
15   -- apparently Kevin Phillips was all blooded -- Mr.
16   Timothy Phillips yelling and challenging anyone who
17   could have done this to his brother.  What the State
18   does submit to you is that at that particular time this
19   individual who is sitting in court today was armed with
20   -- approached Mr. Timothy Phillips and fired eight
21   shots into Mr. Timothy Phillips, killing him at the
22   scene, and during the course of firing that weapon one
23   of the bullets struck a Mr. Stacy Davis, shattering his
24   ankle, while Mr. Davis was also outside the club at
25   that particular time.  And the State intends to produce
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 35

Opening Statement - DeMattia / Gordon                68

1   witnesses who will testify as to the shooting.
2          From this point on, ladies and gentlemen,
3   again, all I ask you is to listen to the testimony
4   carefully of the witnesses, and it might go very fast,
5   but please pay attention and keep an open mind as to
6   what you will eventually have to decide once the case
7   is over and the testimony has ended.  At that time I
8   will be able to address you again in my closing
9   arguments, and I submit to you now, as I will submit to
10  you at the end of my case, that the State bears the
11  burden, welcomes the burden in this matter, and by the
12  time the case is finished and I address you again I
13  will argue to you that we have proved and we will prove
14  our case beyond a reasonable doubt that this individual
15  on that day is responsible for the death while
16  possessing a handgun, the death of Mr. Timothy Phillips
17  and the shooting of Mr. Stacy Davis.  Thank you for
18  your attention.
19         THE COURT:  Thank you, Mr. DeMattia.  And now
20  presenting an opening statement on behalf of -- of the
21  defendant Naeem Miller will be Mr. Jonathan Gordon.
22  Mr. Gordon?
23         MR. GORDON:  Thank you, Your Honor.  Mr.
24  Miller, Mr. DeMattia.  Good morning, ladies and
25  gentlemen.  Ladies and gentlemen, I want you to picture

Opening Statement - Gordon                69

1   now a very, very cold, 2:30 in the morning, scene in
2   Newark at Toby's Lounge.  It's 2:30 in the morning,
3   it's cold outside and there's a bar that's happening on
4   Bergen Street.  Things are happening in the bar,
5   there's a lot of people inside.  There are people
6   dancing, there are people drinking.  At some point
7   inside that crowded bar where people are dancing and
8   drinking, a fight breaks out.  It's not very large
9   inside, there are a lot of people around.  I want you
10  to try to imagine, as you listen to the evidence in
11  this case, what it's like to be in that fairly-enclosed
12  area under those circumstances.
13         You're going to hear testimony in this case
14  that at some point this person, Kevin Phillips, got
15  into a fight with somebody in the bar and somebody
16  punched him so hard that he went down on the ground
17  inside the bar.  He got punched so hard that his nose
18  was all bloody and bleeding all over his face.  He got
19  punched so hard that he was dazed and didn't even know
20  exactly who had hit him and was under the strain of
21  that moment of having suffered that injury.  You're
22  going to find out later that all the other people in
23  the bar that were in there were then asked to leave the
24  bar -- it was close to closing time -- by various
25  security members -- bouncers, if you will -- who were

**Elite Transcripts, Inc.**
14 Boonton Avenue, Butler, New Jersey 07405
973-283-0196 FAX 973-492-2927

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 36

                    Opening Statement - Gordon                    70
1   in the bar at that time.  So try to picture that scene
2   now.  There's all this happening inside the bar.
3   There's some violent act and Kevin Phillips is hurt.
4   Now there's confusion.  You're going to hear that, in
5   fact, it was a chaotic scene in there.  It was chaos.
6   People were being pushed out the front door of the bar.
7   You'll hear testimony that this bar door opens out onto
8   the sidewalk on Bergen Street.  You'll hear that the
9   bouncers were pushing and moving everyone toward the
10  door quickly.
11            Outside now it's cold, people outside in
12  jackets, it's pretty dark out there, it's 2:30 in the
13  morning.  It's not the afternoon, it's the morning.  A
14  lot of these people that were coming out had been
15  drinking.  Now there are people outside on the
16  sidewalk.  What you're going to hear is that the
17  brother of Kevin Phillips, Timothy Phillips, was angry
18  and upset.  He was acting belligerent.  People were
19  trying to calm him down inside the bar, and when he got
20  outside he was trying to figure out who had punched his
21  little brother.
22            He started to yell, he started to point, he
23  started to swing his fists on people that were standing
24  around right outside of the bar door.  He started to
25  yell.  He was acting belligerent.  Ladies and

                    Opening Statement - Gordon                    71
1   gentlemen, outside that bar it was a chaotic scene.  At
2   some point immediately after Tim Phillips started to
3   swing shots were fired, gun shots.  I submit to you
4   when you come into the courtroom with your common sense
5   you're going to know when you hear the evidence that
6   when those gun shots started people started to duck and
7   go down on the ground.  People tried to get away, but
8   that in fact what you'll hear is that it happened very,
9   very fast.  And when those shots were done two people
10  were down on the ground.
11            Ladies and gentlemen, on that date, December
12  16th of 2001, Naeem Miller did not possess a gun.  He
13  had no gun in his possession.  You'll hear no evidence
14  that Naeem Miller knew Timothy Phillips.  No one is
15  going to tell you that Tim Phillips knew Naeem Miller.
16  Now one is going to tell you anything about any
17  argument, or beef that Naeem Miller had with Tim
18  Phillips.  On that date Naeem Miller had no reason
19  whatsoever to shoot Timothy Phillips.  In fact, he did
20  not shoot him.  He didn't point a gun at him.  He
21  didn't shoot Stacy Davis either.  He didn't have a gun
22  in his hand.  You're not going to hear any credible
23  evidence that will convince you that under those
24  circumstances, in that enclosed area, and then
25  immediately spilling onto the street, under those

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 37

Opening Statement - Gordon                72

1  circumstances of some violence already occurring, the
2  drinking that was going on, all of the chaos that
3  you're going to hear about, you're not going to hear
4  credible evidence that's going to convince you that the
5  State can prove to you that Naeem Miller was there or
6  possessed a gun.
7          Ladies and gentlemen, when we chose you as
8  jurors we asked of you a few things that are very
9  important.  We asked you to bring your common sense in
10 here and to leave any prejudice that you have outside,
11 any preconceived notions, any partiality.  We ask you
12 to be fair and impartial.  All Naeem Miller asks of you
13 now is that you go along with what you promised us.  Be
14 fair, be impartial, listen to the evidence as it comes
15 in.  As Judge Vena just told you this morning,
16 reasonable doubt in a case can come from evidence or a
17 lack of evidence.  At the conclusion of this case I
18 will come to you and argue to you in my closing
19 argument.  That will be my last opportunity to speak to
20 you on behalf of Naeem, to defend him against the
21 accusations in this case, and when I do, ladies and
22 gentlemen, I'm going to ask you at that time to honor
23 our principle of law, not guilty, not guilty until and
24 unless the State proves each and every element of each
25 and every charge beyond a reasonable doubt.

Opening Statement - Gordon/ Colloquy       73

1          I thank you now in advance for your
2  attention.  I look forward to speaking to you again in
3  closing argument and explaining to you then what I
4  think the evidence and the lack of evidence means to
5  the State's failure to prove this case to you beyond a
6  reasonable doubt.  Thank you again, ladies and
7  gentlemen.
8          THE COURT:  Thank you, Mr. Gordon.  We're now
9  going to take our mid-morning break, and when we resume
10 we'll begin with the testimony of the first witness on
11 behalf of the State.  Please limit yourself to the 15
12 minutes.  We'll do our best to get you back in here and
13 get started at the end of the 15 minutes.  Remember,
14 don't discuss the case even among yourselves.  The time
15 to do that is not for a while yet.  Enjoy your break.
16 We'll see you back here in 15 minutes.
17                    (Recess)
18         THE COURT:  All right.  We're ready to
19 continue.  The first witness on behalf of the State,
20 Mr. DeMattia?
21         MR. DeMATTIA:  Newark Police Officer G.
22 Ramos.
23         THE COURT:  Officer Ramos to the stand,
24 please.
25         COURT OFFICER:  Please raise your right hand.

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

Ramos - Direct                                                    74

```
 1      G E O R G E   R A M O S,   STATE'S WITNESS, SWORN
 2                COURT OFFICER:  State your name of the
 3      court's record?
 4                THE WITNESS:  Sergeant George Ramos, 6961,
 5      Newark P.D.
 6                THE COURT:  Good morning, Sergeant, please be
 7      seated.
 8                THE WITNESS:  Good morning.
 9                THE COURT:  Mr. DeMattia?
10                MR. DeMATTIA:  Thank you, Judge.
11      DIRECT EXAMINATION BY MR. DeMATTIA:
12           Q    Sir, can you please keep your voice up loud
13      enough so that the people at the edge of the jury can
14      also hear what you have to say.
15           A    Yes.
16           Q    Sir, by whom are you employed?
17           A    I'm employed by the Newark Police Department.
18           Q    In what capacity?
19           A    A sergeant.
20           Q    How long have you been a police officer?
21           A    I've been a police officer for approximately 14
22      years and sergeant for three years.
23           Q    Back in December of 2001 what was your rank?
24           A    I was a police officer.
25           Q    A regular patrolman?
```

Ramos - Direct                                                    75

```
 1           A    Patrol.
 2           Q    Now, Sergeant Ramos, I'd like to bring your
 3      attention back to December 16th of 2001.  Were you on
 4      duty in the capacity of a regular patrolman on that
 5      date into evening?
 6           A    Yes, sir.
 7           Q    Did you have occasion to respond to 966
 8      Bergen Street, City of Newark?
 9           A    Yes, sir.
10           Q    Who were you with that evening?
11           A    I was working with Officer Vivian Poole.
12           Q    And how were you dressed?
13           A    Full patrol uniform.
14           Q    and what were you driving?
15           A    Marked patrol unit.
16           Q    And what is located at 966 Bergen Street in
17      the City of Newark?
18           A    That's, from my recollection, Toby's Lounge.  It's
19      a bar.
20           Q    Bar, tavern?
21           A    Tavern.
22           Q    And the reason why you were -- Well, strike
23      that.  Were you summoned to respond to that location at
24      approximately 2:35 a.m. on December 16th of 2001?
25           A    Yes, sir.
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

```
                           Ramos - Direct                    76
1          Q       For what reason?
2     A    Shots fired at the location.
3          Q       Did you have occasion to actually respond to
4     that location?
5     A    Yes, sir.
6          Q       When you responded to that location do you
7     recall what you observed?
8     A    When we arrived we saw quite a bit of a crowd
9     outside.  There was two individuals that were victims
10    from gunshot sounds.  One was laying on his back and
11    the other one was, I believe, sitting by the curb also
12    shot.
13         Q       What was the condition of the one who was
14    lying on his back?
15    A    The one that was lying on his back to me it looked
16    very serious and critical, a lot of bleeding from the
17    victim.  He wasn't responding, from my recollection.
18         Q       Did you attempt to talk to him?
19    A    No.
20         Q       He wasn't responding.  What do you mean by
21    that?
22    A    From my recollection he wasn't at that point.
23         Q       Did you at any time ascertain his name, the
24    one that was lying on his back not responding?
25    A    I personally didn't.  My partner got most of the
```

```
                           Ramos - Direct                    77
1     information.  She was writing for that particular tour.
2          Q       What did she write?
3     A    From my recollection I think it was Mr. Phillips,
4     Timothy Phillips, as being one of the victims.
5          Q       Well, when you say your partner wrote
6     something, to memorialize the events of herself and
7     your activity that evening?
8     A    Yes, that was the incident report.
9          Q       Would you like to refresh your memory by
10    having a copy in front of you?
11    A    Yes, I would like that.
12         MR. DeMATTIA:  Your Honor, it's been
13    previously marked S-1 for identification, a two-page
14    incident or 802 report authored by V. Poole.
15    BY MR. DeMATTIA:
16         Q       Sir, take a look at that exhibit and tell me
17    if you recognize it?
18    A    Yes, sir.
19         Q       And what is it?
20    A    It's a Newark Police Incident Report.
21         Q       For what incident?
22    A    For the incident that we're talking about on 12-
23    16-01 at 966 Bergen Street.
24         Q       All right.  Does that help you recall the
25    actual name of the person who was lying on his back?
```

**STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005**

SHEET 40

Ramos - Direct                                          78

```
 1   A     Yes, sir.
 2         Q     And who was that?
 3   A     Timothy Phillips.
 4         Q     Okay.  There was another individual that you
 5   indicated seemed to be shot?
 6   A     Yes, sir.
 7         Q     Were you able to ascertain his identity?
 8   A     Yes.  It was Stacy Davis, according to the report.
 9
10         Q     Was he conscious and awake?
11   A     Yes, sir, he was.
12         Q     Did you talk to him?
13   A     No, I don't recall speaking to him.
14         Q     Okay.  Did there come a time when other
15   people responded to the scene in terms of law
16   enforcement?
17   A     Yes, sir.
18         Q     What was your job there that particular
19   evening?
20   A     Well, we basically were the primary unit assigned
21   to the incident.  There were other units by the time we
22   got there just approaching the scene, and our primary
23   concern was to secure the crime scene and secure any
24   witnesses that there might have been, and obviously
25   render first aid to the victims, and also to render
```

Ramos - Direct                                          79

```
 1   them transport to the hospital as quickly as possible.
 2         Q     Well, do you know if any emergency personnel
 3   --
 4   A     Yes, there was emergency personnel there.
 5         Q     They did respond?
 6   A     Yes.
 7         Q     Okay.  Do you know what happened to the
 8   person who was lying on his back identified as Timothy
 9   Phillips and the other victim Stacy Davis?
10   A     Well, he was treated by EMS at the scene and so
11   was the second victim.
12         Q     Were they taken anywhere?
13   A     Yes, they were taken to the emergency room at
14   College Hospital.
15         Q     And did you secure the name of any witnesses
16   at that particular time?
17   A     From my -- from my recollection I cannot recall if
18   I gathered the witnesses' names, but there were some
19   witnesses at the scene that were indicated on the 802
20   -- incident report.
21         Q     And whose job was it to talk to them and take
22   statements from?
23   A     Well, primarily my partner got most of the names
24   because she was writing on that particular day, and the
25   responding detectives from Robbery/Homicide, the
```

**Elite Transcripts, Inc.**
14 Boonton Avenue, Butler, New Jersey 07405
973-283-0196 FAX 973-492-2927

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 41

```
                 Ramos - Direct / Phillips - Direct         80
 1   Prosecutor's Office later on, gathered more information
 2   from the scene.
 3             MR. DeMATTIA:  I have no further questions.
 4             THE COURT:  Cross-examine?
 5             MR. GORDON:  Thank you, Your Honor.  I have
 6   no questions of this witness.
 7             THE COURT:  Thank you, Officer.  You're
 8   excused.
 9             THE WITNESS:  Thank you, Your Honor.
10             THE COURT:  Mr. DeMattia, are you ready to
11   call your next witness?
12             MR. DeMATTIA:  Kevin Phillips, Your Honor.
13             THE COURT:  Kevin Phillips to the stand,
14   please.
15             COURT OFFICER:  Raise your right hand, sir.
16   K E V I N   P H I L L I P S,  STATE'S WITNESS, SWORN
17             COURT OFFICER:  State your name for the
18   court's record.
19             THE WITNESS:  Kevin Rubin Phillips.
20             THE COURT:  Good morning, sir.  Please be
21   seated.  Mr. DeMattia?
22             MR. DeMATTIA:  Thank you, Judge.
23   DIRECT EXAMINATION BY MR. DeMATTIA:
24        Q    Mr. Phillips, if you can, I'd like you to
25   keep your voice up loud enough so that everyone on the
```

```
                      Phillips - Direct                     81
 1   jury can be able to hear what you have to say.
 2   A    All right.
 3        Q    Sir, how old are you?
 4   A    31.
 5        Q    And do you know a person by the name of
 6   Timothy Phillips?
 7   A    Yes.
 8        Q    Who was Timothy Phillips?
 9   A    He's my brother by birth.
10        Q    I want to bring your attention back to
11   December 16th of 2001, sir.  Do you recall in the early
12   morning hours of that particular date where you were
13   located?
14   A    Yes.
15        Q    And where was that?
16   A    It was at a tavern called Roland's on Bergen.
17        Q    And does that have a different name now, or
18   known by any other name?
19   A    Yes, but I can't -- don't know the new name.
20        Q    But your recollection is Roland's.
21   A    Yes.
22        Q    All right.  Is that at 966 Bergen Street?
23   A    Yes.
24        Q    Have you ever been there before that date on
25   December 16th, 2001?
```

**STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005**

SHEET 42

Phillips - Direct                                                82

```
 1    A     Yes.
 2    Q     Familiar with the area?
 3    A     Very well.
 4    Q     Who were you accompanied by on that
 5  particular day?
 6    A     My brother Timothy Phillips and a couple of
 7  friends.
 8    Q     And what was your purpose of going there,
 9  sir?
10    A     It was a social bar.  We go have some drinks,
11  dance with some women, enjoy ourselves.
12    Q     Was that pretty much happening toward the --
13  up and until the closing hours?
14    A     Yes.
15    Q     Did something occur toward the closing hours
16  of the bar?
17    A     Yes.
18    Q     Describe what was happening or what happened.
19    A     I was dancing with a female.  I was approached by
20  a gentleman -- I don't know who he is -- I was looking
21  eye-to-eye to him so he definitely was my size, my
22  height.  And he asked me to stop dancing with the
23  female.  I told him, you know, the female was grown and
24  she didn't have a problem with it, you know, then he
25  shouldn't have a problem with it.  And he went on to
```

Phillips - Direct                                                83

```
 1  tell me that, you know, he don't care what she say, I
 2  need to stop dancing with her.  And I told him I don't
 3  -- I don't see the reason why, you know?  I wasn't
 4  disrespecting her and didn't think he had no
 5  involvement in what we were doing.
 6    Q     What was your condition at that time, sir?
 7    A     As far as?
 8    Q     Were you drunk?
 9    A     No.
10    Q     How were you responding to his request, in
11  what manner?
12    A     I was telling him in the plainest form that there
13  was no reason why I should stop dancing with her.  The
14  female was standing right there, had nothing to say.
15  She didn't tell me stop dancing with me while we were
16  talking.  She was still dancing.
17    Q     To this date do you know who that person was,
18  that male person was?
19    A     No.
20    Q     Can you describe him, to the best of your
21  ability?
22    A     Well, like I said, I was looking at him eye-to-eye
23  so I know he had to be my height -- I'm 6-3 -- and --
24    Q     As far as his build, sir, do you recall?
25    A     He was a wide, heavy guy.
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

```
                         Phillips - Direct                      84
 1        Q      Okay, sir.   Forgive me for asking, but how
 2   much do you weigh?
 3   A    360.
 4        Q      Was he in your vicinity?
 5   A    Yes.
 6        Q      And well then what went on to happen?
 7   A    He was approached by I guess his friends that knew
 8   me and they went on to tell him, you know -- they call
 9   me "Chubb" on the street -- they said, well, that's
10   Chubb, you know, ain't no big deal, it's cool, you
11   know.  It's nothing.  Let it go.
12        Q      Did something occur after that?
13   A    He went on to push him out of the way and he
14   punched me.
15        Q      Where did he punch you?
16   A    In my chin.
17        Q      What happened after that?
18   A    He locked onto my shirt, I locked onto his shirt
19   and we began to punch each other several times in the
20   face, both with our right hands.
21        Q      What happened after you were punching each
22   other several times?
23   A    I slipped on the liquor, or whatever, that was on
24   the floor, he reached over, he punched me again.  I got
25   up.  Somebody pulled him away, who I don't know, maybe
```

```
                         Phillips - Direct                      85
 1   his friends or whatever.
 2        Q      What was your condition at that time when you
 3   got up?
 4   A    I was bleeding from the nose, bleeding from the
 5   mouth, you know.
 6        Q      How much blood?
 7   A    I don't know.  I had on a white t-shirt.
 8   Basically it was pretty soaked in the front.
 9        Q      Well, this was in what location of the
10   tavern?
11   A    When you walk in the bar it's basically by the
12   door, the dance floor is to the right, we was to the
13   right basically by the back.
14        Q      Now that that had happened and it seemed that
15   you had gotten up was there anymore fighting between
16   you and this gentleman?
17   A    No.
18        Q      What happened at that point?
19   A    I went to look for my associates and my brother
20   that I went to the bar with.  I found my brother.  He
21   asked me what happened.  I told him some guy didn't
22   like me dancing with his niece or whatever and we got
23   into it.  We began to fight.
24        Q      What was your brother's reaction?
25   A    He was like who was it?  I said I don't know.  He
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 44

```
                        Phillips - Direct                    86
 1    said come outside.
 2         Q    Could you describe what your brother looks
 3    like, his physical build, height?
 4    A    My brother was about 185, about 6 even -- 5-11, 6
 5    feet tall.
 6         Q    Okay.  After you told him that and it being
 7    closing time, what occurred?
 8    A    We went outside and he said do you see him?  I
 9    said no.  So he began to talk like, you know what I'm
10    saying, not to me but at me, you know what I'm saying,
11    without looking at me, like you know what I'm saying,
12    you don't know who it was?
13         Q    Describe his condition, his demeanor, your
14    brother?
15    A    He had took his shirt off, you know, and he had on
16    a tank top and it was tucked inside his boxers, you
17    know what I'm saying?  He was somewhat of a pretty boy,
18    so he kept hisself real neat.  So he took his shirt off
19    and he just was asking, you know what I'm saying, you
20    all know who was my brother fighting?  Who was my
21    brother fighting?  Why don't you try to fight me?  You
22    know what I'm saying.  Why you got to pick on my little
23    brother when I ain't around?
24         Q    Okay.  And as you're walking out of this
25    establishment and you come to, for lack of a better
```

```
                        Phillips - Direct                    87
 1    term, a front door, when you open it what -- what does
 2    it lead you to?
 3    A    The street.
 4         Q    The street, or is there some --
 5    A    The sidewalk.
 6         Q    All right.  There is a sidewalk.
 7    A    Yes.
 8         Q    Okay.  Right onto the sidewalk?  Any stoops
 9    or --
10    A    No.
11         Q    Okay.  And at the time that you say your
12    brother was saying what he was saying to no one in
13    particular where was this occurring?
14    A    He was directly in front of the door but like
15    closer to the curb, you know what I'm saying, than he
16    was to the door, but he was in front of the doorway.
17         Q    Did there come a time when he moved from that
18    location?
19    A    No, basically he was just standing right there.
20    Then he proceeded to walk into the -- he stepped down.
21    He was actually in the street in front of the car.
22    There was a car parked normally right in front of the
23    bar and he was standing in front of that car.
24         Q    Did he continue to say anything at that time?
25    A    Yes, he was asking, you know what I'm saying, who
```

**Elite Transcripts, Inc.**
14 Boonton Avenue, Butler, New Jersey 07405
973-283-0196 FAX 973-492-2927

# STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

```
                         Phillips - Direct                    88
 1    was fighting my little brother?
 2         Q    Was he saying it -- forgive me for asking it
 3    this way -- was he saying it in that calm way you just
 4    said it?
 5    A    No, no, he was upset.
 6         Q    What was his demeanor?
 7    A    His demeanor was he wanted to know why if we've
 8    been coming here for so long why did whoever feel like
 9    they had to come at me the way that they did.  We know
10    basically everybody down there.  We're considered
11    somewhat of regulars -- everybody know everybody -- so
12    he was upset.
13         Q    Where were you at the time?
14    A    At the time the car that he was standing in front
15    of I was behind the car that was behind that one in the
16    mirror bending down trying to get my breathing
17    together.  I'm a really heavyset guy, blood coming from
18    my nose, you know what I'm saying?  It wasn't allowing
19    me to breathe regularly.
20         Q    How did you feel at that time?
21    A    Exhausted, tired.
22         Q    What was your condition in terms of visual?
23    A    It was blurry due to the fact from the punching.
24    Like I say, he was -- he was a big guy hisself, so I --
25    basically I took the weight of that -- I took the loss
```

```
                         Phillips - Direct                    89
 1    of that fight.
 2         Q    While you were near the car what happened?
 3    A    Basically I bent down, I was fixing -- trying to
 4    get myself together and I heard the shots coming from
 5    across the street, so I stayed where I was, you know,
 6    to avoid getting hit.
 7         Q    Where was your brother at the time?
 8    A    He was standing in front of that car in the
 9    street.
10         Q    Where you had left him?
11    A    Yes.
12         Q    When you heard the shots did you observe
13    anything?
14    A    All I observed was a gentleman from the waist
15    down, small build, slim -- slim silhouette, you know,
16    the jeans or whatever, from the waist down, and he slid
17    on top of my brother and shot some more times.
18         Q    Did you ever get a look at that individual's
19    face?
20    A    No.
21         Q    Can you tell me today who that individual was
22    if you saw him again?
23    A    No.
24         Q    After the shots stopped what did you do?
25    A    I made sure that it was safe, I went over and
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 46

```
                         Phillips - Direct              90
 1    grabbed my brother and began to try to talk him out of
 2    not leaving me?
 3        Q    What was his condition when you approached
 4    your brother?
 5    A    He was unconscious.
 6        Q    Therefore did he say anything to you?
 7    A    No.
 8        Q    What did you do from that point on?
 9    A    One of my other associates came out and I told him
10    I've got to go get my mother.  A female with her
11    girlfriends took me to my house.  I went in and got my
12    mother and my little brother and proceeded back to
13    Bergen.
14        Q    Was your brother there when you got back?
15    A    No, they had already taken him to the hospital.
16        Q    Did you go to the hospital?
17    A    Yes.
18        Q    Which one was that?
19    A    University.
20        Q    When you got to University Hospital what did
21    you discover?
22    A    Basically they wasn't telling us nothing
23    immediately.  Shortly after they told us that our
24    brother -- my brother had died in route to the
25    hospital.
```

```
                         Phillips - Direct              91
 1        Q    Okay.  Sir, that evening was your brother
 2    armed with any type of weapon?
 3    A    No.
 4        Q    At all?
 5    A    No.
 6        Q    That evening, sir, did you --  Well, how many
 7    shots did you hear?
 8    A    Anywhere between five and seven, somewhere around
 9    there.
10        Q    Did you see a weapon?
11    A    I seen a weapon.  When he was shooting down it was
12    below his waist so I seen his waist, I seen the gun, I
13    seen his hand and the fire coming out the gun.
14        Q    Did you see any other guns in that area on
15    any other persons that evening?
16    A    No.
17        Q    Did you see where this person when the shots
18    stopped took off to?
19    A    No.
20        Q    Did you see if anybody else was injured while
21    you were still at the scene?
22    A    No, I didn't -- I didn't realize that until after
23    I was holding my brother I heard an associate of mine
24    screaming saying he was hit.
25        Q    Did you know that person?
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 47

Phillips - Direct                                      92

```
 1   A     Yes.
 2   Q     Who was that person's name?
 3   A     Stacy.
 4   Q     Prior to arriving at the tavern at 966 Bergen
 5   Street that evening were you at any other location?
 6   A     Yes, we had stopped off at a local tavern on
 7   Chancellor, and I forgot the cross block, just to pick
 8   up some other friends because we were coming from my
 9   deceased brother's son's birthday party, and the rest
10   of our friends was going to meet us at that bar just to
11   help us finish celebrating.
12   Q     That same evening was it your nephew's
13   birthday?
14   A     Yes.
15   Q     And when you went to this other tavern who
16   was with you?
17   A     My brother Timothy Phillips and a few associates.
18   Q     Did anything happen at that tavern or on the
19   way there?
20   A     No.
21   Q     From there to another location?
22   A     No.
23   Q     Any fights with anyone?
24   A     No, very joyous occasion.
25   Q     Did you know if anyone was following you?
```

Phillips - Direct                                      93

```
 1   A     No.
 2   Q     From one location?
 3   A     No.
 4   Q     All right.  Sir, you do have prior
 5   involvement with the criminal justice system here in
 6   New Jersey?
 7   A     Yes.
 8   Q     Back in December, if I might show you this,
 9   sir, December 20th of 1995 you had pled guilty to
10   possession of CDS with the intent to distribute,
11   endangering a child, where you received a five-year
12   prison sentence?
13   A     Yes.
14   Q     And that was back in 1995?
15   A     Yes.
16   Q     You've done your time?
17   A     Yes.
18   Q     Are you still on parole and probation?
19   A     No.
20         MR. DeMATTIA:  No further questions, Your
21   Honor.
22         THE COURT:  Cross-examine.
23         MR. GORDON:  Your Honor, I have no questions
24   of this witness.
25         THE COURT:  Thank you, Mr. Phillips, you're
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 48

Sidebar                                                                94

```
1    excused.  Can I see counsel at sidebar, please?
2              (Sidebar)
3         THE COURT:  Who is next?
4         MR. DeMATTIA:  We're definitely going to run
5    out of witnesses today, Judge.  We could have done this
6    case in one day.  Felicia Wright is next.  She's
7    probably, would you say, a little more important with
8    this thing that Mr. Phillips, warrant a little bit more
9    cross-examination?
10        MR. GORDON:  That's not saying much.
11        MR. DeMATTIA:  If you wanted to break now,
12   Your Honor, instead of --
13        THE COURT:  So you anticipate that she'll
14   take more than a half an hour.
15        MR. DeMATTIA:  Oh, yes.
16        THE COURT:  Yes, so we might as well break
17   now and come back early, you know, and -- but now is a
18   logical time?
19        MR. GORDON:  That's fine, Judge.
20        THE COURT:  Okay.
21             (Sidebar concluded)
22        THE COURT:  All right.  As I explained to you
23   we oftentimes, depending upon the logic of where we are
24   in the proceeding, we take our breaks at different
25   times.  Usually it's 12:30 to 1:30.  Our next witness
```

Colloquy                                                               95

```
1    we anticipate is going to take a little longer, and in
2    order to -- than the prior witnesses -- so in order to
3    enable you to better understand and retain information
4    it would probably be better not to break up this
5    witness's testimony by lunch, so we'll have an earlier
6    lunch and we'll commence her testimony as soon as we
7    get back and, therefore, we'll break now for lunch.
8    Remember don't discuss the case among yourselves or
9    with anybody else.  If anybody attempts to contact you,
10   speaks to you, don't respond, don't tell your fellow
11   juror members.  Make the officer aware of it
12   immediately.  Remember everybody has been told to stay
13   out of contact with you.  If you need help with
14   anything direct it to an officer or a member of the
15   staff.  With that we'll see you back here in
16   approximately -- in an hour, at approximately 1:05.
17   Enjoy your lunch.
18             (Luncheon recess)
19        THE COURT:  We're ready to call the next
20   witness for the State.  You may do so, Mr. DeMattia.
21        MR. DeMATTIA:  Felicia Wright.
22        THE COURT:  Felicia Wright to the stand,
23   please.
24        COURT OFFICER:  Raise your right hand.
25   F E L I C I A   W R I G H T,  STATE'S WITNESS, SWORN
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 49

```
                    Wright - Direct                    96
 1          COURT OFFICER:  State your name for the
 2  court's record, please?
 3          THE WITNESS:  Felicia Wright.
 4          COURT OFFICER:  Okay.  Have a seat.
 5          THE COURT:  Good afternoon, ma'am.  Please be
 6  seated.  Mr. DeMattia?
 7          MR. DeMATTIA:  Thank you.
 8  DIRECT EXAMINATION BY MR. DeMATTIA:
 9      Q    Ms. Wright, I'm going to be asking you
10  questions so I'd like you to keep your voice up loud
11  enough so that everyone at the end of the jury can hear
12  what you have to say.
13          Now, Ms. Wright, how old are you?
14      A    34.
15      Q    And I want to bring your attention back to
16  December 16th of 2001 at approximately -- you know,
17  after midnight -- 1, 2, 3 o'clock in the morning.  Were
18  you at any particular location at that time?
19      A    Yes.
20      Q    What was the location that you were at.
21      A    At Roland's Bar.
22      Q    Okay.  I'm having a bit of a problem hearing
23  you, ma'am, so I know that they may be.  What was the
24  name of the place?
25      A    Roland's Bar.
```

```
                    Wright - Direct                    97
 1      Q    Is that located at 966 Bergen Street --
 2      A    Yes.
 3      Q    -- City of Newark?
 4      A    Yes.
 5      Q    How familiar are you with that location?
 6      A    Very familiar.
 7      Q    And why is that?
 8      A    I live in the area.
 9      Q    How long have you lived in the area?
10      A    Maybe about 10 -- maybe 10 years around that area.
11      Q    And how often would you go to that location
12  at -- that Bergen Street location, Roland's Bar?
13      A    Every weekend.
14      Q    Do you know a lot of people who go there?
15      A    Yes.
16      Q    I want to take your attention to specifically
17  now December 16th, 2001 at that Roland's Bar located at
18  Bergen Street, Newark.  Did there come a time --  Well,
19  first of all, what time, do you recall, if you can, get
20  there to Roland's Tavern?
21      A    I'd usually get there about 11, 11:30.
22      Q    And do you recall if anything happened in
23  Roland's Bar that evening?
24      A    Would you say that again?
25      Q    Inside the bar itself were you a witness to
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 50

```
                          Wright - Direct                    98
 1   anything that happened inside the bar?
 2   A    No.
 3        Q    Did you know if anything occurred that
 4   evening inside the bar?
 5   A    A fight broke out inside the bar that night,
 6   but --
 7        Q    Were you a part of that fight, by any chance?
 8   A    No, no.
 9        Q    Do you know anyone who was involved in that
10   fight?
11   A    I wasn't trying to find out who was fighting.
12        Q    So did you have any type of confrontation
13   that night at Roland's Tavern?
14   A    No.
15        Q    Now, I want to take your attention to closing
16   time, around closing time, between 2 and 2:30 in the
17   morning.  Was it, in fact, a time when that bar was
18   closing?
19   A    Yes.
20        Q    All right.  And were you aware if the fight
21   had taken place at that time, or around that time?
22   A    No.
23        Q    But you know --
24   A    It was --
25        Q    I'm sorry.
```

```
                          Wright - Direct                    99
 1   A    The fight was maybe I'll say 20 minutes to a half
 2   an hour before the time I was leaving.
 3        Q    Well, what happened when you were leaving?
 4   A    When I was leaving the bar?
 5        Q    Yes, ma'am, when you were leaving the bar.
 6   A    I heard gunshots.
 7        Q    Okay.  And where were you when you heard the
 8   gunshots?
 9   A    I was going to leave the bar.
10        Q    Were you outside already?
11   A    No.
12        Q    How close to the outside were you when you
13   heard the shots?
14   A    By the door.
15        Q    By the door.  Okay.  When the door was opened
16   -- When -- when you open the door to Roland's Tavern
17   and step out, what do you step out to?
18   A    When I walked out the bar I looked out the bar --
19   After I heard all the gunshots I'm ready to leave the
20   bar now.  I walked out the bar, I seen a young man on
21   the ground.
22        Q    Did you know who that man was?
23   A    At the time, no.
24        Q    Did you eventually find out.
25   A    Yes.
```

**STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005**

Wright - Direct                                    100

```
 1        Q      And who was that that was on the ground?
 2   A    Timothy.
 3        Q      Timothy Phillips?
 4   A    Yes.
 5        Q      Were you familiar with Timothy Phillips?
 6   A    Yes.
 7        Q      Do you know him?
 8   A    Yes.
 9        Q      Do you know his family?
10   A    Yes.
11        Q      How well do you know him or his family?
12   A    I know him -- I know him maybe five years.  His
13   family I don't really know.
14        Q      Okay.  And what was the condition of Timothy
15   Phillips or the person you saw at that time and you
16   later found out was Timothy Phillips, what was his
17   condition?  What did he look like?
18   A    He didn't look good at all.
19        Q      Was he standing?
20   A    No.
21        Q      What was -- what was he doing?
22   A    He was laying on the ground.
23        Q      Approximately where from the front door of
24   the tavern?
25   A    Off to the side of it, to my right, like if you
```

Wright - Direct                                    101

```
 1   come out the bar, on my right side.
 2        Q      As soon as you come out the bar and you open
 3   the door what do you step out onto, the street?
 4   A    Onto the sidewalk.
 5        Q      There's a sidewalk there.
 6   A    Right.
 7        Q      Am I right?  And then the street is a short
 8   distance from it?
 9   A    Yes.
10        Q      Where was Timothy, if you recall?
11   A    Laying on the ground.
12        Q      And did you see anyone --  Well, what did you
13   see as Timothy was lying on the ground?  Did you look
14   around and notice anything else?
15   A    Yes, I seen people running.
16        Q      Did you see anyone in particular running?
17   A    Yes.
18        Q      Who did you see, ma'am?
19   A    Naeem.
20        Q      I'm sorry?
21   A    Naeem.
22        Q      Did you say the name Naeem, ma'am?
23   A    Yes.
24        Q      All right.  Let's talk a little bit about
25   that.  You know a person by the name of Naeem.
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 52

|                | Wright - Direct | 102 |
|----------------|-----------------|-----|

```
 1   A      Yes.
 2   Q      What's his last name?
 3   A      Miller.
 4   Q      How well do you know Naeem Miller?
 5   A      He's my daughter's father's cousin.
 6   Q      You have a daughter?
 7   A      Yes.
 8   Q      What is your daughter's name?
 9   A      Charisma.
10   Q      And who is her father?
11   A      Ish -- Ishmael.
12   Q      What's his full name, ma'am?
13   A      Donald Williams.
14   Q      Donald Williams?
15   A      Right.
16   Q      And this Donald Williams, is he related
17   somehow to Naeem Miller?
18   A      That's how I found out -- that's how I met
19   through his family as cousins.
20   Q      As cousins?
21   A      Yes.
22   Q      So how long are you familiar with Naeem
23   Miller?
24   A      I don't know him know him.  I don't know him like
25   that, but when I was first introduced to him it must
```

|                | Wright - Direct | 103 |
|----------------|-----------------|-----|

```
 1   have been years, at least 15 years now.
 2   Q      At least 15 years.  And during the course of
 3   these 15 years, Ms. Wright, how often would you have an
 4   opportunity to see Naeem Miller?
 5   A      Well, if I was to see him it would be like around
 6   the area where we live.
 7   Q      Where did you live at the time?
 8   A      On Custer Avenue and Osborne Terrace.
 9   Q      Where does, or did, Mr. Naeem Miller live at
10   the time?
11   A      From my understanding on Goodwin Avenue.
12   Q      Goodwin Avenue.
13   A      Yes.
14   Q      Any close street to that, 52nd Street?
15   A      Excuse me?
16   Q      Goodwin Avenue and what?
17   A      Nye Avenue.
18   Q      By Nye Avenue?
19   A      Yes.
20   Q      Your location used to be Custer Avenue, you
21   said, and Mr. Miller was Goodwin near Nye Avenue.  How
22   far is that from each other?
23   A      Maybe two blocks across and two blocks up.
24   Q      Okay.  And how far is it to Roland's Tavern
25   from your location?
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 53

Wright - Direct                                              104

```
 1    A     From my house to Roland's?
 2          Q     Former location, right.
 3    A     Two blocks.
 4          Q     And from Nye Avenue and Goodwin Avenue.
 5    A     How far is it to Roland's?  Maybe about a good
 6    five -- five to six blocks, something like that.
 7          Q     Would you consider that in the neighborhood?
 8    A     Yes.
 9          Q     How about Huntington Terrace.  Do you know
10    where that is?
11    A     Yes.
12          Q     Where is that located?
13    A     That's in the area, too.
14          Q     About how far from where you lived in Custer
15    Avenue?
16    A     Huntington Terrace is one block up -- one block up
17    and a block across from where I was living.
18          Q     And how about Goodwin by Nye, how far is
19    Huntington Terrace from there?
20    A     Goodwin and Nye, Huntington Terrace, two blocks up
21    and a block across.
22          Q     And --
23    A     One, two, maybe three blocks up and a block
24    across.
25          Q     And finally, Huntington Terrace from Roland's
```

Wright - Direct                                              105

```
 1    location?
 2    A     From Huntington Terrace to Osborne Terrace is one
 3    block, and it's just one long strip straight to Bergen.
 4          Q     Straight to Bergen where Roland's Tavern is
 5    located?
 6    A     Yes.
 7          Q     So within a five-block area all these streets
 8    we just mentioned are within Roland's -- Roland's
 9    Tavern distance?
10    A     Just about.
11          Q     Okay.  Now, that evening you said you came
12    out, saw the body of Timothy Phillips, one particular
13    individual you saw running.  That was Naeem Miller?
14    A     Yes.
15          Q     Had you seen Naeem Miller before you went
16    into the tavern that evening?
17    A     Earlier that day I think we all passed him in the
18    car.  I usually see him all the time, though.
19          Q     What do you mean by all the time, before --
20    A     If I would come outside --
21          Q     Excuse me.  Let me just finish.  Before
22    December 16th of 2001 how often did you see him?  What
23    do you mean all the time?
24    A     If I would come outside around the area, on
25    Osborne area and everything, I would see him, you know.
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

```
                       Wright - Direct                  106
 1    Now, I don't hold conversations with him, none of that
 2    because, like I said, I don't know him like that, but I
 3    would see him out with the -- just hanging out on the
 4    block.
 5         Q    And over the course of how many years has
 6    this been occurring up to December 16th of 2001?
 7    A    Since I lived on Custer.  I lived on Custer maybe
 8    six straight years before I moved to another location,
 9    if I would come out and go around the area, if I, you
10    know, go around on Renner Avenue or whatever, the
11    majority I would see him hanging out with the boys or
12    whatever.
13         Q    You're both from the same neighborhood at
14    that time.
15    A    Yes.
16         Q    Now, I want to jump ahead.  After December
17    16th, 2001 how often did you see Naeem Miller?
18    A    Say that again?
19         Q    After December 16th of 2001, the night that
20    Timothy Phillips was shot, how often did you see Naeem
21    Miller?
22    A    I didn't.
23         Q    You have to speak up so it's on the record.
24    A    I didn't, I didn't, I didn't.
25         Q    You didn't see him once?
```

```
                       Wright - Direct                  107
 1    A    No, no.
 2         Q    Is this the --  Well, let me ask you a
 3    question.  Do you see Naeem Miller today?
 4    A    Yes.
 5         Q    Can you point to him and describe what he's
 6    wearing.
 7    A    Right here in the black sweater.
 8         THE COURT:  Indicating the defendant.
 9    BY MR. DeMATTIA:
10         Q    So I want to ask you, from December 16th of
11    2001 how many times have you seen him to today?
12    A    I haven't.
13         Q    Is this the first time you're seeing him
14    since December 16th of 2001?
15    A    Yes.
16         Q    Now, you say you saw him running.  Was he
17    carrying anything?  You have to answer the question,
18    ma'am.  Was he carrying anything?
19    A    Yes.
20         Q    What was he carrying?
21    A    He carried a gun.
22         Q    Do you know what type of gun it was, what it
23    looked like?  If you can tell us, ma'am, the type of
24    gun that it looked like, if you can recall?
25    A    It was just a black gun.
```

**STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005**

SHEET 55

Wright - Direct                                        108

1       Q       Do you know weapons, ma'am?
2    A    Yes.
3       Q       Do you know what type of gun it looked like?
4    Do you know the difference between an automatic and a
5    revolver?  Well, Ms. Wright --
6               MR. DeMATTIA:  I'll withdraw that question,
7    Your Honor.
8               THE COURT:  Take your time.
9    BY MR. DeMATTIA:
10      Q       Ms. Wright, let me ask you some other
11   questions, Ms. Wright.  Do you actually want to be here
12   today?
13   A    No.
14      Q       Okay.  Why don't you want to be here today?
15   A    Right now I'm uncomfortable.
16              THE COURT:  Water, anything?
17              THE CLERK:  Do you want water?
18              THE COURT:  Tissue?
19              MR. DeMATTIA:  I would appreciate it, Your
20   Honor.
21              THE CLERK:  I'll get some.
22              MR. DeMATTIA:  Ms. Wright, take a moment and
23   tell me --
24              THE COURT:  Take your time.
25              MR. DeMATTIA:  -- when you're ready because I

Wright - Direct                                        109

1    -- I do have to ask you more questions.  May we get
2    some water and some tissues?
3    BY MR. DeMATTIA:
4       Q       Okay.  Ms. Wright, can I ask you some more
5    questions now, please?
6    A    Yes.
7       Q       Okay.  Ms. Wright, you said you feel -- you
8    feel uncomfortable.  If you can briefly explain to us
9    why you feel uncomfortable?
10   A    I feel like I'm like in the middle.
11      Q       Well, do you --
12   A    I know his family, I know his family.  I don't --
13   I just don't want to be here.
14      Q       But you did receive a subpoena to come today,
15   right, ma'am?
16   A    Yes.  They came and got me this morning.
17      Q       So your discomfort is from the fact that you
18   know both families involved, the victim's family and
19   the defendant's family?
20   A    Yes.
21      Q       Is that making you uncomfortable?
22   A    Yes.
23      Q       We've put you in an uncomfortable situation,
24   correct?
25   A    Yes.

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 56

Wright - Direct                                          110

1    Q    Does that affect the testimony that you must
2  give today, Ms. Wright?  Ma'am, I ask you does it
3  affect the truthfulness of the testimony that you must
4  give today?
5  A    No, no.
6    Q    Are you going to give us the truthful
7  testimony?
8  A    Yes.
9    Q    What type of gun, if you can tell us, was
10 Naeem Miller running away from the scene of Timothy
11 Phillips' killing that evening?
12 A    An automatic.
13   Q    An automatic?
14 A    Yes.
15   Q    Do you recall the color of the gun?
16 A    It was black.
17   Q    Okay.  Ms. Wright, was there anyone else
18 outside at that time after you heard the shots and
19 emerged onto the street that had a gun in their hand,
20 that you observed?
21 A    No.
22   Q    Did you actually see Mr. Miller shooting at
23 Timothy Phillips?
24 A    No, no.
25   Q    But on your way out that door to Roland's

Wright - Direct                                          111

1  Tavern when is the time that you heard these shots?
2  A    What do you mean?
3    Q    Take me as you're opening the door to
4  Roland's Tavern, what do you hear, to come out?
5  A    I hadn't went out the door yet.
6    Q    Okay.  As you're about to open the door what
7  do you hear?
8  A    I heard gunshots.
9    Q    How many?
10 A    From my knowledge I heard at least six, seven.
11 I'm not sure.
12   Q    Okay.  Now, as you open the door to Roland's
13 and you merge onto the sidewalk do you hear anything?
14 Had the shooting stopped?
15 A    Yes.
16   Q    Okay.  When you look up where is Naeem Miller
17 running, in what location?
18 A    Like towards Scheerer Avenue.
19   Q    Is he -- Where is he located, though, in
20 terms of sidewalk, street?
21 A    He was in the street at the time.
22   Q    Okay.  And as he's running away which
23 direction is he running to?
24 A    What do you mean?
25   Q    Which direction is he running to, what street

### Elite Transcripts, Inc.
14 Boonton Avenue, Butler, New Jersey 07405
973-283-0196 FAX 973-492-2927

**STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005**

SHEET 57

|   | Wright - Direct | 112 |
|---|---|---|

```
 1    corner?
 2    A       Towards Scheerer.
 3          Q       Towards Scheerer?
 4    A       Yes.
 5          Q       When he got to the street corner of Scheerer
 6    and Bergen what did he do?
 7    A       What do you mean what did he do?
 8          Q       When he got to that intersection of Scheerer
 9    and Bergen Street --  By the way, how far is that where
10    Scheerer and Bergen Street intersect?  How far is the
11    bar from that intersection?
12    A       Maybe two, three houses from the corner.
13          Q       Okay.  When he got to the intersection again
14    of Scheerer and Bergen Street what did he do?  Did he
15    stop, continue --
16    A       Turned the corner.  No, he had turned the corner.
17          Q       Turned the corner which way, to the right or
18    to the left?
19    A       To the right.
20          Q       And where did he go, on what street?
21    A       I don't know.
22          Q       On what street was that then?
23    A       Scheerer.
24          Q       Did you know where he went from that point?
25    A       No.
```

|   | Wright - Direct | 113 |
|---|---|---|

```
 1          Q       Did you ever see him again until today?
 2    A       No.
 3          Q       By the time you saw him, ma'am, about how far
 4    was he from the body of Timothy Phillips, if you can
 5    estimate the distance?
 6    A       He was away from him.  He wasn't by him.
 7          Q       If Timothy Phillips is where you're sitting.
 8    A       Naeem was maybe past maybe by the doorway maybe.
 9          Q       By that doorway?
10    A       Maybe.
11          THE COURT:  Forty-six feet.
12    BY MR. DeMATTIA:
13          Q       What were the lighting conditions surrounding
14    Roland's Tavern that evening?
15    A       You mean like street lights?
16          Q       Yes.
17    A       It's -- it's bright out there.  It's pretty
18    bright.
19          Q       Are there street lamps right in that
20    vicinity?
21    A       Yes.
22          Q       Did you have any problem recognizing Naeem
23    Miller that evening?
24    A       No.
25          Q       Across the street from -- from Roland's
```

## STATE OF NEW JERSEY v NAEEM MILLER — March 23, 2005

SHEET 58

```
                          Wright - Direct                    114
 1    Tavern do you happen to know what's located across the
 2    street from the tavern on the other side of the street?
 3    A    It's a Chinese store.
 4         Q    Chinese store?  Do you know the name of it?
 5    A    Fong's.
 6         Q    Fong's?  Was it open?
 7    A    Yes.
 8         Q    What else is located over there?
 9    A    It's an insurance place and a little church.
10         Q    I imagine they were closed.
11    A    Yes.
12         Q    Did you see if Mr. Miller, what direction he
13    came from?
14    A    No.  I don't know.
15         Q    Do you have any knowledge if he was in Fong's
16    Chinese store?
17    A    I don't know.  I don't know.
18         Q    Was anyone else coming from any location,
19    across the street, with a gun in their hand?  Did you
20    see anyone else with a gun in their hand?
21    A    No, I didn't see him come from across no street
22    with no gun in his hand.
23         Q    You just saw him running from the scene with
24    a gun in his hand.
25    A    Leaving from the -- yes.
```

```
                          Wright - Direct                    115
 1         Q    Do you know a person by the name of a Anjuana
 2    Williams?
 3    A    Yes.
 4         Q    How well do you know Anjuana Williams?
 5    A    Somewhat well.
 6         Q    How long have you known her for?
 7    A    Anjuana maybe -- I met her through my niece.  I
 8    haven't known her --  Maybe met her a couple of years
 9    ago.
10         Q    Back in December of 2001 did you know her?
11    A    Yes.
12         Q    Who she was?
13    A    Uh-huh.
14         Q    Do you have any problem with recognizing who
15    she is?
16    A    No.
17         Q    If you saw this Anjuana Williams you'd be
18    easily -- she'd be easily recognizable to you?
19    A    Yes.
20         Q    Okay.  That evening, going back to December
21    16th, 2001 inside Roland's Lounge, did you see Anjuana
22    Williams at all?  Do you recall seeing Anjuana Williams
23    that night?
24    A    No.
25         Q    If you had seen her that night would you have
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

```
                              Wright - Direct                 116
 1    recognized her?
 2    A    Yes.
 3         Q    When you went into the tavern did you stay in
 4    any particular location?
 5    A    What, inside the bar?
 6         Q    For all night?
 7    A    No.
 8         Q    What did you do?
 9    A    What do you mean?
10         Q    Well, did you walk around at all, ma'am?
11    A    Oh, yes.
12         Q    Please keep your voice up.  They need to hear
13    you.
14    A    Yes, yes, yes.
15         Q    Did you walk around at all?
16    A    Yes.
17         Q    Around what time did you get there?
18    A    Between like 11, 11:30 I go there.
19         Q    About how many times did you walk around the
20    bar, talk to people?
21    A    All right.
22         Q    Did you see her there?
23    A    Anjuana?
24         Q    Yes.
25    A    No.
```

```
                              Wright - Direct                 117
 1         Q    Okay.  At the time of the shooting when you
 2    came outside did you see Anjuana Williams there at all?
 3    A    No, I didn't see her.
 4         Q    Okay.  In Fong's restaurant across the street
 5    did you see her emerging from there?
 6    A    I didn't see her.
 7         Q    You didn't see her at all that evening.
 8    A    No.
 9         Q    And you have no problem recognizing her.
10    A    No.
11         Q    Now, did there come a time when the police
12    had an opportunity to speak to you after December 16th,
13    2001?
14    A    They came to my house.
15         Q    They, do you recall who they were?
16    A    A cop, Ben Powell.
17         Q    Investigator Ben Powell?
18    A    Yes.
19         Q    He's from my office?
20    A    Yes.
21         Q    All right.  Any other law enforcement people?
22    A    There was a cop with him.  I can't recall his
23    name, though.
24         Q    Did they ask you information about the
25    evening of December 16th, 2001?
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

Wright - Direct                                    118

```
1    A    Yes.
2         Q    Did you ever give a formal statement --
3    A    No.
4         Q    -- about the incident?
5    A    No, I did not.
6         Q    That was your choosing.  Did we ask you?
7    A    Yes.
8         Q    Did Ben Powell ask you?
9    A    Yes.
10        Q    Did you agree to give a formal written
11   statement?
12   A    No, I did not.
13        Q    Did you agree to talk to him, however?
14   A    I spoke to him about it.
15        Q    All right.  Did you talk about the events of
16   December 16, 2001 with Investigator Ben Powell?
17   A    Yes.
18        Q    All right.  Do you have knowledge of anything
19   happening to Investigator Ben Powell?
20   A    I heard he had passed.
21        Q    And how?
22   A    I don't -- I don't know.
23        Q    Okay.  You don't know, but he -- he died,
24   correct?
25   A    Yes.
```

Wright - Direct                                    119

```
1         Q    Okay.  When you talked to Investigator Ben
2    Powell did he have an opportunity to show you a
3    photograph?
4    A    Yes.
5              MR. DeMATTIA:  Okay.  Your Honor, it's
6    previously marked S-20 for identification.
7    BY MR. DeMATTIA:
8         Q    Now, when he showed you a photograph he was
9    talking to you about what had happened on December
10   16th --
11   A    Yes.
12        Q    -- was he not?
13   A    Yes.
14        Q    Did you tell him who you saw that evening
15   with a gun?
16   A    Uh-huh, I think.
17        Q    I'm sorry.  Please --
18   A    I think -- I don't -- I'm not quite sure.  I told
19   him nothing about no gun that night.
20        Q    Okay.  Did he show you a picture?
21   A    Yes.
22        Q    All right.  Whose picture is that?
23   A    It's Naeem.
24        Q    Naeem Miller?
25   A    Yes.
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 61

Wright - Direct                                              120

```
1          Q      Okay.  The person in court today?
2     A    Yes.
3          Q      And did Investigator Powell have you do
4     anything with the photograph?
5     A    Yes, he told me to sign it.
6          Q      And what did you do to the back?
7     A    Signed it.
8          Q      Signed it?  Keep your voice up, please.
9     A    I signed it.
10         Q      And what date was it?
11    A    January the 9th.
12         Q      Of what year?
13    A    2002.
14         Q      2002.  Now, does Mr. Miller look the same as
15    in this picture?
16    A    No.
17         Q      What's different?
18    A    His hair is cut.
19         Q      Please speak loud, ma'am.  They need to hear
20    you.
21    A    His hair is cut.
22         Q      His hair is cut?
23    A    Yes.
24         Q      In his picture how is his hair?
25    A    Dreaded.
```

Wright - Direct                                              121

```
1          Q      Dreaded?
2     A    Yes.
3          Q      Longer hair?
4     A    Yes.
5          Q      Okay.  Does he have a beard in the picture,
6     the way he has today?
7     A    No.
8          Q      In your time that you seen him during the
9     course of your 15 years prior to December 16th of 2001,
10    have you ever seen him with hair like that and a beard
11    like that?  Ma'am, you'll have to answer yes or no.
12    A    No.
13         Q      And, ma'am, although you never consented or
14    agreed to giving a formal statement, after you talked
15    to Investigator Powell, did there come a time when you
16    were subpoenaed to the Essex County Grand Jury?
17    A    Yes.
18         Q      Okay.  And do you recall what date that was?
19    Or on that particular time when you were called before
20    the Essex County Grand Jury did you, in fact, testify,
21    before an Essex County Grand Jury?
22    A    Yes.
23         Q      All right.  And were you asked questions
24    about the events of December 16th, 2001?
25    A    Yes, yes.
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

Wright - Direct                                   122

```
1         Q     Did you want to be in front of an Essex
2  County Grand Jury at that time?
3  A     No.
4         Q     Who was the prosecutor that was there?
5  A     You.
6         Q     But you were subpoenaed and you showed up.
7  A     Yes.
8         Q     Did you give truthful testimony before the
9  Essex County Grand Jury?
10 A     Yes.
11        Q     Did that make you feel uncomfortable?
12 A     Yes.
13        Q     Ma'am, just a few more questions that I have.
14 With the time period after December 16th, after Mr.
15 Phillips was shot and killed on December 16th, this
16 Anjuana Williams, did you see her in the neighborhood
17 after December 16th, 2001?
18 A     Yes.
19        Q     Did you ever talk to her about this incident?
20 A     No.
21        Q     Did she ever talk to you about this incident?
22 A     No.
23        Q     In the months after December 16th, 2001 were
24 you ever contacted by any of the people from my office
25 or Newark Police Department if you had seen Mr. Miller?
```

Wright - Direct / Cross                           123

```
1  After the shooting.
2  A     Any time after?
3         Q     Any time after the shooting were police in
4  the area asking you if you saw Mr. Miller?
5  A     No, sir.
6         Q     Asking you now, if you --
7  A     I mean have I ever seen him.
8         Q     Yes.
9  A     Oh, yes, they asked me have I seen him.  I told
10 him no.
11        Q     And did you see him?
12 A     No.
13        MR. DeMATTIA:  Okay, Judge.  I have no
14 further questions for Ms. Wright.
15        THE COURT:  Cross-examine.
16        MR. GORDON:  Thank you, Your Honor.
17 CROSS-EXAMINATION BY MR. GORDON:
18        Q     Ms. Wright, that night, 11, 11:30, that's
19 when you got to Roland's, correct?
20 A     Yes.
21        Q     And so that would have been on December 15th,
22 the Saturday night, right?
23 A     Yes.
24        Q     And prior to going to Roland's where had you
25 been that night?
```

## STATE OF NEW JERSEY v NAEEM MILLER — March 23, 2005

SHEET 63

```
                         Wright - Cross                    124
 1    A     Home.
 2          Q     At home?
 3    A     Uh-huh.
 4          Q     Okay.  Did you consume any alcohol when you
 5    were at your house that night?
 6    A     Yes.
 7          Q     Do you recall approximately what time on
 8    Saturday, December 15th, 2001 you began to consume
 9    alcohol?
10    A     About 10:30, right before it was time for me to go
11    out.
12          Q     As you sit here today can you tell the
13    members of the jury if you remember what alcohol, what
14    type of alcohol, you were consuming when you were in
15    your house on Saturday night?
16    A     Beer.
17          Q     Do you remember approximately how many beers
18    you had when you were still in your house?
19    A     Yes.
20          Q     How many?
21    A     A 24-ounce can.
22          Q     Is that it?
23    A     That's it.
24          Q     Now, at some point around 11, 11:30 you left
25    to go to Roland's, right?
```

```
                         Wright - Cross                    125
 1    A     Yes.
 2          Q     And when you got to Roland's did you consume
 3    any alcohol there?
 4    A     One beer.
 5          Q     Okay.  When you were there at 11 o'clock or
 6    11:30 you ordered a beer at the bar?
 7    A     Not at 11:30, maybe like 12, 12:30.
 8          Q     So is it your testimony to the jury that you
 9    were in the bar for a while before you actually got a
10    beer?
11    A     Uh-huh.
12          Q     And then did you order a beer at the bar?
13    A     Yes.
14          Q     And you sat there drinking the beer or
15    walking around drinking the beer?
16    A     Walking, right.
17          Q     And you stayed in the bar until the time of
18    the shooting, right?
19    A     Yes.
20          Q     And to the best of your knowledge that
21    shooting took place around 2:30 in the morning, right?
22    A     It was after 2, exactly what time I don't know.
23          Q     All right.  And so is it your testimony now
24    that around 12 you got one beer and for two-and-a-half
25    hours you were only working on that one beer in -- in
```

**STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005**

Wright - Cross                                        126

```
1    Roland's?
2    A    That's it.  That's all I needed.
3         Q    That's all you needed.
4    A    Yes.
5         Q    Did you consume any other type of alcohol at
6    that time?
7    A    No.
8         Q    Had you consumed during those hours any type
9    of narcotics at all?
10   A    No.
11        Q    Now, when you were inside the bar you
12   testified that as you --  You weren't aware when you
13   were in there of any confrontation going on in the bar,
14   were you?
15   A    A fight had broke out in the bar.
16        Q    You had -- you knew about that right?
17   A    Huh?
18        Q    You knew about it.  You remember it?
19   A    Yes.  I didn't try to find out where it was, and
20   none of that.  It wasn't -- it wasn't a long fight or
21   nothing, you know?
22        Q    Do you remember seeing anybody get hit?
23   A    No.
24        Q    Well, what was it that made you know there
25   was a fight inside the bar?
```

Wright - Cross                                        127

```
1    A    The crowd.
2         Q    What did the crowd do?
3    A    You know how in a fight people gather around, you
4    know, punch out.
5         Q    And do you recall -- well, do you recall
6    being asked questions by the prosecutor when you were
7    in front of the Essex County Grand Jury on May 9th of
8    2003?
9    A    Yes.
10        Q    And do you recall being asked by Mr. DeMattia
11   about whether or not you witnessed anything that
12   appeared to be a confrontation or a fight?  Do you
13   recall being asked that question by Mr. DeMattia in
14   front of the Essex County Grand Jury?
15   A    No, I don't remember him asking that.
16        Q    Well, let me back up then and ask you when
17   you went to that grand jury proceeding where Mr.
18   DeMattia was asking you questions, do you remember
19   being sworn under oath like they swore you here today?
20   A    Uh-huh.
21        Q    And they swore you under oath to tell the
22   truth, the whole truth and nothing but the truth,
23   correct?
24   A    Uh-huh.
25             THE COURT:  Please try to respond to any of
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 65

Wright - Cross                                            128

```
 1   the questions verbally because we don't -- it's hard to
 2   get the uh-huhs or things like that.  Okay?
 3   BY MR. GORDON:
 4       Q    Now, so you don't recall giving -- giving Mr.
 5   DeMattia an answer to the question did you witness
 6   anything that appeared to be confrontation or a fight,
 7   you don't recall as you sit here today that you told
 8   the Essex County Grand Jury no?
 9       A    I don't know.  I was scared.  That day I was
10   nervous.  I don't -- I don't -- I was nervous.  I'm
11   nervous now.
12       Q    Were you under subpoena at the Essex County
13   Grand Jury to appear there?
14       A    Yes.
15       Q    And did somebody bring you there like
16   somebody brought you here today?
17       A    Did they pick me up to bring me?  I believe they
18   did pick me up.
19       Q    Someone from the Prosecutor's Office came and
20   got you, true?
21       A    Oh, my God.  I believe they did come and get me.
22       Q    By the way, you mentioned earlier that the
23   first contact you had with law enforcement after the
24   shooting was Ben Powell came to your house, is that
25   correct?
```

Wright - Cross                                            129

```
 1       A    Yes.
 2       Q    And he came with another law enforcement
 3   officer?
 4       A    Uh-huh.
 5       Q    And did he discuss with you the fact that he
 6   believed you had information for him, or was he coming
 7   there because you called him?
 8       A    No, I didn't call him.
 9       Q    You never called Ben Powell to come to your
10   house, did you?
11       A    No.
12       Q    And when he came to your house did you know
13   Ben Powell from before that?
14       A    I didn't know him know him, but I knew that he
15   worked in the Prosecutor's Office.
16       Q    You did know that, didn't you?
17       A    Yes.
18       Q    When he came to your house.  Had you ever had
19   any discussions with him or dealings with him face-to-
20   face before that time?
21       A    No.
22       Q    But when he came to your house you recognized
23   him.  Did you let him in?
24       A    I wasn't home and he came back.
25       Q    Well, he came back and at some point you were
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

Wright - Cross                                        130

```
 1    home, right?
 2    A    I was on the porch and he came and talked to me on
 3    the porch.
 4    Q        Right.  And did he only talk to you at your
 5    house, or did he ask you to come to the Essex County
 6    Prosecutor's Office at some point?
 7    A    He came and got me and brought me down there.
 8    Q        Let's talk about that for a minute.  You were
 9    on the porch and he came and got you, true?
10    A    No, he was talking to me.  He didn't take me that
11    day.
12    Q        So --
13    A    He didn't take me that day.
14    Q        Okay.  So the first day he just came and
15    talked to you, right?
16    A    Uh-huh.
17    Q        Approximately how long did that talk take?
18    A    Maybe 10, 15 minutes at most.
19    Q        And did he ask you if you had been at
20    Roland's that night?
21    A    He knew.
22    Q        Do you know as you sit here today that Ben
23    Powell knew that you were at Roland's?
24    A    No.
25    Q        Well, you say he knew.  Did he talk to you
```

Wright - Cross                                        131

```
 1    like he knew?
 2    A    Well, once he came to see me and was talking to me
 3    it came up and he asked me was I down there and I said
 4    yes.  After that he was just coming to my house.
 5    Q        You felt pressure from Ben Powell at that
 6    point?
 7    A    No.
 8    Q        Were you uncomfortable with the fact that he
 9    was coming to your house?
10    A    I mean who wants a cop coming to their house?
11    Q        So you felt some -- some discomfort with
12    that, right?
13    A    (No verbal response)
14    Q        Now, when he was there the first time did he
15    discuss with you that he wanted you to come to his
16    office, to the Essex County Prosecutor's Office, to
17    talk more?
18    A    Yes.
19    Q        And did you set a date and time at that time,
20    or did that come later?
21    A    I really don't remember if we set a date at --
22    No, I don't recall.
23    Q        On some date after that he came back to pick
24    you up and take you to the Prosecutor's Office, right?
25    A    Yes.
```

# STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

Wright - Cross                                     132

```
 1         Q     Do you recall now as you sit here was that a
 2   day later or a week later?  Approximately how long?
 3         A     I don't know.  I don't know.  I don't -- I don't
 4   know how long after it was.
 5         Q     When he came to talk to you on the porch that
 6   day was that the day that you put your signature on the
 7   back of that picture, or was that the next time?
 8         A     That wasn't the day.  I don't think I came down
 9   here with them that day.
10         Q     So as you sit here today is it -- is it your
11   best recollection that when you went the second time
12   that's when he showed you a picture of Naeem?
13         A     Yes.  No, that was -- that was the first time
14   coming down here, but that wasn't the first time that I
15   seen him or talked to him.
16         Q     Okay.  Let's try to be clear so the jury
17   understands.  He came to your house and you were on the
18   porch, right?
19         A     Uh-huh.
20         Q     And he talked to you about the December 16th
21   events, right?
22         A     Yes.
23         Q     And he wanted you to come to his office, to
24   the Prosecutor's Office, at some point, right?
25         A     Uh-huh.  Yes.
```

Wright - Cross                                     133

```
 1         Q     That day did he show you a photograph or no?
 2         A     That day?  No.
 3         Q     No?
 4         A     I don't -- I don't --  No, I didn't see that
 5   photograph until I got -- until they, you know, brought
 6   me here down to the Prosecutor's Office.
 7         Q     Okay.  And now you don't remember how many
 8   days passed, right?
 9         A     I don't know.
10         Q     Until you came down.
11         A     No.
12         Q     But at some point they came and picked you
13   up, right?
14         A     Yes.
15         Q     And they brought you down here to their
16   office.  You think they showed you the photo that day?
17         A     Yes.
18         Q     Now, between December 16th of 2001 and the
19   date that you came down to the Prosecutor's Office, had
20   you had any discussion with anyone about the fact that
21   you thought you had seen Naeem outside of Roland's that
22   night?
23         A     Say that again?
24         Q     Did you tell anybody during that time period
25   between December 16th and the time that Ben Powell
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 68

Wright - Cross                    134

1   showed up on your porch -- let's talk about that period
2   -- did you tell anyone that you had seen Naeem that
3   night in front of Roland's bar?
4   A    No.
5        Q    By the way, do you know somebody by the name
6   of Stacy Davis?
7   A    I don't know him.  I don't know him.
8        Q    Well, maybe I'm using the wrong word, know.
9   Are you aware of the existence of a person by the name
10  of Stacy Davis?
11  A    Yes.
12       Q    On December 16th of 2001 were you aware of
13  the existence of a person by the name of Stacy Davis?
14  A    Yes.
15       Q    Had you ever spoken to him prior to that
16  date?
17  A    No.
18       Q    Since that date of December 16th, 2001 have
19  you ever spoken with Stacy Davis?
20  A    No.
21       Q    Have you had any communication with him of
22  any kind?
23  A    No.
24       Q    Now, I want to bring you back again when you
25  came to the Prosecutor's Office with Ben Powell and you

Wright - Cross                    135

1   were interviewed, you did not give a written statement,
2   correct?
3   A    I didn't.
4        Q    He showed you a photograph of Naeem and you
5   signed the back of it.
6   A    He asked me --
7        Q    True?
8   A    Yes.
9        Q    Did you have any contact with Ben Powell, or
10  anyone from the Prosecutor's Office between that date
11  and when you got your subpoena to come before the Essex
12  County Grand Jury?
13  A    No.
14       Q    On December 16th of 2001 you testified
15  earlier you knew, or you were aware of the existence of
16  Timothy Phillips?
17  A    Pardon?
18       Q    You knew Timothy Phillips was, right?
19  A    Oh, yes, I know who he is.
20       Q    And did you know his brother Kevin?
21  A    Yes.
22       Q    Would you see them at any time prior to
23  December 16th, 2001 in Roland's?
24  A    Yes.
25       Q    Is it fair to say that you were a regular in

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 69

Wright - Cross                                    136

```
 1   Roland's?
 2   A    Yes.
 3        Q    And they were regulars in Roland's?
 4   A    Somewhat.
 5        Q    Somewhat?  That's fair to say.  Somewhat you
 6   would see them there?  Now, was there a time that
 7   between December 16th, 2001 and the time that you spoke
 8   to Ben Powell for the first time on the porch that you
 9   had any discussion with any member of Timothy's family
10   about the shooting?
11   A    No.
12        Q    Right up until today have you had any
13   discussion with anyone in Timothy's family about the
14   shooting?
15   A    No.
16        Q    Did you see anybody here today in the
17   building from Timothy's family?
18   A    Yes.
19        Q    And you knew them, right?
20   A    Yes.
21        Q    And you spoke to them outside in the hallway
22   at all?
23   A    Yes.
24        Q    Was that this morning?
25   A    Yes.
```

Wright - Cross                                    137

```
 1        Q    Before you saw those people this morning had
 2   you talked to any of them since the date of the
 3   shooting?
 4   A    No.
 5        Q    Now, when you spoke to Ben Powell did he tell
 6   you how he found out that you were at Roland's that
 7   night?
 8        MR. DeMATTIA:  Well, Judge, that would have
 9   to be hearsay, first of all.
10        MR. GORDON:  I didn't ask what he said.  I
11   asked did she -- did he tell her how he found out?
12        THE WITNESS:  No.
13        MR. DeMATTIA:  That would be asking for --
14        THE WITNESS:  No.
15        MR. DeMATTIA:  All right.
16        THE COURT:  Wait a minute now.  When somebody
17   objects you have to stop answering.
18        MR. DeMATTIA:  A response based on hearsay,
19   that's my objection, Judge.
20        THE COURT:  Well, it's certainly an out-of-
21   court statement, but I assume it's --
22        MR. GORDON:  It's not offered for its truth,
23   Your Honor.
24        THE COURT:  -- not offered for its truth, so
25   I'll allow it.
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 70

```
                        Wright - Cross                    138
 1              MR. DeMATTIA:  May I inquire what it's
 2    offered for then, Judge?
 3              THE COURT:  What -- what the witness knew.
 4    Objection is overruled.  Please continue.
 5    BY MR. GORDON:
 6        Q     Did Ben Powell tell you when he saw you on
 7    the porch how -- don't tell us how, if he did -- but
 8    did he tell you how he knew you were at Roland's bar?
 9        A     No.
10        Q     Now, you said before that when you first
11    stepped out of the bar -- Well, I'll withdraw that,
12    Your Honor.  Let me ask you this.  When you stepped out
13    of that bar door that night, Ms. Wright, were there
14    other people other than Naeem and other than the people
15    that were on the ground, were there other people
16    outside on the sidewalk?
17        A     There was a couple of people outside.
18        Q     Well, when you say a couple of people
19    let's --
20        A     Well, maybe five -- four, five people, something
21    like that, around that.
22        Q     So it's your testimony now that when you got
23    out of that bar --
24        A     It might have been a little more than that.
25        Q     Well, let's try to get at the truth, Ms.
```

```
                        Wright - Cross                    139
 1    Wright.  Try to remember --
 2              MR. DeMATTIA:  Objection, Judge, as to that
 3    characterization, Judge, truth.
 4              THE COURT:  Sustained.  Sustained.
 5              MR. GORDON:  I'll withdraw that, Your Honor.
 6    BY MR. GORDON:
 7        Q     Give us your best estimate now for the jury,
 8    when you stepped out of Roland's bar how many people,
 9    other than Naeem or the people that were on the ground,
10    did you see on the sidewalk?
11        A     On the sidewalk?
12        Q     Yes.
13        A     I would say four.
14        Q     And did you see any people in the street in
15    the immediate area in front of Roland's?
16        A     No.
17        Q     Were there cars parked out there on Bergen
18    Street that night?
19        A     It was -- it was -- that I recall there was a
20    crowd there.  It was --  I believe there was a crowd
21    there.
22        Q     Were you able to see across the street to the
23    area where Fong's Chinese restaurant was open?
24        A     Yes.
25        Q     There were some people over there, too,
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 71

Wright - Cross                                    140

```
 1    right?
 2    A    No, not outside.
 3         Q    So really the only people you saw out there
 4    that night when you stepped out were about four or
 5    five, give or take, people.
 6    A    Yes.
 7         Q    All right.  You said you heard shots.  Did
 8    anybody -- Could you see anyone else running at the
 9    time the shots were fired?
10    A    Yes.  Yes.
11         Q    Okay.  At the time the shots were fired you
12    were still inside the bar, right?
13    A    Yes.
14         Q    And so where was it that you saw people
15    running?
16    A    Outside the bar.
17         Q    So it's your testimony now that you were
18    coming out of the door looking through the door?
19    A    I was on my way out the door.  Okay?  When I was
20    standing by the door you could hear the gunshots.  The
21    last shot that I heard then I'm coming out.  I'm ready
22    to get out the bar now, I'm ready to go home.
23         Q    So you just said that some people were
24    running, right?
25    A    Yes, outside the bar.
```

Wright - Cross                                    141

```
 1         Q    Okay.  How many people did you see running?
 2    A    I mean, people was running different directions.
 3    I would say like --
 4         Q    I'm sorry.
 5    A    -- three -- two or three different people.
 6         Q    Okay.  Are those two or three people part of
 7    the four people you told the jury about a minute ago or
 8    those are different?
 9    A    No, no.
10         Q    So two or three people were running and there
11    were another few people, maybe four five, not running
12    but standing in the sidewalk area?
13    A    Yes.
14         Q    Now, so is it safe to say then that it was a
15    simultaneous event, the gunshots, then you saw people
16    running?  It was like right away?
17    A    I can't -- Say that again, sir?
18         Q    You heard the gunshots and then, since you
19    were just coming out of the bar, you saw people
20    starting to run.
21    A    Yes.  I wasn't the only one who came out of the
22    bar.  The people who was, you know what I'm saying,
23    running, too, I'm not sure if they was already outside,
24    did they come out the bar behind me?  A couple of
25    people came out the bar.
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 72

Wright - Cross                                      142

```
 1        Q    Okay.  Well, let's try to be clear about
 2   this.  You were stepping out the door.  There were some
 3   people behind you, right?
 4        A    Of course, yes.
 5        Q    And there were some people directly in front
 6   of you who were just leaving, also, right?
 7        A    Yes, maybe one or two, if that.
 8        Q    Okay.  So those one or two people were in
 9   front of you, there were some people on the sidewalk,
10   and some people were also running, right?
11        A    No, see, I'm telling you the people that I seen
12   running the opposite way, I don't know if them the same
13   people came out the bar with me, you know what I'm
14   saying?
15        Q    When you say the opposite way which direction
16   are you talking about?
17        A    We're not talking of Scheerer now.
18        Q    Well, when you step out of that bar to the
19   left is Scheerer and to the right is Renner, right?
20        A    To the left is Scheerer, to the right is Renner.
21        Q    Both those streets intersect and cross
22   Bergen, right?
23        A    Uh-huh.
24        Q    So some people were running in the direction
25   of Bergen, right?
```

Wright - Cross                                      143

```
 1        A    Yes.
 2        Q    Now, you indicated that the lighting out
 3   there was pretty good.  There was some lighting in
 4   front of Roland's that night.  You said you saw Naeem
 5   running --  When you first laid eyes on him did you say
 6   he was approximately as far back as that door?
 7        A    About as far as the door.
 8        Q    Okay.  So -- so we're clear --  By the way,
 9   do you wear glasses?
10        A    No, I don't.
11        Q    You don't need glasses for vision at night,
12   do you?
13        A    No, I don't.
14        Q    So when you saw Naeem were you just near the
15   door of the bar?
16        A    I was outside the door.
17        Q    How many steps out of the door?
18        A    Like maybe three, four steps out the door.
19        Q    And then you looked and saw Naeem.  So in
20   relationship to Fong's, is Fong's directly across the
21   street from the bar?
22        A    Uh-huh.  Uh-huh.  Yes, it is.
23        Q    Okay.  So you're on the sidewalk on the other
24   side of Bergen.  Bergen is two lanes in both
25   directions, right?
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

```
                        Wright - Cross                    144
1     A     Uh-huh.  Yes.
2           Q     And you first laid eyes on Naeem when he was
3     approximately this far from you, right?
4     A     Yes.
5           Q     And he was running.
6     A     Yes.
7           Q     Was he running towards you?
8     A     No.
9           Q     Was he running towards Renner, to your right?
10    A     No.
11          Q     Was he running towards Scheerer to your left?
12    A     Yes.
13          Q     And so was he turned this way to be running,
14    or was he turned toward Fong's or towards you?
15    A     He was -- you would see the side and the back of
16    him.
17          Q     Excuse me?
18    A     You would see the back and the side --  You know,
19    I could see the side of his face.
20          Q     So, where you are now is a couple -- two or
21    three steps outside the door of Roland's, Renner is
22    this way, Scheerer is this way, right?
23    A     Yes.
24          Q     You see a person that you think is Naeem and
25    he's turned somewhat sideways to you.
```

```
                        Wright - Cross                    145
1     A     Yes.
2           Q     Profile.
3     A     Uh-huh.
4           Q     Okay?  Right?
5     A     Yes.  Yes.
6           Q     And he's running, right?
7     A     Yes.
8           Q     And right here when you see him running
9     that's the front of Fong's Chinese restaurant, all the
10    way over here, right?  Or no?
11    A     Say -- say that again?
12          Q     Well, you just said Fong's is directly across
13    from --
14    A     Right in front of you.
15          Q     -- where you're coming out, right?
16    A     Yes.
17          Q     Okay.  And Fong's has a front door that faces
18    on Bergen, right?
19    A     Yes.
20          Q     And so when you first saw that person
21    running, were they -- if you were looking at them but
22    directly behind them, would you see Fong's, or was that
23    person away from the front of Fong's?
24    A     Past Fong's.
25          Q     Past.  Do you know what's next to Fong's over
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 74

Wright - Cross                                        146

1    here as we get towards Scheerer?
2    A    Uh-huh.
3         Q    What's over there?
4    A    Insurance company.
5         Q    If you were looking beyond the person you saw
6    running is the insurance company there or something
7    else?
8    A    It's an insurance company.
9         Q    So --
10   A    It's the insurance company and church together,
11   like you know --
12        Q    So when you looked after you stepped out of
13   Roland's and you saw the person you think was Naeem and
14   he was turned sideways to you, just beyond that person
15   is that the insurance company now, or is it something
16   else?
17   A    It's the insurance company.
18        Q    Okay.  The person you saw --
19   A    -- and --
20        Q    -- running --
21   A    Go ahead.
22        Q    -- was running, and when you first laid eyes
23   on them and they were in front of the -- front of the
24   insurance company, right?
25   A    Just about in that area, around that.

Wright - Cross                                        147

1         Q    And was that person jogging or were they
2    running fast?
3    A    Running and jogging is what?  It was --
4         Q    Well, jogging is a little bit slower and
5    running is running.  Which do you remember?  Tell the
6    jury.
7    A    I don't know.
8         Q    You don't know?
9    A    No.  I seen Naeem running -- just running.
10        Q    Describe the shirt that the person that you
11   saw had on.
12   A    Huh?
13        Q    The shirt, what did the shirt look like?  Or
14   the top -- the jacket or the shirt?
15   A    What are you talking about, now?
16        Q    That night when you stepped out of Roland's
17   when you saw a person running in front of the area of
18   the insurance company towards Scheerer did you see
19   their clothing?
20   A    I don't recall what they was wearing.
21        Q    Do you recall if they had on a jacket?
22   A    It's been four years.  Yes, I'm quite sure.  I'm
23   quite sure he had a jacket.  It was cold.
24        Q    Well, I'm not asking you to --
25   A    But I don't recall what kind of jacket or if they

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 75

```
                        Wright - Cross                       148
 1    had it on.  I don't -- I don't know.  I don't know.
 2         Q    Okay.  Well, do you recall that it did appear
 3    to be a jacket or don't you know?
 4    A    I don't know.  I don't know.
 5         Q    Do you recall if you were able --
 6    A    I don't recall nothing.
 7         Q    Do you recall if you were able to see the
 8    pants, if any, that the person you saw over here in
 9    front of the insurance company was wearing?
10    A    Why would I be looking at somebody's clothes when
11    they're trying to get away from somewhere?
12         Q    So is the answer no, you don't remember?
13    A    I don't -- No, no.
14         Q    By the way, when you were stepping out of the
15    bar, when you looked over here and saw this person
16    turned sideways, were there any other people either on
17    the street, on Bergen or on the sidewalk, in that -- in
18    that area in front of you at that time?
19    A    What do you mean, over by the insurance company?
20         Q    No, over by you.
21    A    By me?  Yes, there was people out there.
22         Q    Some of those people were some of the people
23    who were out there when the shots were fired, right?
24    A    I have no idea if they was out there when shots
25    were fired.  I wasn't out there.
```

```
                        Wright - Cross                       149
 1         Q    Okay.  Well, let's -- let's focus in on that
 2    time frame for a minute.  How long between the time
 3    that you heard the last shot that you heard and the
 4    time that you stepped through the door onto the
 5    sidewalk?
 6    A    Maybe not even what, 10 seconds -- 10 seconds at
 7    the most.
 8         Q    Well, if you remember -- if you don't that's
 9    fine, just tell us -- but let's try to be more
10    specific.  Was it 10 seconds or was it 15 seconds?
11    A    I'm giving you 10 to 15 seconds after the last
12    shot that I heard is when I left out.
13         Q    Okay.  So you heard the last shot, 10 to 15
14    seconds go by, you still haven't gotten out that door,
15    right?
16    A    No.
17         Q    Am I correct?
18    A    Ten to 15 seconds is when I left out the door.  I
19    would say 15 seconds, then I left out.  Oh, God.
20         Q    So after that last shot 15 seconds go by,
21    then you step through the door, right?
22    A    Yes.
23         Q    And then did you immediately look and see a
24    person in front of the insurance who were running, or
25    was there some period of time that transpired first?
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

Wright - Cross                                        150

```
 1    A      When I walked out the bar is when I seen Timothy
 2    first, then looked up and seen the person running.
 3           Q      Okay.  So you said you saw Timothy first.
 4    Timothy was much closer to you, right?
 5    A      Yes.
 6           Q      Timothy was laying in the area of the curb,
 7    right?
 8    A      Yes.
 9           Q      The curb in front of Roland's, right?
10    A      Yes.
11           Q      So Timothy was more closer to you like -- up
12    like this on you, right?  Somewhere in this area?  How
13    far were you from Timothy when you first saw him?
14    A      Maybe from here to the table.
15           Q      This table in front of you, the counsel
16    table?
17    A      Yes, I would say so.  I would say so.
18           Q      Okay.  So approximately 15 feet, that's fair
19    to say?
20    A      I would say so, yes.
21           Q      And when you first laid eyes on him lying
22    down were you surprised?
23    A      I didn't know if he was dead or not and I wasn't
24    trying to find out.
25           Q      Okay.  Well, but you saw him down there and
```

Wright - Cross                                        151

```
 1    your eyes went to him.
 2    A      Yes.
 3           Q      And you looked at him, right?
 4    A      Yes.
 5           Q      Could you tell that he was injured at that
 6    time?
 7    A      Yes.
 8           Q      And you could tell that by seeing the wound.
 9    You could see that he was wounded.
10    A      Blood, everything, yes.
11           Q      Did you see Stacy Davis that night?
12    A      That night, yes.
13           Q      Did you see him in the bar?
14    A      Yes, I did -- No, no, I didn't see him in the bar
15    because I didn't know who he was.  I don't know him.
16           Q      Well, as you sit here --
17    A      I don't know him.
18           Q      Okay.  Well --
19    A      I've seen him after this incident, but in the bar
20    that night I don't recall seeing him in the bar.  You
21    know, there's plenty of people in a bar you don't know,
22    you're not going to, you know?
23           Q      Sure.  You -- you said you saw Stacy Davis
24    since this incident.
25    A      Yes.
```

**Elite Transcripts, Inc.**
14 Boonton Avenue, Butler, New Jersey  07405
973-283-0196 FAX 973-492-2927

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 77

Wright - Cross                                    152

```
1        Q    How many times?
2    A   Once.
3        Q    Where?
4    A   At -- at the jury.
5        Q    At the grand jury, is that correct?
6    A   Yes.
7        Q    When you testified before the Essex County
8    Grand Jury back on May 9th of 2003?
9    A   Yes.
10       Q    Did you speak to him at that time?
11   A   No.  I don't know him.
12       Q    Okay.  And --  But now you saw him in front
13   of the grand jury there.  Can you tell the jury on
14   December 16th of 2001 did you see him that night?
15   A   I don't recall his face.  I don't.  I don't recall
16   his face.  If he was to walk in here right now I don't
17   know who he is.  I don't recall his face.
18       Q    So did you see another person who was down on
19   the ground other than Timothy?
20   A   Was he on the ground?  I don't recall him being on
21   the ground either.
22       Q    Well, did you see another person either
23   sitting or looking like they had been injured?
24   A   Yes, because he --  Yes.
25       Q    Where was that person?
```

Wright - Cross                                    153

```
1    A   He was standing against the -- the --  It's a
2    store with a gate next to the -- the bar.  I seen this
3    guy standing there.  Now, if it was Stacy I don't know
4    for sure.
5        Q    Well, did that person appear to be injured as
6    well?
7    A   Not to me.
8        Q    Okay.  So --
9    A   At the time.
10       Q    I'm sorry.  Go ahead.
11   A   Not to me he didn't look injured.
12       Q    So just so we're clear for the jury, the only
13   person you saw when you stepped out of the bar that
14   appeared injured was Timothy.
15   A   Yes.
16       Q    And so you looked at Timothy.  Did you take
17   any steps towards Timothy at that time?
18   A   No.
19       Q    Okay.  Did you try to take steps away from
20   Timothy at that time?
21   A   I'm trying to get home.
22       Q    So you wanted to get out of there.
23   A   Yes.
24       Q    And did you start to walk in one direction or
25   the other?
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 78

Wright - Cross                                            154

1   A     Straight across.  Straight in front of me, home,
2   going home.
3         Q     So you were going towards Custer?
4   A     Yes.
5         Q     And you were walking across?
6   A     I walked right out the bar, in a round -- out into
7   the street and up to Custer.
8         Q     So you turned to the right or to the left to
9   go home after you go straight?
10  A     I have to go to my right.
11        Q     But did you cross to where Fong's was?
12  A     I didn't go all the way on the sidewalk, no.
13        Q     Did you get into the --
14  A     Diagonally cross the street.  Huh?
15        Q     I'm sorry.  Go ahead.
16  A     Diagonally walk right across the street, right
17  into the street and straight across.  I didn't go like
18  right directly into Fong's.
19        Q     And you were going to your right.
20  A     Yes.
21        Q     And you got --  So you started going towards
22  Fong's, but then you angled diagonally.
23  A     Yes.
24        Q     Eventually did you get on the sidewalk, on
25  the same side of the street as Fong's?

Wright - Cross                                            155

1   A     Not where Fong's at, across Renner on that -- the
2   next sidewalk, yes.
3         Q     All right.  So you -- you were quite a bit
4   down before you actually got on the sidewalk.
5   A     Yes.
6         Q     All right.  I want to bring you back now for
7   a minute to when you first stepped out of the bar again
8   and ask you, you looked at Timothy on the ground.
9   A     Uh-huh.
10        Q     And you -- you made a decision in your mind
11  that you didn't want to go to him, you wanted to get
12  out of there.
13  A     Yes.
14        Q     True?
15  A     Yes.
16        Q     But somewhere in-between that time that's the
17  time that you looked across the street and could see a
18  person running.
19  A     Yes.
20        Q     Right?  And, again, we're talking about
21  somebody that was that far back.  Now, by the way, that
22  night you couldn't see the clothing.  Could you see
23  what the hair looked like of the person?
24  A     Yes, you could see the dreads.
25        Q     It was dreads?

**STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005**

Wright - Cross                                    156

1    A      Yes.
2           Q      Were there any other people around that night
3    that had dreads in their hair?
4    A      Everybody got dreads there -- around there.
5           Q      Everybody got dreads, don't they?
6    A      Yes.
7           Q      Back in 2001.  What about twists?  Is that
8    different than dreads?
9    A      No, there's no difference.
10          Q      Kind of the same thing, just maybe a little
11   different length, right?
12   A      Uh-huh.
13          Q      So everybody had dreads.  So you indicated
14   from that distance -- and just so we're clear -- you
15   saw an automatic, you said, right?  True?
16   A      Yes.
17          Q      The automatic you said was black, right, a
18   dark color?
19   A      A dark color.
20          Q      The person that had the gun in their hand,
21   was it their right hand or their left hand?
22   A      Right.
23          Q      Are you sure?
24   A      Positive.
25          Q      So as they're turned this way running in

Wright - Cross                                    157

1    front of the insurance company toward Scheerer Avenue
2    the gun is in their right hand, correct?
3    A      Yes.
4           Q      And how do you know it wasn't a revolver?
5    A      Because I know what a revolver look like.
6           Q      What's the difference between a revolver and
7    an automatic?
8    A      A revolver have a -- a revolver, wheel, and an
9    automatic have a clip.
10          Q      Okay.  How big is a clip on an automatic?
11   You could show us with your hands, okay?
12   A      Maybe like this.
13          Q      And the clip, that's where the ammunition
14   goes, right?
15   A      Yes.
16          Q      You're familiar enough with guns to know that
17   clip goes into the gun somewhere, right?
18   A      Yes.
19          Q      The clip goes into the bottom of the butt of
20   the gun, right?
21   A      Yes.
22          Q      That's on an automatic, right?  On a revolver
23   the bullets are placed in and then the middle of the
24   gun spins, right?
25   A      Yes.

**STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005**

SHEET 80

```
                            Wright - Cross                    158
 1          Q      And that part where the gun spins, show the
 2    jury, how big is that part on a revolver?
 3    A    huh?
 4          Q      How big is the part that spins on a revolver?
 5          MR. DeMATTIA:  Well, Judge, I have to object
 6    because there's many different types of guns and -- and
 7    I don't believe that she should be put in the position
 8    to say what a revolver that wasn't involved in this
 9    incident looks like.
10          THE WITNESS:  I'm ready to go.
11          THE COURT:  Overruled.
12          MR. GORDON:  She said she's very familiar.
13          THE COURT:  Overruled.  You can answer the
14    question.
15          THE WITNESS:  He wants to know how big is a
16    barrel on a -- on a revolver?  That's what you want to
17    know?
18    BY MR. GORDON:
19          Q      Not the barrel, the part where you put the
20    bullets in.
21    A    What, the holes?
22          Q      The thing that spins in the middle.
23    A    That's a barrel, ain't it?  It's round like this?
24          Q      Okay.  So the thing that distinguishes, in
25    your experience, the automatic from the revolver, the
```

```
                            Wright - Cross                    159
 1    one has something about this big, right?  That's the
 2    revolver, right?
 3    A    Uh-huh.
 4          Q      The thing that goes in the automatic it's a
 5    clip, right?
 6    A    Yes.
 7          Q      Doesn't a clip go into the gun?
 8    A    It don't go into no revolver.
 9          Q      On the automatic.
10    A    Oh, yes, it do.
11          Q      The clip goes into the gun.
12    A    Yes.
13          Q      So if someone were holding an automatic, are
14    you saying that you didn't see the round part that
15    spins on the revolver on the gun you saw?  Is that what
16    you're saying?
17    A    What revolver --  What are you talking about?
18    What revolver?
19          Q      Confused.  Let me try again.  Maybe I
20    confused you.  You knew, because you just told this
21    jury, you saw an automatic weapon in the hand of a
22    person --
23    A    I know what I seen.
24          Q      -- 46 feet away at night, right?
25    A    Uh-huh.
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 81

Wright - Cross                                      160

1    Q    And you knew it was an automatic.  You could
2    tell, right, just because of the shape of the gun?
3    A    Yes.
4    Q    Okay.  And the shape is different than the
5    revolver shape, right?
6    A    Yes.
7    Q    And the reason it's different isn't it
8    because on the revolver you have that spinning middle
9    of the gun where the bullets go in, right, that part
10   that you just told us is this big, right?
11   A    No, not necessarily that.  A revolver have a
12   longer -- you know, have a nose on it.
13   Q    Okay.  A longer nose.  You mean where the
14   bullet comes out?
15   A    It -- it have a -- a revolver have a snout on it
16   like a nose on it.
17   Q    Okay.  And the automatic has what?
18   A    Is -- it's more squarer, you know?
19   Q    So you were able to see that the gun that you
20   saw was more square and not as what?
21   A    And not as long.  It's not as long as -- the nose
22   wasn't longer on it.
23   Q    Okay.  So when the person that you saw with
24   the gun in their hand, their right hand, running like
25   this across that street, you could tell as they ran

Wright - Cross                                      161

1    that that gun was more square than a revolver.
2    A    Yes.
3    Q    Is that what you're telling this jury?
4    A    That's what I'm telling you.
5    Q    But the jacket you don't know.
6    A    I don't recall no jacket or none of that.
7    Q    Well, is it possible that the person who was
8    running didn't have a jacket?
9    A    I don't know.  Maybe it is possible --
10   Q    You don't even know that, do you?
11   A    -- that he didn't have a jacket.
12       MR. GORDON:  May I just have a moment, Your
13   Honor?
14       THE COURT:  Sure.
15   BY MR. GORDON:
16   Q    Now, Ms. Wright, after that time that you saw
17   what you saw you left and went home, right?  Is that
18   true?
19   A    Yes.
20   Q    And other than testifying at the grand jury
21   in May of 2003 and coming here to court today you've
22   never testified about any of this, right?
23   A    Never.
24   Q    Is that true?
25   A    That's true.

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 82

```
                    Wright - Cross / Redirect              162
1               MR. GORDON:  Thank you.  I have nothing
2      further, Your Honor.
3               THE COURT:  Redirect?
4      REDIRECT EXAMINATION BY MR. DeMATTIA:
5          Q     But if you didn't know the type of jacket
6      that this individual was wearing, do you know who the
7      individual was running with the gun?
8          A     When I looked up and seen the individual I thought
9      deeply that it was him, and until like, you know, the
10     same night you got everybody you know Naeem did this,
11     you know Naeem did that and --  You know what I'm
12     saying, this is --
13         Q     Well, let me ask you this.  How many --  Once
14     again, I want to establish.  How many times have you
15     seen this person before December 16th, 2001?
16         A     Naeem?  Plenty, plenty of times.
17         Q     Plenty.  Can you give us a number?  I know
18     that might be hard but I'm now in a position where I
19     have to ask you.
20         A     Many, many times.  Many times.  A number?  Many
21     times.
22         Q     Well, a number, thousand?
23         A     Thousands of times.
24         Q     Okay.  Beside Naeem Miller was anyone else
25     running with a gun in their hand, that you saw?
```

```
                    Wright - Redirect                     163
1          A     No.
2          Q     Now, was there enough lighting for you to see
3      anything?
4          A     There was enough --
5      Were you able to see?
6          A     Yes, I could see.
7          Q     Do you wear glasses to see?
8          A     No.
9          Q     Did you ever wear glasses?
10         A     No.
11         Q     Do you need glasses today?
12         A     No.
13         Q     Did you need glasses on the night of December
14     16th, 2001?
15         A     No.
16         Q     With regard to a time frame, you said 10 to
17     15 seconds.  Were you looking at your watch and timing
18     yourself?
19         A     No.
20         Q     Was it an estimate on your part?
21         A     No.
22         Q     Was it an estimate?  Was it a guess?  Was it
23     fact?  I mean, how do you --  You know --
24         A     I mean --
25         Q     You didn't time yourself, did you?
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 83

```
                          Wright - Redirect                    164
 1    A     I paused.  You know, you just pause for a minute.
 2          Q     Okay.  You said you had seen the family of
 3    Timothy Phillips today obviously.
 4    A     Yes.
 5          Q     You said that for Mr. Gordon, correct?
 6    A     Yes.
 7          Q     How did it make you feel?
 8    A     Uncomfortable.
 9          Q     Okay.  Do you see the family for Naeem Miller
10    today?
11    A     Yes.
12          Q     And how does that make you feel?
13    A     Uncomfortable.
14          Q     Where is the family of Naeem Miller today
15    right now?
16    A     To my right.
17          Q     Excuse me?
18    A     To my right.
19          Q     Okay.  Do you recognize the people to your
20    right?
21    A     Yes.
22          Q     Who do you recognize?
23    A     His mom, his brothers, cousins, his sister.
24          Q     How does that make you feel?
25    A     Bad, wrong.
```

```
                    Wright - Redirect / Recross              165
 1          Q     Why?
 2    A     Because I don't want to be here.
 3                MR. DeMATTIA:  No further questions, Your
 4    Honor.
 5                THE COURT:  Mr. Gordon?
 6    RECROSS-EXAMINATION BY MR. GORDON:
 7          Q     Ms. Wright, didn't you just said that people
 8    were saying Naeem did this and Naeem that?  Did you say
 9    that in front of this jury?
10    A     Yes.
11          Q     In fact, you're not sure as you sit here
12    today and when Naeem is on trial that he's the person
13    that you saw that night.  You're not 100 percent, are
14    you?
15    A     When I looked up I -- I said it was him, but then
16    I was sure after, you know, people were saying what
17    they were saying.
18          Q     Okay.  So I think -- correct me if I'm wrong
19    -- but what you're telling this jury is you thought it
20    was Naeem.
21    A     Yes.
22          Q     It could have been Naeem.  You believed it
23    might have been Naeem --
24    A     Uh-huh.
25          Q     -- but later when you heard some other person
```

**STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005**

SHEET 84

Wright - Recross / Redirect                              166

1   from the street say something then in your mind you
2   felt stronger that it was Naeem.  Is that fair to tell
3   these people?
4   A    Yes.  Yes.
5        Q    But prior to hearing whatever you heard,
6   whenever you heard it, you were not 100 percent sure.
7   A    I was --
8        Q    You had a doubt in your mind.
9   A    No.
10       Q    You believed it might have been him but you
11  had a doubt, didn't you?
12  A    It's possible, yes.
13            MR. DeMATTIA:  Nothing further, Your Honor.
14            THE WITNESS:  But I'm not --
15  REDIRECT EXAMINATION BY MR. DeMATTIA:
16       Q    When did this doubt occur, Ms. Wright?  Five
17  seconds ago?
18  A    No.
19       Q    Do you have a doubt that it was Naeem Miller
20  running on the street with the gun that evening?
21  A    No, I was certain it was him, but you -- I don't
22  know.  I don't -- I don't know.
23       Q    And then people on the street started talking
24  also that it was him?
25  A    Yes.

Wright - Redirect / Colloquy                             167

1        Q    As Mr. Gordon said?
2   A    Yes.
3            MR. DeMATTIA:  I have nothing further, Judge.
4            THE COURT:  Mr. Gordon?
5            MR. GORDON:  Your Honor, I'm done with this
6   witness.
7            THE COURT:  Thank you, Ms. Wright.  You're
8   excused.
9            THE WITNESS:  Thank you.
10           THE COURT:  All right, ladies and gentlemen.
11  We're going to take our mid-afternoon break.  We'll see
12  you back here at 3 o'clock.  Remember please do not
13  discuss the case among yourselves or obviously with
14  anyone else.
15                    (Recess)
16           THE COURT:  All right, ladies and gentlemen.
17  We will continue.  Mr. DeMattia, please call your next
18  witness.
19           MR. DeMATTIA:  Detective Murad Muhammad.
20           THE COURT:  Detective Muhammad to the stand,
21  please.  Good afternoon, sir.
22           THE WITNESS:  Good afternoon, Your Honor.
23           THE CLERK:  Raise your right hand, sir.
24  M U R A D   M U H A M M A D,  STATE'S WITNESS, SWORN
25           THE CLERK:  State your name, please?

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

```
                    Muhammad - Direct                 168
 1           THE WITNESS:  Murad Muhammad.
 2           THE COURT:  Mr. DeMattia?
 3   DIRECT EXAMINATION BY MR. DeMATTIA:
 4           Q    Sir, by whom are you employed?
 5   A    City of Newark, the Homicide Squad.
 6           Q    And for how long have you been assigned to
 7   the Homicide Squad?
 8   A    Approximately eight years.
 9           Q    And you're at the rank of detective,
10   Detective Murad Muhammad?
11   A    That's correct.
12           Q    And how long did you say?  I'm sorry.
13   A    About eight years.
14           Q    And before that?
15   A    Going for my 14th year.
16           Q    As a police officer?
17   A    That's correct.
18           Q    What are some of your duties with relation to
19   your position in the Homicide Squad.
20   A    To investigate auto fatalities and deaths of
21   individuals.
22           Q    Did you have occasion to become involved in
23   the investigation of the death of a Mr. Timothy
24   Phillips and a shooting of a Mr. Stacy Davis that
25   occurred on December 16th, 2001 in the vicinity of
```

```
                    Muhammad - Direct                 169
 1   Toby's Lounge, 966 Bergen Street, City of Newark?
 2   A    Yes, that's correct.
 3           Q    Were you assigned to investigate that matter
 4   with anyone from my office?
 5   A    Yes.
 6           Q    And who was that?
 7   A    Investigator Benjamin Powell.
 8           Q    And is Investigator Benjamin Powell available
 9   nowadays?
10   A    No, he's not.
11           Q    What has happened to Investigator Powell?
12   A    Investigator Powell died.
13           Q    As a result of a?
14   A    Car accident.
15           Q    Okay.  After the start of this investigation.
16   A    That's correct.
17           Q    Approximately August of last year?
18   A    Yes.
19           Q    Were you the on-scene investigator at that
20   particular time for this investigation?  Did you arrive
21   there that evening?
22   A    No, I did not.
23           Q    Okay.  You picked it up when, sir?
24   A    On the 17th.
25           Q    When you picked it up on the 17th did you
```

**STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005**

Muhammad - Direct                                    170

```
 1   collaborate with Investigator Powell?
 2   A    Yes.
 3        Q    Okay.  What are some of the things you did
 4   with Investigator Powell with regard to this
 5   investigation?
 6   A    We reviewed reports that were submitted, and we
 7   went to the scene.
 8        Q    Okay.  That was hours later?
 9   A    Yes.
10        Q    And at the scene what did you do?
11   A    We talked to people and we looked to see what the
12   scene looked like.
13        Q    Okay.  Are you familiar with that area?
14   A    Yes.
15        Q    And what is located at 966 Bergen Street?
16   A     A bar called Toby's Lounge.
17        Q    And the streets that are closest to it on
18   each side of the block, let's say?
19   A    Scheerer Avenue and Renner Avenue, I believe.
20        Q    And approximately how far is the intersection
21   of Nye Avenue and Goodwin Avenue from that location, if
22   you know?
23   A    Approximately three -- three to four blocks.
24        Q    And how about Huntington Terrace?
25   A    About the same, two or three blocks.
```

Muhammad - Direct                                    171

```
 1        Q    When you went to that area, you say with
 2   Detective Powell, you weren't able to get any
 3   identifications of any suspects, were you?
 4   A    No.
 5        Q    Did you ever talk to the brother of the
 6   decedent, Mr. Timothy Phillips?  I guess his name is
 7   Rubin Phillips, or Kevin Rubin Phillips?
 8   A    Yes.
 9        Q    Was he able to make the identification of
10   anyone who was responsible for the shooting?
11   A    No.
12        Q    Did there come a time when you responded to
13   the hospital where the surviving victim, Mr. Davis, had
14   been taken and questioned him on December 18th, 2001?
15   A    Yes.
16        Q    He was not able to make an identification at
17   that time, was he?
18   A    No, he was not.
19        Q    What was his condition at that time?
20   A    He had suffered a gunshot wound to the left leg
21   and he was in some pain.
22        Q    Now, did there come a time when through you
23   and your efforts and Investigator Powell's efforts that
24   you approached a Superior Court judge for a warrant in
25   this matter?
```

## STATE OF NEW JERSEY v NAEEM MILLER — March 23, 2005

Muhammad - Direct                                          172

```
 1    A    Yes.
 2         Q    And was that on January 18th of 2002?
 3    A    I believe so.
 4         Q    And yourself and Ben Powell went to the court
 5    of Judge Fullilove for what purposes?
 6    A    For arrest warrants.
 7         Q    For which individual?
 8    A    Naeem Miller.
 9         Q    And upon getting that arrest warrant in
10    January, January 18th of 2002, what did you do?
11    A    We went looking for the suspect.
12         Q    When you say you went looking for the suspect
13    what efforts did you make?
14    A    We went to try and take him into custody at a
15    location that we knew that he probably resided at.
16         Q    And what was that?
17    A    46 Goodwin Avenue, I believe.
18         Q    And is that near the intersection of Goodwin
19    Avenue and Nye Avenue in the City of Newark?
20    A    Yes.
21         Q    And were you able to locate Mr. Miller at
22    that time?
23    A    No.
24         Q    Okay.  Did you speak to anyone?
25    A    Yes.
```

Muhammad - Direct                                          173

```
 1         Q    Who did you speak to?
 2    A    I spoke to his brother and his parents.
 3         Q    And what did you tell them?
 4    A    Told them that we had arrest warrants for Mr.
 5    Miller and also the circumstances of the arrest
 6    warrant.
 7         Q    Okay.  Did you tell them what the arrest
 8    warrant was for?
 9    A    Absolutely.
10         Q    Did you go anywhere else to locate Mr.
11    Miller?
12    A    Yes, we did.
13         Q    Where?
14    A    We went to a location I believe it was in East
15    Orange, and then the neighborhood.
16         Q    Okay.  How many times did you attempt to
17    canvas areas to locate Mr. Miller?
18    A    Several.
19         Q    When that homicide warrant was secured and
20    there is a suspect not arrested yet do you do anything
21    with regard to your search with that warrant?  Do you
22    place it in any computer?
23    A    Yes, we do.
24         Q    Explain to the jury what you mean by that.
25    A    When you're looking for a suspect who's wanted you
```

## STATE OF NEW JERSEY v NAEEM MILLER — March 23, 2005

Muhammad - Direct                                     174

```
 1    put him into a system, it's NCI/SCI.  It's a national
 2    and state system that notifies all other agencies in
 3    cities and in states for the suspect.
 4        Q     And did you do that with regard to this
 5    homicide warrant for Mr. Miller?
 6    A    Yes, we did.
 7        Q     Did you also prepare anything to disseminate
 8    in the immediate neighborhood of the location of where
 9    Mr. Miller's residence was?
10    A    Yes.
11            MR. DeMATTIA:  Your Honor, it's been marked
12    S-3 for identification.
13    BY MR. DeMATTIA:
14        Q     I want to show you what's been marked S-3 for
15    identification.  Do you recognize that?
16    A    Yes.
17        Q     What is it?
18    A    It's a wanted poster.
19        Q     Does -- does it have the picture of any
20    particular individual?
21    A    Yes, it does.
22        Q     Who?
23    A    Naeem Miller.
24        Q     Okay.  Do you see Naeem Miller in court
25    today?
```

Muhammad - Direct                                     175

```
 1    A    Yes, I do.
 2        Q     Can you point and describe what he's wearing?
 3    A    The gentleman over to my right in the black
 4    sweater with the t-shirt that's colored white.
 5            THE COURT:  Indicating the defendant.
 6    BY MR. DeMATTIA:
 7        Q     Does he look -- today does he look like that
 8    picture you put in the wanted poster?
 9    A    Similar, yes.
10        Q     What's different?
11    A    The beard and the afro.  He has a low haircut in
12    this flyer.  It has braids.
13        Q     Long?
14    A    Short -- short braids.
15        Q     What did you do with that?
16    A    Well, what we did with this here we -- we put it
17    out on cars, we put it out on the immediate area of the
18    house where he resided at and in Bergen Street where
19    the incident occurred.
20        Q     Did you give it to any people?
21    A    Yes, I did.
22        Q     Do you recall what people you gave it to?
23    A    Just people in the area.
24        Q     What area?
25    A    Huntington Terrace, Shephard, Renner, Bergen
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 89

```
                    Muhammad - Direct                    176
 1   Street, and where he live at.
 2        Q    Did you contact any out-of-state locales in
 3   order to attempt to find him?
 4   A    Yes, we did.
 5        Q    Which locales were they?
 6   A    I believe it was North Carolina and Pennsylvania.
 7        Q    Any others?
 8   A    I can't recall.
 9        Q    Were you able to locate him at that point?
10   A    No.
11        Q    How many times would you say you visited that
12   area in an attempt to locate Mr. Miller?
13   A    Several.  More than -- more than seven.
14        Q    And how long did this go on for, Detective?
15   A    It went on for a while.
16        Q    Was Mr. Miller eventually located?
17   A    Yes, he was.
18        Q    Do you recall the date in May of 2004 that he
19   was located?
20   A    No, I don't.
21        Q    But he was located at that time in May of
22   2004?
23   A    Yes.
24        Q    Where was he located?
25   A    I believe it was Pennsylvania.
```

```
                 Muhammad - Direct / Cross               177
 1        Q    Do you know what town it was?
 2   A    I believe it was Stratton or --
 3        Q    Scranton, Pennsylvania?
 4   A    Right, correct.
 5        Q    Now what family members had you talked to to
 6   inform them that Mr. Miller was wanted for murder?
 7   A    His brother, his father and his mother.
 8        MR. DeMATTIA:  I have no further questions,
 9   Judge.
10        THE COURT:  Cross-examine.
11        MR. GORDON:  Thank you, Your Honor.
12   CROSS-EXAMINATION BY MR. GORDON:
13        Q    Detective, were you the lead investigator
14   assigned to this case?
15   A    We both were, Investigator Powell and myself.
16        Q    So you were the co -- co-detectives handling
17   the investigation, is that fair to say?
18   A    Yes, that's fair to say.
19        Q    And Investigator Powell was a member of the
20   Essex County Prosecutor's Office, correct?
21   A    That's correct.
22        Q    And you were a member of the Newark Police
23   Department?
24   A    Yes.
25        Q    The Robbery/Homicide Section, is that correct?
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 90

Muhammad - Cross                                    178

1   A      Yes.
2          Q      And when you were assigned the case on
3   January 17th of 2002 you indicated that you reviewed
4   some reports at that time?
5   A      Yes, sir.
6          Q      And that was to familiarize yourself with the
7   circumstances surrounding the event, correct?
8   A      Correct.
9          Q      And also to familiarize yourself with
10  whatever efforts law enforcement had made up until that
11  time in the investigation so that you would not, at
12  least for one reason, not duplicate their work, is that
13  correct?
14  A      Yes, that's fair to say.
15         Q      And did you have an opportunity before you
16  came here to testify today to review any papers in the
17  recent past with regard to this case?
18  A      Yes.
19         Q      Do you recall approximately when that was?
20  A      About a week.
21         Q      A week ago from today?
22  A      Yes.
23         Q      And do you recall what documents you reviewed
24  in preparation for your testimony before this jury?
25  A      My reports that I executed.

Muhammad - Cross                                    179

1          Q      Did you have multiple reports or just one
2   report?
3   A      I have one report.
4          Q      And did you review anything other than your
5   own report in preparation for your testimony?
6   A      Yes.
7          Q      What else did you review?
8   A      The file on this here incident.
9          Q      When you say the file do you know where the
10  file is located right now?
11  A      No, I do not.
12         Q      At that time did you go and retrieve the
13  file, is that fair to say?
14  A      No, I did not.
15         Q      Okay.  In order to review the file how did
16  you get it?
17  A      From the A.P.
18         Q      So you went to Mr. DeMattia and got it from
19  him?
20  A      My reports I got them from 22 Franklin Street.
21         Q      That's where your office is located, your
22  headquarters?
23  A      Exactly.
24         Q      For Robbery/Homicide?
25  A      Yes.

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 91

Muhammad - Cross                                    180

1    Q    So some of the reports were located there a
2  week ago and that's where you obtained them, correct?
3    A    Yes.
4    Q    And some of the reports were in the
5  possession of Mr. DeMattia in the Prosecutor's Office?
6    A    Yes.
7    Q    All right.  And do you recall now as you sit
8  here today whether or not you were aware of anyone
9  interviewing Stacy Davis prior to your being assigned
10  the case on January 17th of -- I'm sorry -- December
11  17th of 2001?
12    A    Yes.
13    Q    Do you recall if that occurred?
14    A    Repeat the question?
15    Q    Do you recall if it occurred that some other
16  person interviewed Mr. Davis prior to you being
17  assigned the case on December 17 of 2001?
18    A    Yes.
19    Q    Do you recall --  Did that happen?
20    A    Yes.
21    Q    Do you recall who it was that conducted an
22  interview?
23    A    Detective LeBella.
24    Q    And do you know where Detective LeBella
25  conducted that interview?

Muhammad - Cross                                    181

1    A    I don't recall.
2    Q    All right.  Did you --  When you became aware
3  of it was that through some report that you reviewed,
4  or from speaking to someone, or something else?
5    A    Report.
6    Q    And was that through a report that Detective
7  LeBella offered?
8    A    Yes.
9    Q    Do you know a Detective DeFabio, Michael
10  DeFabio?
11    A    Yes.
12    Q    Do you know at that time in December of 2001
13  where he was assigned to work?
14    A    I believe the Robbery Squad.
15    Q    So he was with you in the Robbery Squad
16  working in that squad at that time.
17    A    With Detective LeBella.
18    Q    With Detective Lebella.  And did you learn,
19  without telling us what you learned, did you learn the
20  details of that interview that you say you believe
21  Detective LeBella conducted with Stacy Davis?
22    A    Yes.
23    Q    And did you interview or discuss that with
24  Detective LeBella?
25    A    I believe so.

### Elite Transcripts, Inc.
14 Boonton Avenue, Butler, New Jersey 07405
973-283-0196  FAX 973-492-2927

**STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005**

SHEET 92

Muhammad - Cross                                    182

1    Q    To the best of your knowledge, when that
2  interviewed occurred was Detective DeFabio there?
3    A    I don't recall.
4    Q    Now, I take it it was your intention at the
5  time that you were assigned the case to do everything
6  you could to solve the crime and close the case, is
7  that fair to say?
8    A    Yes.
9    Q    You and Investigator Powell, correct?
10   A    That's correct.
11   Q    Were you aware if any --  Well, let me ask
12 you this.  Do you know what a crime bulletin is?
13   A    Yes.
14   Q    What is a crime bulletin?
15   A    A crime bulletin can consist of information on a
16 -- a target or a suspect that's wanted.
17   Q    And does that information get placed into
18 some writing, or is it something that goes over the
19 air, or something different?
20   A    It -- it varies.
21   Q    Is it fair to say that sometimes a crime
22 bulletin is reduced to writing so that there's actually
23 something you could read that's the crime bulletin?
24   A    Yes.
25   Q    And is that, to the best of your knowledge,

Muhammad - Cross                                    183

1  generally speaking first, an internal thing that goes
2  just within your unit of robbery/homicide, or does that
3  get disseminated to other persons?
4    A    It's disseminated through the squad and it has to
5  be reviewed.
6    Q    So, am I correct, is it fair to say to the
7  jury that a crime bulletin is generally an internal
8  memo within the squad?
9    A    Yes.
10   Q    Does it happen, in your experience, that
11 sometimes the information in the bulletin gets
12 disseminated to other law enforcement agencies
13 throughout the City of Newark?
14   A    Not on the crime bulletin.
15   Q    Have you had an opportunity in your
16 experience as a detective in robbery/homicide to come
17 to see different crime bulletins over the years?
18   A    Yes.
19   Q    And do you recall in this case when you were
20 assigned on December 17, 2001, do you recall reviewing
21 any crime bulletins that had been generated in this
22 case the day before December 16th?
23   A    The day before I received this investigation?
24   Q    Correct.
25   A    Okay, before the 17th.  That's correct.

**STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005**

SHEET 93

Muhammad - Cross                                                        184

1    Q    Okay.  And do you recall seeing a crime
2  bulletin that had been generated on the date of the
3  incident, December 16th, 2001?
4    A    Yes, I believe so.
5         MR. GORDON:  Your Honor, I would like to have
6  this document marked, if I could, for identification.
7  I'm showing it to the prosecutor now.  I would request
8  that it be marked as D-1.
9         THE COURT:  D-1 for identification.
10         MR. GORDON:  Thank you.
11  BY MR. GORDON:
12    Q    Detective Muhammad, I'm showing you now
13  what's been marked as D-1 for identification.  I'll ask
14  you please to review that document and tell me when
15  you're finished.
16    A    Okay.
17    Q    Detective, do you recall if that is a crime
18  bulletin?  Well, what is that document, Detective?
19    A    It's a crime bulletin.
20    Q    And is that a crime bulletin such as you've
21  just been describing to the jury that you've seen
22  before in your experience?
23    A    Yes, sir.
24    Q    Does it indicate on the printed part of it --
25  that would be on the form itself, not the details of

Muhammad - Cross                                                        185

1  the incident, but the printed form -- Crime Bulletin
2  Robbery/Homicide Section?
3    A    Yes.
4    Q    Does it indicate right under there attention
5  all units city-wide?
6    A    Yes.
7    Q    And did -- did you -- and -- and to the best
8  of your knowledge -- is this crime bulletin related to
9  the investigation of the death of Timothy Phillips?
10    A    Yes, it is.
11    Q    Are you able to tell that in part because of
12  the CC number?
13    A    Yes.
14    Q    That CC number that's indicated there, a CC
15  number is a Central Complaint number, correct?
16    A    That's correct.
17    Q    And, in fact, any event that's reported in
18  the City of Newark where -- where police get involved
19  ultimately gets assigned a Central Complaint number, is
20  that fair to say?
21    A    Yes, sir.
22    Q    And in this case, to the best of your
23  knowledge, does the CC number reflected there indicate
24  the investigation of the death of Timothy Phillips?
25    A    Yes.

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 94

Muhammad - Cross                                    186

```
 1        Q    Now, when you were assigned the case and you
 2   indicated you reviewed a crime bulletin, are you able
 3   to tell the jury now is this document the document that
 4   you reviewed when you were assigned the case?
 5   A    Yes.
 6        Q    And without regard to the details of this
 7   investigation, is what you see here in your experience
 8   common?  Is that what a crime bulletin generally looks
 9   like, and does it appear to be what a crime bulletin is
10   used for?
11   A    It depends on its office procedures.
12        Q    Okay.  So -- so, correct me if I'm wrong,
13   it's fair to say that a generation of this type of
14   document in a robbery/homicide case, or a case where
15   robbery/homicide is involved, is something that's
16   normal, in the normal course of your business, is that
17   correct?
18   A    Yes.
19        Q    And do you know generally speaking who is it
20   that fills out or authors a robbery/homicide crime
21   bulletin?
22        MR. DeMATTIA:  Well, Judge, I would object to
23   the general nature of it.  If we're trying to find out
24   who authored this I believe the question should be who
25   authored this report, if this witness did, not the
```

Muhammad - Cross                                    187

```
 1   general nature of things.
 2        MR. GORDON:  I'm getting there, Your Honor.
 3        THE COURT:  Okay, thanks.
 4        MR. GORDON:  Can he answer that one?
 5        THE COURT:  Yes.
 6   BY MR. GORDON:
 7        Q    Can you answer my question, Detective, do you
 8   know?
 9   A    Repeat it, please?
10        Q    Sure.  Do you know generally is it someone
11   from robbery/homicide that generates a document like
12   this, or could it be somebody else?  Who generally does
13   it?
14        MR. DeMATTIA:  I -- I renew my objection,
15   Your Honor.
16        THE COURT:  I'll allow it.
17        THE WITNESS:  The primary investigator.
18   BY MR. GORDON:
19        Q    All right.  Now, when you say primary
20   investigator, just so we're clear, in this case you and
21   Investigator Powell, Ben Powell, were you the primary
22   investigators?
23   A    Not at the -- not at the moment of this here
24   bulletin.
25        Q    I'm sorry.  So is it fair to say then that
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 95

Muhammad - Cross                                    188

1  before you got assigned in this case somebody else from
2  the time that it first got reported until you got
3  assigned was technically the primary investigator?
4  A      That's correct.
5      Q      All right.  Do you know as you sit here today
6  who the primary investigator was on the case from
7  December 16th, when it was reported, until you got the
8  assignment on December 17th?
9  A      DeFabio or either LeBella.
10     Q      And we're talking about again Detective
11 Michael DeFabio or Detective John Lebella?
12 A      That's correct.
13     Q      They're both members of the Robbery/Homicide
14 Section.
15 A      That's correct.
16     Q      Now, when you reviewed this document and you
17 got assigned the case, did you speak to either
18 Detective John LeBella or Detective Michael DeFabio
19 about the contents of the document?  Without telling us
20 what was said did you have a conversation about the
21 contents of that document?
22 A      I don't believe so.
23     Q      But you were aware of the contents of the
24 document.
25 A      Yes.

Muhammad - Cross                                    189

1      Q      Did you take any action --  When you got
2  assigned the case on December 17, 2001 did you take any
3  action to investigate the information that's in that
4  crime bulletin?
5  A      Yes.
6      Q      Can you tell us what steps you took and when
7  did you take them?
8  A      I can't tell you which steps and when did I take
9  them.
10     Q      Okay.  Well, maybe I misunderstood you.  Did
11 you take some steps based upon the information
12 contained in that document?
13 A      Yes.
14     Q      What steps did you take?
15 A      I talked to Investigator Ben Powell.
16     Q      So you conferred with him about the contents
17 of that document?
18 A      Yes, the file.
19     Q      I'm sorry?
20 A      Yes, the whole file.
21     Q      Okay.  That was part of the file that you
22 reviewed.
23 A      Yes.
24     Q      And specifically with regard to the details
25 of the incident that are contained in that crime

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 96

Muhammad - Cross                                    190

```
 1    bulletin did you discuss those -- without telling us
 2    what was said -- specifically with Investigator Ben
 3    Powell?
 4    A     I believe so.
 5          Q     And after you did that did that did either
 6    you or he formulate a plan to act upon the details of
 7    the incident that are contained in that crime bulletin?
 8    A     No, we did not.
 9          Q     Did you decide to purposely ignore that
10    information?
11    A     No.
12          Q     Did you decide that it was better not to
13    pursue the information in there at that time?
14    A     No, we did not.
15          Q     Well, you and Ben Powell decided not to act,
16    correct?
17    A     That's not what I said.
18          Q     Did you act?
19    A     No, we did not.
20          Q     You were aware of the information but you did
21    not act, correct?
22    A     Not at that time.
23          Q     And at that time you mean January -- December
24    17 -- excuse me -- of 2001.
25    A     That's correct.
```

Muhammad - Cross                                    191

```
 1          Q     At that point in time when you reviewed that
 2    document on December 17, 2001, the suspect or suspects
 3    in this case were still at large, correct?
 4    A     Yes.
 5          Q     They -- they were suspects.  At that point in
 6    time when you reviewed that information I take it you
 7    had not taken a statement from any person, or you had
 8    not reviewed a statement from any person that
 9    identified Naeem Miller as the suspect in this case, is
10    that correct?
11    A     That's correct.
12          Q     Did you become aware of the identity or the
13    description of another suspect at that time that you
14    reviewed that crime bulletin on December 17 of 2001?
15    A     No, I did not.
16          Q     You did not become aware that there was
17    another suspect?
18    A     No.
19          Q     At the time that you reviewed that with
20    Investigator Powell did you take -- then take that
21    information contained in there in that crime bulletin
22    and discuss it with any other person other than
23    Investigator Powell?
24    A     I don't believe so.
25          Q     Did you take a statement from Kevin Phillips
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 97

Muhammad - Cross                                    192

1   at some point on --  Well, did you take a statement
2   from Kevin Phillips once you were assigned the case?
3   A    Yes.
4        Q    Do you recall the date?
5   A  No, I do not.
6        Q    Is it possible that it was either that day
7   that you got assigned the case or the next day?
8             MR. DeMATTIA:  Judge, I wouldn't like the
9   detective to speculate so I object to possible --
10            THE COURT:  Well, he said he forgets.
11  Anything that can be used to refresh his recollection
12  is appropriate.
13            MR. GORDON:  Thank you, Judge.
14  BY MR. GORDON:
15       Q    Detective Muhammad, I'm showing you what's
16  been marked S-2 for identification.  I'll ask you
17  please to take a look at that and tell us when you've
18  finished looking at it?
19  A    Okay.
20       Q    Do you recognize what that is?
21  A    Yes.
22       Q    What is that?
23  A    It's a continuation report that I -- I did.
24       Q    So that's your report that you authored in
25  this case.

Muhammad - Cross                                    193

1   A    Yes.
2        Q    And do you think reviewing that report now
3   would refresh your recollection as to if and when you
4   interviewed Kevin Phillips?
5   A    It's possible.
6        Q    Could you take a look and let me know when
7   you finish reviewing it, and tell me if it refreshes
8   your memory about when you interviewed Kevin Phillips?
9   A    Okay.
10       Q    Does it refresh your recollection?
11  A    Yes.
12       Q    And when was it that you interviewed Kevin
13  Phillips?
14  A    It says on the 17th of December, 2001.
15       Q    So that was the date that you were assigned
16  the case with Investigator Powell, correct?
17  A    Yes.
18       Q    And after interviewing Mr. Kevin Phillips I
19  take it you then became aware for the first time that,
20  in fact, Mr. Phillips had been in a violent
21  confrontation inside Roland's Bar on December 16th,
22  correct?
23  A    Yes.
24       Q    And, in fact, he described during the giving
25  of his statement, did he not, that the person that he

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

Muhammad - Cross                    194

1   was in that violent confrontation with was a big person
2   who was in the neighborhood of 6-foot-1 and 260 pounds,
3   or thereabouts, is that correct?
4   A    I have to refer to his statement.
5        Q    All right.
6             MR. DeMATTIA:  Your Honor, I'll ask that
7   another document be marked.
8             THE COURT:  Okay.
9   BY MR. GORDON:
10       Q    Detective Muhammad, I'm going to show you
11  what's been marked D-2 for identification and ask you
12  to take a look at that and tell us when you're
13  finished.
14  A    It's a statement.
15       Q    Do you recognize it?
16  A    Yes.
17       Q    And you reviewed it as part of your review of
18  this matter when you were assigned the case on December
19  17, 2001, is that correct?
20  A    This statement was taken on the 17th.
21       Q    And are you able to review that and tell us
22  if it refreshes your recollection about the height and
23  weight of the person that Kevin Phillips got into the
24  violent confrontation with inside Roland's?
25  A    Yes.

Muhammad - Cross                    195

1        Q    Do you see that on Page 3 of the statement?
2   A    Yes.
3        Q    And the question was asked of Kevin Phillips
4   can you give me a good description of the guy that you
5   had the fight with inside the bar, and the answer was
6   he was between 275-290, medium-brown complexion,
7   approximately 6-foot-1 in height.  Is that correct?
8   A    That's correct.
9        Q    Do you know if that information was ever
10  disseminated to any law enforcement on December 16th of
11  2001?
12  A    No, I do not.
13       Q    Did it ever come to your attention that
14  anyone of that description was being sought by any law
15  enforcement agency?
16  A    No.
17       Q    When you --  If I may just have that crime
18  bulletin and your report -- I'm sorry -- and your
19  report.  When you reviewed the crime bulletin we talked
20  about earlier, that's marked D-1, did you at that time
21  --  I'm sorry.  You reviewed that on December 17th,
22  2001.
23  A    Yes.
24       Q    Was that before or after the statement was
25  taken from Kevin Phillips?

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 99

```
                        Muhammad - Cross              196
 1    A     That was before.
 2          Q     And after reviewing the statement of Kevin
 3    Phillips, or being made aware of its contents, did you
 4    discuss with Investigator Powell the description that
 5    Kevin Phillips had given of the person that he had the
 6    fight with inside the bar?
 7    A     Yes, I believe so.
 8          Q     Did you discuss with Investigator Powell
 9    whether or not that information had been transferred or
10    given to anyone citywide or inter- or intra-Homicide
11    Squad, or Robbery/Homicide, whether that information
12    had been given to anyone?
13    A     No, we did not.
14          Q     And after reviewing the crime bulletin did
15    you make any connection between the crime bulletin,
16    that you recognized earlier as being generated by
17    either Detective LeBella or Detective DeFabio in this
18    case, with the information that Kevin Phillips had
19    given about the description of his assailant?
20    A     Yes.
21          Q     And what was that?
22    A     It was similar.
23          Q     And based upon the fact that you, as the lead
24    investigator in the case, believed there was a
25    similarity, is it your testimony now that you and
```

```
                        Muhammad - Cross              197
 1    Investigator Powell did nothing to pursue that
 2    information to attempt to solve this crime and to find
 3    a suspect?
 4    A     No, it is not.
 5          Q     Then I'll ask you again, based upon all that
 6    knowledge that you had at that point in time, you and
 7    Investigator Powell did nothing about all that
 8    description, correct?
 9    A     Yes, we did.
10          Q     What did you do?
11    A     We talked about it.
12          Q     Other than talking about it -- you already
13    told the jury you talked about it -- other than talking
14    about it did you go anywhere or call anyone and talked
15    to anyone about it?
16    A     Yes.
17          Q     All right.  Which one was it?  Did you go
18    somewhere?
19    A     We talked to Mr. Phillips.
20          Q     And after you talked to Mr. Phillips did you
21    talk to anyone else?
22    A     Yes.
23          Q     Who did you talk to then?
24    A     We talked to other people.
25          Q     Did you talk to anyone whose name you can
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 100

```
                    Muhammad - Cross / Redirect          198
 1   tell us now?
 2   A    No, I cannot.
 3        Q    And you didn't make any notation or anything
 4   in the report about any other person that you spoke to
 5   about that issue, right?
 6   A    That's correct.
 7             MR. GORDON:  Thank you.  I have nothing
 8   further.
 9             THE COURT:  Redirect?
10             MR. DeMATTIA:  Yes.
11   REDIRECT EXAMINATION BY MR. DeMATTIA:
12        Q    Based on the description that you had of
13   whatever height, whatever weight, did you have anything
14   else?
15   A    No, we did not.
16        Q    The height and the weight, about how many
17   people in the world are like that?
18   A    Several million people.
19        Q    I mean, I'm not trying --  Did you narrow --
20   Did you have any information to narrow it down?
21   A    None.
22        Q    You just had a height and a weight.
23   A    That's correct.
24        Q    Did you have a name?
25   A    None.
```

```
                    Muhammad - Redirect / Recross          199
 1        Q    Did you have a description?
 2   A    No.
 3        Q    Could you do anything with a height and
 4   weight?
 5   A    Not much at all.
 6        Q    Did you talk about it?
 7   A    Yes.
 8        Q    But you didn't go out and arrest anybody with
 9   a height and weight?
10   A    No, we did not.
11        Q    Why not?
12   A    We didn't have a name for the height and the
13   weight.
14        Q    Oh, okay.  Thank you.
15             MR. DeMATTIA:  No further questions, Judge.
16             THE COURT:  Mr. Gordon?
17             MR. GORDON:  Thank you, Your Honor.
18             THE COURT:  Limited to the scope of redirect,
19   please.
20             MR. GORDON:  Thank you.
21   RECROSS-EXAMINATION BY MR. GORDON:
22        Q    You had a little more than height and weight,
23   didn't you, Detective?
24   A    I'd have to refer to the bulletin.
25        Q    Did you know, other than the bulletin, did
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 101

Muhammad - Recross                              200

1   you know more than the height and the weight of the
2   potential suspect at that time?
3   A     Black male.
4         Q     Did you know anything about the identity of
5   the black male?
6   A     No.
7         Q     Do you recall Investigator Powell taking a
8   statement from a person by the name of Gerard Brown on
9   December 16th of 2001?
10  A     I don't recall.
11        Q     Well, is it -- By the way, was Investigator
12  Powell working on the case before you got assigned?
13  A     Yes.
14        Q     And so when you got assigned on December 17th
15  you reviewed all the statements.  You told us that
16  before, right?
17  A     Yes, I believe so.
18        Q     And did you review a statement given by a
19  Gerard Brown on December 16th to Investigator Powell at
20  the Essex County Prosecutor's Office?
21  A     I don't recall.
22        MR. GORDON:  Your Honor, I'll ask that this
23  be marked.
24        MR. DeMATTIA:  Judge, I would object based on
25  my line of questioning to scope of redirect.

Muhammad - Recross                              201

1         THE COURT:  Well, are we going to get to some
2   connection?
3         MR. GORDON:  On the way.
4         THE COURT:  All right.  I'll overrule the
5   objection.
6   BY MR. GORDON:
7         Q     I'm going to show you, Detective, what's been
8   marked D-3 for identification.  I'm showing it to the
9   prosecutor now.  I ask you to take a look at that and
10  let us know when you're finished.
11  A     Okay.
12        Q     Do you recognize that document?
13  A     Yes.
14        Q     What do you recognize it to be?
15  A     It's a formal statement.
16        Q     Does it appear to be a formal statement taken
17  from a person named Gerard Tyrell Brown?
18  A     That's correct.
19        Q     Apparently taken on December 16th of 2001,
20  the day before you were assigned to this case?
21  A     Yes.
22        Q     Taken by Investigator Ben Powell, Essex
23  County Prosecutor's Office?
24  A     Yes.
25        Q     And is that one of the statements that on

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 102

Muhammad - Recross                                                202

1    December 17 of 2001 was part of the file which you
2    reviewed to get yourself up to speed on this case?
3    A    I don't think so.
4         Q    Are you telling us now that that statement
5    taken the day before was not in the file?
6              MR. DeMATTIA:  Judge, I object to the
7    question.  It's whether he had an opportunity to review
8    it is what's pertinent, not in the file.
9              THE COURT:  Well, I think that he can say
10   that if that's the case.  Objection's overruled.
11             THE WITNESS:  What's the question?
12   BY MR. GORDON:
13        Q    When you got the case on December 17 you told
14   us before you reviewed the paperwork in the file,
15   correct?
16   A    Yes.
17        Q    And this statement was apparently taken the
18   day before by your partner, who became your partner on
19   December 17th, Investigator Powell, correct?
20   A    Yes.
21        Q    This is one of the statements that pertains
22   to the shooting incident at Roland's Lounge, correct?
23   A    That's correct.
24        Q    Is this document one of the ones that was in
25   the file?

---

Muhammad - Recross                                                203

1    A    I don't think so.
2         Q    So are you telling this jury that you never
3    reviewed this when you first got the case?
4    A    Yes.
5         Q    Are you sure?
6    A    I'm almost positive.
7         Q    But you did have discussions in depth with
8    Investigator Powell about this case, right, on December
9    17th?  Right?
10   A    Yes.
11        Q    And you talked about different reports that
12   had been generated up to that time, correct?
13   A    Yes.
14        Q    Is it your testimony to this jury and this
15   trial that you never discussed with Investigator Powell
16   the fact that he had taken a statement the day before
17   from Gerard Tyrell Brown?
18   A    I don't know.
19        Q    It's possible that you did know that, didn't
20   you?
21   A    Yes.
22             MR. DeMATTIA:  Objection as to speculation,
23   Your Honor.
24             THE COURT:  Sustained.
25   BY MR. GORDON:

**STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005**

SHEET 103

Muhammad - Recross                    204

1     Q     In any event, when you and Investigator
2  Powell were discussing the case on December 17th and
3  you discussed the information that was in the crime
4  bulletin about the suspect, and you decided to do
5  nothing, were you aware of this statement?
6     A     We did do something.  You're saying we didn't do
7  nothing.  We did do something, and --
8        THE COURT:  Just answer the question.  Okay?
9  BY MR. GORDON:
10    Q     Let's try it again, Detective.  You did tell
11 this jury, didn't you, that the only thing you did was
12 speak to Mr. Phillips.  Isn't that what you just told
13 these people?
14    A     On the 17th.
15    Q     On the 17th of December of 2001.
16    A     That's correct.
17    Q     And that was after you and Investigator
18 Powell discussed the case and what had happened up to
19 that point, from the day before, the date of the
20 shooting, until that moment when you and Investigator
21 Powell were conferring, right?
22    A     Yes, with the file that I had.
23    Q     With the file that you had.  And whether or
24 not that statement that you're holding in your hand now
25 was in the file at that time, Detective, Investigator

Muhammad - Recross                    205

1  Powell apparently took that statement less than 24
2  hours before, right?
3     A     That's correct.
4     Q     So when you were conferring with him isn't it
5  fair to say that you and he conferred about the
6  contents of this statement?
7     A     Yes.
8     Q     And in that statement can you take a look at
9  it and tell us if it refreshes your recollection about
10 whether or not the only thing you knew at that time was
11 height, weight and black male about the suspect?
12    A     That's correct.
13    Q     What's correct?
14    A     You said what did I know.
15    Q     I said what did you know?
16    A     Black male, the height and the weight.
17    Q     Anything about clothing that was discussed?
18    A     I have to refer to that statement, but that's what
19 he told Ben Powell.
20    Q     Well, what I'm asking you is, if you look at
21 that statement does it refresh your recollection about
22 discussing with Ben Powell that you had only height,
23 weight, black male?
24    A     No, it doesn't.
25    Q     After reviewing that statement do you believe

**Elite Transcripts, Inc.**
14 Boonton Avenue, Butler, New Jersey 07405
973-283-0196 FAX 973-492-2927

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 104

Muhammad - Recross                                      206

1   that Investigator Powell only had height, weight, black
2   male?
3              MR. DeMATTIA:  Objection to the question,
4   Your Honor.
5              THE COURT:  Sustained.
6   BY MR. GORDON:
7       Q    Well, let me ask you this, Detective.  When
8   you conferred with Investigator Powell on January 17th
9   (sic) and you discussed the case, and you discussed the
10  file, and you discussed what to do, is it your
11  testimony now that you didn't know that Investigator
12  Powell had taken a statement that contained many more
13  details about the suspect?
14             MR. DeMATTIA:  Objection to the
15  characterization of a suspect, Judge.  What suspect and
16  what characterization is he referring to as many more
17  details?  It's conclusionary.  I ask it be stricken
18  from the record.
19             MR. GORDON:  Judge, I'll withdraw the word
20  suspect and say person.
21             THE COURT:  I'm going to sustain the
22  objection on different grounds.  You're describing the
23  contents at this point and what -- what Investigator
24  Powell knew or didn't know.  The objection is sustained
25  as hearsay.

---

Muhammad - Recross                                      207

1              MR. GORDON:  I'll rephrase, Your Honor.
2   Thank you.
3              THE COURT:  Thank you.
4   BY MR. GORDON:
5       Q    When you were talking with Investigator
6   Powell and you decided to do nothing about the
7   information in the crime bulletin, which did describe a
8   suspect, correct?
9              MR. DeMATTIA:  Objection, Judge.  Again,
10  suspect, did nothing.  He's summing up.  It's improper.
11             THE COURT:  Well, and it's also hearsay, once
12  again, containing statements with regard to the
13  contents.  The objection is sustained.
14  BY MR. GORDON:
15      Q    At the time that you discussed this with
16  Investigator Powell on January 17th and you decided to
17  do nothing, you indicated you decided to do nothing
18  because you didn't have enough to work with, right?
19      A    That's correct.
20      Q    I mean, that's what you're telling this jury
21  in this case, isn't it, that at that time all you knew
22  was height, weight, black male.
23      A    That's correct.
24      Q    All right.  After reviewing that statement is
25  it your testimony that Investigator Powell only knew

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 105

```
                    Muhammad - Recross                    208
 1   height, weight, black male?
 2               MR. DeMATTIA:  Well, Judge, he can't --
 3   Objection.  He can't testify.
 4               THE COURT:  Sustained.  Ask him what he knew.
 5   BY MR. GORDON:
 6        Q    When you spoke to Investigator Powell on that
 7   date did he decide to do nothing, or did you decide to
 8   do nothing, or was it a joint decision?
 9               MR. DeMATTIA:  Objection, Judge, as to the
10   conclusionary language he's using as nothing.  He's
11   summing up again, Judge.  He's taking it out of
12   context.
13               THE COURT:  Well, at some point in time this
14   witness did say that --  The objection is overruled.
15   That's what the witness said at some point.  If the
16   witness disagrees with the predicate of the question he
17   can say so.
18               MR. GORDON:  Would you like me to repeat the
19   question, Detective?
20               THE WITNESS:  Yes, sir.
21   BY MR. GORDON:
22        Q    You and Investigator Powell, after reviewing
23   everything that you reviewed, you told us a little
24   while ago, did you not, that you conferred and the
25   decision was made between and amongst yourselves, to do
```

```
                    Muhammad - Recross                    209
 1   nothing about that description of that person.
 2        A    Not at that time.
 3        Q    Not at that time.  And that was because, I
 4   think you told the jury, because all you knew at that
 5   time -- and when I say all you knew, everything that
 6   came out of your discussion with Investigator Ben
 7   Powell -- was that the only thing you and he knew, as
 8   far as you knew, was height, weight, black male.
 9        A    That's correct.
10        Q    And now, having reviewed the statement, I'm
11   asking you did you -- did you come to know anything
12   else other than height, weight, black male?
13        A    No, I did not.
14        Q    And when you met with Ben Powell you never
15   learned then any of the details of what he had learned
16   in the statement of Gerard Tyrell Brown the day before.
17        A    It's possible.
18        Q    What's possible?
19        A    That we talked about it.
20        Q    Oh, it is possible that you talked about it.
21   Okay.  Well, let's try to be precise.
22               MR. DeMATTIA:  Objection, Judge.
23               THE COURT:  Sustained.
24               MR. GORDON:  I'll rephrase.
25               THE COURT:  Thank you.
```

**STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005**

SHEET 106

```
                     Muhammad - Recross              210
 1   BY MR. GORDON:
 2        Q    You thought it's possible you talked about
 3   it, right?
 4   A    Yes, sir.
 5        Q    Now, at some point after January 17 did you
 6   come to learn more than black male and the description
 7   that you had on the 17th?  Did you learn more later --
 8   height, weight, black male -- did you learn more later
 9   after the 17th about that person we're talking about?
10   A    About, yes.
11        Q    At any point in time did you go -- you
12   personally -- and speak with Gerard Tyrell Brown, you?
13   A    I don't recall.
14        Q    It's possible?
15   A    I don't recall.
16        Q    And at any point in time did you go anywhere
17   else and talk to anyone about trying to ascertain the
18   identity of the person whose description you only had
19   as height, weight, black male?
20   A    Yes.
21        Q    Where did you go and when?
22   A    To the immediate area where the incident occurred.
23        Q    But you didn't talk to Gerard Tyrell Brown,
24   right?
25   A    I don't believe so.
```

```
          Muhammad - Recross / Redirect / Recross    211
 1        Q    And the height, weight, black male we're
 2   talking about is, again, 6-2, 270 to 280, or
 3   thereabouts, right?  True?
 4   A    It's true.
 5        Q    Did you know anything about clothing of that
 6   person?
 7   A    I don't believe so.
 8             MR. GORDON:  Thank you, Your Honor.  I have
 9   nothing further of Detective Muhammad.
10             THE COURT:  Mr. DeMattia?
11   REDIRECT EXAMINATION BY MR. DeMATTIA:
12        Q    That person that he's asking you about is the
13   person who was fighting with Mr. Phillips inside?
14   A    I believe so.
15        Q    Not the shooter.
16   A    That's correct.
17             MR. DeMATTIA:  Thank you.
18   RECROSS-EXAMINATION BY MR. GORDON:
19        Q    Well, let's see, Detective.
20             MR. GORDON:  Judge, I'm going to ask that
21   this be marked.
22             MR. DeMATTIA:  Judge, can I be heard at
23   sidebar?
24             THE COURT:  Okay.
25                    (Sidebar)
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 107

```
                            Sidebar                        212
 1              MR. DeMATTIA:  He's going to confront him
 2    with something that I had not even crossed closely to
 3    with regard to my one-question redirect, or two
 4    questions redirect, or re-redirect, or whatever you
 5    want to call it.  Now, to confront him with documents
 6    -- I've allowed him a little leeway -- to confront him
 7    with documents -- I want to stop it from the beginning
 8    -- that he did not author to get out information that
 9    is improper.  I've been -- You know, I haven't been
10    objecting.  Anything that he did not do personally,
11    especially when he keeps saying suspect to confuse them
12    about a suspect.  What type of suspect?  A suspect who
13    had a fight, a suspect who did the shooting?  I'm
14    objecting, Judge, because it's totally misleading.  I
15    ask that you not allow it.  He can call him as his own
16    witness, Your Honor.
17              THE COURT:  What has this got to do with the
18    person that we're talking about?  The person that we're
19    talking about is -- is the person that was the fighter,
20    not the shooter.
21              MR. GORDON:  The redirect, or the re-re-
22    redirect just was that the person we're talking about
23    is the fighter, but in fact --
24              MR. DeMATTIA:  No, based on the shooter.
25              MR. GORDON:  I think I can finish.
```

```
                            Sidebar                        213
 1              MR. DeMATTIA:  That's what the two questions
 2    were.
 3              THE COURT:  Go ahead.
 4              MR. GORDON:  What I'm saying is that there
 5    was, in fact, a suspect at some point in time that fits
 6    the description of the person that was fighting, and
 7    this document turned over in discovery, is something
 8    that may be generated by this witness, or it certainly
 9    may be generated by someone in Robbery/Homicide, and I
10    want to know if -- Now we're getting down to it.
11    We're talking about is the suspect, or someone who was
12    a suspect, the person who was in the fight, the person
13    who was involved in the fight, because clearly,
14    according to some members of law enforcement, that
15    person in the fight was the suspect.
16              MR. DeMATTIA:  Bring those law enforcement
17    members in, Your Honor.
18              THE COURT:  Stay away from --  The objection
19    is not the one that Mr. DeMattia is articulating to my
20    -- in my view.  But there is a hearsay objection here.
21    You need to be careful.
22              MR. GORDON:  I'm being careful, Judge.
23              THE COURT:  You have to -- you have to
24    confront him with -- and I want to hear about in the
25    question anything that's contained -- even as to what
```

**Elite Transcripts, Inc.**
14 Boonton Avenue, Butler, New Jersey 07405
973-283-0196  FAX 973-492-2927

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 108

Sidebar                                        214

1   this document is -- have you ever seen this document
2   before?  Did you generate it?
3           MR. GORDON:  Okay.
4           THE COURT:  And if the answer is no that's
5   it, that's the end of the inquiry.
6           MR. GORDON:  Okay.
7           MR. DeMATTIA:  Judge, how about my objection
8   with the fact that he was cross-examining him on a
9   statement, okay, that I asked him specifically on my
10  redirect in that statement are we talking about a
11  description of the shooter or a description of the
12  person who had the fight?  He said the fight and not
13  the shooter.  That is it, Your Honor.  Why are you
14  allowing him to now go on more testimony on a statement
15  that he introduced?  I didn't introduce this, Your
16  Honor.
17          THE COURT:  You had asked him that last
18  question.  You did that twice.
19          MR. DeMATTIA:  I asked him what last
20  question, Your Honor?
21          THE COURT:  The one that was just asked on
22  re-redirect, and he's cross-examining him in response
23  to the answer to that question.
24          MR. DeMATTIA:  I didn't use these documents,
25  Your Honor.

Sidebar / Muhammad - Recross                    215

1           THE COURT:  It doesn't matter whether you
2   used them or not.
3           MR. DeMATTIA:  I respectfully disagree.
4           THE COURT:  I understand.  Let's go.
5                   (Sidebar concluded)
6           THE COURT:  The objection is overruled.
7   Please -- please mark the two-page document.
8           MR. GORDON:  I'm showing it to the
9   prosecutor.
10          THE COURT:  D-4 for identification.  Present
11  it unidentified by title or otherwise to the witness.
12  BY MR. GORDON:
13      Q    Detective Muhammad, I'm showing you what's
14  been marked as D-4 for identification and ask you to
15  take a look at that document, and tell us when you're
16  done reviewing it.
17  A    Okay.
18      Q    Is that a document that you personally
19  generated in this case, or reviewed in this case?
20          MR. DeMATTIA:  Your Honor, that's a compound
21  question.
22          MR. GORDON:  I'll rephrase it.
23          THE COURT:  Thank you.
24  BY MR. GORDON:
25      Q    Is that a document that you reviewed in

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 109

```
                  Muhammad - Recross / Colloquy            216
 1    connection with this case?
 2           MR. DeMATTIA:  Objection, Your Honor.  It has
 3    to be established as to authenticity first.
 4           THE COURT:  Sustained.
 5    BY MR. GORDON:
 6        Q    Is that -- is that a document that you
 7    generated in this case?
 8    A    No, I did not.
 9        Q    If on the date of January -- I'm sorry --
10    December 17 of 2001 do you recall, as you sit here
11    today, whether or not the witness, Gerard Tyrell Brown,
12    was ever summoned back to your office by you for any
13    further inquiry on information about the person that
14    was in the fight inside the bar with Kevin Phillips?
15    A    I don't recall.
16           MR. GORDON:  Thank you, Your Honor.  I'm
17    finished with this witness.
18           MR. DeMATTIA:  Nothing.
19           THE COURT:  Thank you, Detective.  You're
20    excused.  All right, ladies and gentlemen.  It's 4:15.
21    That's the bad news, that we went to 4:15.  The good
22    news is that by going to 4:15 today -- and I think it's
23    good news -- and I'm not sure, it depends on your
24    perspective -- I believe you've all been here since
25    Monday, so the very next day that you're here you
```

```
                         Colloquy                           217
 1    actually get to get paid $40 a day instead of the
 2    princely sum of $5, I think you get for the first three
 3    days.  Again, that's the good news, but perhaps -- I
 4    think it's additional good news for you, but perhaps
 5    those of you who have been looking forward to getting
 6    that $40 as soon as you possibly can, then for those
 7    it's bad news.  We are not for purposes of this trial
 8    -- because we've accomplished so much and because we've
 9    gotten -- we've gone until this late -- it's
10    unnecessary for us, especially in light of the fact
11    that our Friday schedule becomes Thursday because
12    Friday is a holiday, and I could accomplish all the
13    things I usually do on a Friday I can do it tomorrow,
14    because we've managed to get as far as we have and our
15    next witnesses have really only been planned to be
16    scheduled for on Tuesday.  You will recall I also told
17    you on Monday is always a big day and it's always
18    reserved almost exclusively for non-trial matters.  So
19    that will give you a bit of a break so you don't get to
20    hit your $40 payday then until Tuesday.  I hope you
21    haven't planned on spending that over the weekend, so
22    you'll have to wait until Tuesday.
23           And in the meantime, of course, you
24    understand we're going to start promptly -- hopefully
25    promptly at 9 o'clock on Tuesday, so that we can move
```

STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 110

```
                           Colloquy                          218
 1    as expeditiously as possible.
 2              But I'm going to remind you that you cannot
 3    discuss this case.  You can't discuss it amongst
 4    yourselves, you can't discuss it with your family, your
 5    employer, or anybody else.  You can, of course, advise
 6    family and employers as to what our schedule is and
 7    that you're sitting as a seated juror on a criminal
 8    case.  That's all, not even what kind of case it is,
 9    even if you don't identify any individuals, or time
10    frame, or location, not anything, not even the kind of
11    case.  Of course, to do so would be to invite a
12    response, obviously which is improper, as I'm sure you
13    understand by now.
14              Obviously if anybody attempts to talk to you
15    about the case you need to report that fact to me or
16    the staff immediately.  Don't indicate that to anybody
17    else, including amongst yourselves.  Don't forget to
18    get your parking thing validated because you're still
19    on your $5 -- so parking is still more than the $5 that
20    you make -- before you leave, but you don't have to
21    report out or report in because we'll be taking care of
22    that for you.  If there's any questions direct them to
23    the officers on your way out.  They'll be sure to get
24    an answer for you or direct you to who can provide the
25    answer.
```

```
                           Colloquy                          219
 1              I hope you enjoy your long weekend, and for
 2    those of you who are celebrating Easter, Happy Easter.
 3    And we'll see you bright and early at 9 o'clock on
 4    Tuesday.  Thank you very much.
 5                     (Proceedings concluded)
```

**Elite Transcripts, Inc.**
14 Boonton Avenue, Butler, New Jersey 07405
973-283-0196 FAX 973-492-2927

## STATE OF NEW JERSEY v NAEEM MILLER -- March 23, 2005

SHEET 111

CERTIFICATION

I, Catherine J. Weigel, the assigned transcriber, do hereby certify that the foregoing transcript of proceedings in the Essex County Superior Court, on March 23, 2005, Tape No. 1, Index No. 09:39:28 - 16:19:38, is prepared in full compliance with the current transcript format for judicial proceedings and is a true and accurate compressed transcript of the proceedings as recorded to the best of my knowledge and ability.

*Catherine Weigel*

Catherine Weigel       AOC#490
ELITE TRANSCRIPTS, INC.                    August 12, 2005
BUTLER, NEW JERSEY    07405

**Elite Transcripts, Inc.**
14 Boonton Avenue, Butler, New Jersey  07405
973-283-0196  FAX 973-492-2927