**Exhibit D**

### STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005

SHEET 1



SUPERIOR COURT OF NEW JERSEY
LAW DIVISION, CRIMINAL PART
ESSEX COUNTY
INDICTMENT NO. 03-05-1830
APP. DIV. NO.

```
STATE OF NEW JERSEY,      )
                          )
        Plaintiff,        )      TRANSCRIPT
                          )          of
     vs.                  )      JURY TRIAL
                          )
NAEEM MILLER,             )
                          )
        Defendant.        )
```

Place: Essex Co. Courthouse
       50 West Market St.
       Newark, N.J.  07102

Date:  March 29, 2005

BEFORE:

   HONORABLE THOMAS R. VENA, J.S.C. and JURY

TRANSCRIPT ORDERED BY:

   LOUIS G. GONNELLA, ESQ. (Office of the Public Defender,
   Appellate Section, 9th Floor, 31 Clinton St., Box 46003,
   Newark, N.J.  07101)

APPEARANCES:

   GREGORY DeMATTIA, ESQ., Assistant Prosecutor
   Attorney for the State

   JONATHAN D. GORDON, ESQ.
   Attorney for Defendant

Transcriber Catherine Weigel
ELITE TRANSCRIPTS, INC.
14 Boonton Avenue
Butler, New Jersey  07405
(973) 283-0196
Video Recorded
Operator, Kathy Fagan

## STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005

SHEET 2
2

I N D E X

| Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| FOR THE STATE | | | | |
| Steven Bright | 3 | | | |
| Lila Perez | 17 | 28 | | |
| Stacy Davis | 30 | 63 | 66 | |
| Stanley Rosa | 68 | | | |
| Kyle Kemp | 75 | | | |
| Timothy Charles | 76 | | | |

| Exhibits | Ident. | Evid. |
|---|---|---|
| S-21 & 21A Six photographs/envelope | | 88 |
| S-20   Photograph | | 87 |
| S-3    Wanted poster | | 86 |
| S-24   Bright report | 5 | |
| S-4    Photograph | 9 | 87 |
| S-4A   Blowup of S-4 | 9 | 87 |
| S-7 - S-14 Photographs | | 87 |
| S-17   Autopsy report | 19 | |
| S-18   Diagrams | 19 | 87 |
| S-15   Ballistics photo | 27 | 87 |
| S-16   Ballistics photo | 27 | 87 |
| S-25   Photograph | 39 | 89 |
| S-26   Photo Array Preamble | 71 | |
| S-27   Photograph | 78 | 90 |

MOTION FOR ACQUITTAL
ARGUMENT

| | | |
|---|---|---|
| BY: MR. GORDON | 92 | |
| BY: MR. DeMATTIA | 93 | |
| DECISION | 93 | |
| CHARGE CONFERENCE | 94 | |

Colloquy / Bright - Direct
3

1       THE COURT:  -- returned in this matter, which
2   is entitled STATE OF NEW JERSEY VS. NAEEM MILLER.  All
3   the jurors are now present, as is the defendant and
4   counsel for both the State and Mr. Miller.  We are
5   ready to proceed from where we left off, and that would
6   be with Mr. DeMattia calling his next witness.
7       MR. DeMATTIA:  Steve Bright.
8       THE COURT:  Steve Bright to the stand,
9   please.
10      COURT OFFICER:  Raise your right hand.
11  S T E V E N   B R I G H T,  STATE'S WITNESS, SWORN
12      COURT OFFICER:  State your full name for the
13  record.
14      THE WITNESS:  Steven Bright.
15      THE COURT:  Please be seated.  Good morning.
16      THE WITNESS:  Good morning.
17      THE COURT:  Mr. DeMattia?
18  DIRECT EXAMINATION BY MR. DeMATTIA:
19      Q    Sir, by whom are you employed?
20      A    The Essex County Prosecutor's Office.
21      Q    In what capacity?
22      A    I'm Lieutenant in charge of the Crime Scene Unit.
23      Q    And for how long have you been the Lieutenant
24  in charge of Crime Scene Unit?
25      A    Since August of 1997.

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

SHEET 3

```
                          Bright - Direct                      4
 1          Q        Prior to that?
 2     A    I was an investigator with the Crime Scene Unit.
 3          Q        For how long?
 4     A    Since November of 1991.
 5          Q        And prior to that?
 6     A    I was in the Homicide Unit.  Actually, I was
 7     working double-duty doing homicide investigations and
 8     crime scene investigations.
 9          Q        And for how long?
10     A    I was doing that for a year.
11          Q        What are some of the duties related with your
12     position as Lieutenant of Crime Scene Unit?
13     A    Well, I supervise --  Well, presently I'm
14     supervising six investigators, and respond to major
15     crimes such as homicides, police shootings, police
16     pursuits with fatalities, some burglaries, you know, on
17     special-interest cases, but mainly homicides and police
18     shootings.
19          Q        And when you get to the scene what are some
20     of the specific duties that you perform?
21     A    What we do at the scene is first we do a walk-
22     through to try to identify any potential evidence, then
23     we photograph the scene, documenting locations,
24     photographically documenting the evidence that's at
25     that scene, and we collect the evidence, process
```

```
                          Bright - Direct                      5
 1     evidence for latent fingerprints.
 2          Q        Did you have occasion to -- you yourself --
 3     respond to the scene of a shooting outside Toby's
 4     Lounge at 966 Bergen Street, City of Newark, on
 5     December 16th of 2001?
 6     A    Yes.
 7          Q        And as a result of your responding there --
 8     You were in charge of processing the crime scene?
 9     A    Yes.
10          Q        And pursuant to your investigation did you
11     compile any type of report?
12     A    Yes, I did.
13          Q        And that is typical in any case that you
14     investigate?
15     A    Yes, it is.
16          Q        Would you like to have that report before
17     you?
18     A    If I could, yes.
19          MR. DeMATTIA:  Judge, it's been previously
20     marked S-24 for identification, a three-page report by
21     Lieutenant Steven Bright.
22          THE WITNESS:  Thank you.
23     BY MR. DeMATTIA:
24          Q        When you got to the scene, Lieutenant, what
25     happened?
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005

SHEET 4

Bright - Direct                                                    6

1   A     When I got to the scene I met with Investigator
2   Ben Powell of this office's homicide squad and
3   Detective LeBella from Newark Police, and they gave me
4   a brief synopsis of what may or may not have occurred
5   at that location that night.
6         Q     Did you proceed to do your walk-through, as
7   you indicated just a few minutes ago?
8   A     Yes.
9         Q     What did you discover upon your walk-through?
10  A     During the walk-through they pointed out six shell
11  casings which were on the street in front of Toby's
12  Lounge, 966 Bergen Street.  The shell casings, there
13  was a black hat and a yellow t-shirt on the street
14  also.  I conducted a further search and I located two
15  additional shell casings, upon which time I documented
16  the locations by taking measurements from two fixed
17  points and then collected the evidence.
18        Q     What fixed points did you use to document the
19  distance?
20  A     If I can refer to my report, I used the --  There
21  was a lamp post on the southeast corner of Bergen
22  Street and Renner Avenue, and I used the southeast curb
23  line of Bergen Street.
24        Q     Okay.  And as part of your duties you
25  indicate that you take photographs.  Did you photograph

Bright - Direct                                                    7

1   some of the evidence that you just referred to, such as
2   the shell casings?
3   A     I photographed all of the evidence.
4         Q     Okay.  With regard to the shell casings how
5   many in total then did you discover at the scene?
6   A     Eight.
7         Q     And then did you take general photographs of
8   the scene itself?
9   A     Yes, I did.
10        MR. DeMATTIA:  All right.  Your Honor, I'd
11  like Lieutenant Bright to take a look at what has been
12  marked S-4 for identification, which is the photograph
13  of the front of the location, and then S-7 through 14,
14  which are photographs of each individual shell casing
15  on the ground.  I don't know if Mr. Gordon would like
16  to see them.
17  BY MR. DeMATTIA:
18        Q     Take a quick look at them.  Okay.  With
19  regard specifically to what's been marked starting with
20  S-7 through S, I guess, 14, they refer to each
21  individual item of what, Lieutenant?
22  A     Each of our shell casings.
23        Q     And in your report you documented I guess
24  distances from those two fixed points where they were
25  located?

### Elite Transcripts, Inc.
14 Boonton Avenue, Butler, New Jersey  07405
973-283-0196     FAX 973-492-2927

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

Bright - Direct                                8

```
 1   A      That's correct.
 2          Q      Okay.  With regard to the photograph S-4,
 3   what does the photograph S-4 depict?
 4   A      s-4 depicts an overall photo of the scene itself
 5   showing the locations of the evidence that was at the
 6   scene.
 7          Q      Does S-4 show the yellow markers with regard
 8   to each of the shell casings?
 9   A      Yes.
10          Q      What type of shell casings were they, by the
11   way?
12   A      I believe 9-mm shell casings.
13          Q      And also there you had mentioned a hat and a
14   yellow shirt.  Does S-4 depict the hat and yellow
15   shirt, also?
16   A      Yes.
17          Q      I guess that would be S-9 and S-10?
18   A      Those photos aren't here.
19          Q      Okay.  No problem.  Evidence marker, I should
20   say, 9 and 10.
21   A      Right.  Yes, they do.
22          Q      All right.  Now, turning around to what's
23   been placed on the bulletin board behind you,
24   Lieutenant, it's been marked S-4A, which is a blowup of
25   S-4.  Does that depict exactly what's in S-4, for the
```

Bright - Direct                                9

```
 1   record?
 2   A      Yes, it does.
 3          Q      It's only an enlargement of S-4.
 4   A      Yes.
 5          Q      Okay.  And with regard to the clarity, or
 6   brightness, or darkness, does that actually depict what
 7   was at the scene that evening, of the photograph
 8   itself?
 9   A      The photograph is -- it's somewhat blurred, but
10   that's due to the enlarging, and the darkness of it is
11   due to the exposure of the film.  It was actually
12   better-lit than this.  Bergen Street is a -- it's a
13   very busy -- very busy street, and pretty much well-
14   lit.
15          Q      If you can stand up maybe with your back
16   toward the judge, with regard to the corner over here,
17   you had mentioned well-lit.  What is this right in
18   front of the tavern?
19   A      This is a street light.
20          Q      And was it working that evening?
21   A      Yes.
22          Q      Now, the yellow markers with circles around
23   them indicate what items?
24   A      These are all shell casings.
25          Q      And is there a car parked right in front?
```

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

SHEET 6

Bright - Direct                                    10

```
 1   A      There's a car here.  8 and 10 were the -- 9 and 10
 2   were the -- was the black hat and the yellow t-shirt.
 3          Q      You can sit down now, Lieutenant.  I'll try
 4   not to have you hop back and forth.
 5                 With regard to the shell casings itself would
 6   that be indicative of any type of weapon that was used?
 7   A      Generally a semi-automatic.
 8          Q      Describe what a semi-automatic is?
 9   A      Semi-automatic handgun actually is -- it's loaded
10   -- the bullets are loaded in a magazine.  I don't know
11   if I could -- if I could show a magazine at all.  I'm
12   not --
13                 MR. DeMATTIA:  Your Honor, would he have
14   permission to just display his weapon?
15                 THE WITNESS:  Not the weapon, the magazine.
16                 THE COURT:  Do you have one with you?
17                 THE WITNESS:  Yes.
18                 THE COURT:  Officer, would you please clear
19   the weapon?
20                 COURT OFFICER:  The weapon is clear.
21                 MR. DeMATTIA:  Thank you, Judge.
22   BY MR. DeMATTIA:
23          Q      If you, Lieutenant, could just hold that up
24   for the jury in its normal closed position.
25   A      This is a semi-automatic handgun.
```

Bright - Direct                                    11

```
 1          Q      And you spoke of a clip just a couple of
 2   seconds ago?
 3   A      Actually the magazine.
 4          Q      Oh, I'm sorry, magazine.
 5   A      A semi-automatic handgun the bullets are loaded in
 6   a magazine, as opposed to a revolver where the bullets
 7   are loaded in a cylinder, which is enclosed.  The
 8   cylinder opens up, you load it, close the cylinder and
 9   as you fire the rounds go either clockwise in some
10   makes and counter-clockwise on others.  With an
11   automatic, semi-automatic, when you fire the round,
12   with each round the slide pops back -- it slides back,
13   the round is ejected -- the shell casing is ejected,
14   the round exits the front of the weapon, but with each
15   round, like I said, the slide pops back and
16   subsequently loads another round into the chamber and
17   you're ready to fire again.
18          Q      And that magazine goes in what portion of the
19   weapon?
20   A      It goes in the bottom of the handgun.
21          Q      That's how it's loaded.
22   A      Yes.
23          Q      Okay.  With regard --  And that ejects
24   casings.  With regard to the revolver, the revolver,
25   does that eject any casings?
```

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

SHEET 7

Bright - Direct                                                        12

1  A      It doesn't eject them until you eject them.
2         Q    In other words, open up the rounds?
3  A      Open up and dump them.
4         Q    And does --  What type of look does a
5  revolver have when compared with your weapon?
6  A      A revolver is, depending on the size, you have
7  like a short 2-inch barrel revolver, but on the most
8  part a revolver is long, has just a single barrel, not
9  boxed, like this is, just enough that the round is
10 going to pass through.  This is more boxy.  A revolver
11 looks like something you would see in a cowboy movie,
12 you know, a western.
13        Q    And once you collected the evidence, sir,
14 what did you do with it?
15 A      What I did was I took the -- the casings back to
16 my office where they were processed for latent
17 fingerprints.
18        Q    And what do you mean by that?  Explain why
19 you did that?
20 A      As a general -- general practice what we do is we
21 process the shell casings, being that they are loaded
22 by hand into the -- well, in a semi-automatic into the
23 magazine or a revolver, they would be loaded into the
24 cylinder, everything is done by hand, so in the event
25 that, you know, the individual left fingerprints on

Bright - Direct                                                        13

1  these casings or cartridges we process them for latent
2  fingerprints.
3         Q    And your success rate with the technology of
4  processing cartridges or casings?
5  A      In my 13-plus years of doing crime scene
6  investigations we have never -- I have never, or anyone
7  in my unit, has never recovered an identifiable latent
8  fingerprint from a spent shell casings.
9         Q    And why is that?  What happens when the
10 bullet is fired?
11 A      Well, first I would have to more or less explain
12 what a latent fingerprint is, which is actually -- A
13 latent fingerprint is made up of 99 percent water, 1
14 percent oils, which are secreted through the pores on
15 your hands.  Namely the fingertip areas is what we use
16 for identifying areas of -- what we use to identify
17 latent fingerprints, because they have the
18 characteristics we're looking for and they're the areas
19 of your fingers that you are most likely to come in
20 contact with a surface.  To touch something you have to
21 touch it with -- to touch and feel you have to use your
22 fingertips as opposed to the inner digits of your
23 fingers.  You can't really -- you can't pick up with
24 this.  You need your fingertips to do that, so that's
25 where your identifying qualities we look for.

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

SHEET 8

Bright - Direct                                              14

1   Now, what happens is when you come in contact with
2   a surface you're leaving oils and water on that
3   surface.  Whether or not they are identifiable is yet
4   to be determined.  You touch a smooth, hard surface and
5   lift your -- like this counter -- and you lift your
6   hand off there's a very good possibility that you left
7   identifiable fingerprints.  Put your hands on this
8   counter and pull it away, you've smudged or smeared any
9   identifying characteristics that -- that you could have
10  left on that surface.
11          Now, we use different chemical processes to try to
12  recover these latent fingerprints.  With latent
13  fingerprints to identify them there's different
14  characteristics.  There's bifurcations, whirls, ridge
15  endings, that we look for.  The possibility of some --
16  And what we generally use is nine points of
17  identification.  With nine points of identification the
18  possibility that someone else on this planet has the
19  same fingerprint as you is say a million times the
20  population of the earth, and so that possibility puts
21  it out of the realm that someone else here on this
22  planet is going to have your fingerprint, your same
23  fingerprints.  Identical twins don't have the same
24  fingerprints, where they have the same DNA.
25      Q    With regard to all that information now add

Bright - Direct                                              15

1   in the factor of the bullet being shot through a semi-
2   automatic.
3   A    Now, when we try to recover latents from a shell
4   casing this shell casing when it goes -- well, what the
5   shell casing and bullet goes through inside of a gun is
6   an explosion.  Now, when you take into consideration
7   that water -- and remember a fingerprint is 99 percent
8   water, water boils at 212 degrees.  The explosion
9   caused in the chamber of a weapon -- chamber of this
10  gun -- is in excess of 300 degrees.  When you bring a
11  temperature up to 300 degrees -- you bring water up to
12  300 degrees that causes -- you see it when you're
13  boiling water in a pot -- it causes evaporation, which
14  is -- you know, a fingerprint is more -- more than
15  likely going to cook off or evaporate off the surface
16  of a shell casing.
17      Q    And in this particular case you had performed
18  these tests, as just described?
19  A    Yes.
20      Q    And your result was not significant at all.
21  A    Nothing.
22          MR. DeMATTIA:  All right.  I have no further
23  questions, Your Honor.
24          THE COURT:  Cross-examine.
25          MR. GORDON:  I have no questions of this

**Elite Transcripts, Inc.**
14 Boonton Avenue, Butler, New Jersey  07405
973-283-0196     FAX 973-492-2927

## STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005

SHEET 9

```
                              Colloquy                        16
 1   witness, Your Honor.
 2               THE COURT:  Thank you, Lieutenant.  You're
 3   excused.
 4               MR. DeMATTIA:  I just need to get my exhibits
 5   down and then I need a moment to confer with the
 6   doctor, Perez, who is my next witness, to see if she's
 7   ready to proceed.
 8               THE COURT:  Okay.  We're going to take our
 9   early break then, ladies and gentlemen.  You may be
10   taking more breaks than -- than -- than scheduled just
11   to enable us to mechanically ensure the presence of
12   witnesses, try to inconvenience you as little as
13   possible.  So we'll -- we'll take a 10-minute break
14   now.  Okay?  See you back here at 10:45.
15                              (Recess)
16               THE COURT:  We'll continue.  Mr. DeMattia,
17   please call your next witness.
18               MR. DeMATTIA:  Lila Perez.
19               THE COURT:  Lila Perez to the stand, please.
20               COURT OFFICER:  Step up and remain standing.
21   Raise your right hand, ma'am.
22   L I L A    P E R E Z,  STATE'S WITNESS, SWORN
23               COURT OFFICER:  State your full name for the
24   record.
25               THE WITNESS:  Lila Perez, P-e-r-e-z.
```

```
                          Perez - Direct                     17
 1               THE COURT:  Good morning, Dr. Perez.  Please
 2   be seated.
 3               THE WITNESS:  Good morning, Your Honor.
 4               THE COURT:  Mr. DeMattia?
 5   DIRECT EXAMINATION BY MR. DeMATTIA:
 6         Q     Good morning, ma'am.
 7   A     Good morning.
 8         Q     By whom are you employed?
 9   A     I'm employed by the Division of Criminal Justice,
10   Regional Medical Examiner.
11         Q     For how long?
12   A     I have been employed by the State since 1986, and
13   by Atlantic County Medical Examiner's Office from 1992
14   to 1998, and I am the Regional Medical Examiner for
15   Cape May and Cumberland County since 2003.
16         Q     And around the time of 2001 who were you
17   working for, Doctor?
18   A     Yes, I was working for the Newark Regional Medical
19   Examiner's Office.
20         Q     And obviously you're a medical doctor.  What
21   type of training did you receive and educational
22   background do you have?
23   A     I was graduated in 1972 at the National University
24   of Leone, Nicaragua.  I did my internship in Nicaragua
25   and also at Queens General Hospital in New York City.
```

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

─ SHEET 10 ─

```
                       Perez - Direct                    18
 1    I did four years of anatomic and clinical pathology
 2    residency in New York City, and a fellowship in
 3    surgical pathology at Beth Israel Hospital.  I started
 4    working as a Medical Examiner in 1981 for the Chief
 5    Medical Examiner's Office in New York.
 6         Q    And do you have any type of certifications?
 7    A    Yes.
 8         Q    What are they?
 9    A    I am board-certified in Anatomic, Theoretical and
10    Forensic Pathology.
11         Q    And have you ever been qualified before in a
12    Superior Court in New Jersey, such as this, as an
13    expert in Forensic Pathology?
14    A    Yes, I have.
15         Q    Approximately how many times?
16    A    Dozens of times.
17         Q    And allowed to testify, also?
18    A    I was allowed to testify, as well.
19         Q    How many times?
20    A    Hundreds of times.
21         MR. DeMATTIA:  I would proffer Dr. Perez as
22    an expert in medical forensic pathology at this point,
23    Your Honor.
24         THE COURT:  Mr. Gordon?
25         MR. GORDON:  You're Honor, I'm thoroughly
```

```
                       Perez - Direct                    19
 1    familiar with Dr. Perez.  I accept her as an expert in
 2    this case.
 3         THE COURT:  Okay.  Dr. Perez is accepted once
 4    again by this court as an expert in the field of
 5    Forensic Pathology.  You may continue, Mr. DeMattia.
 6         MR. DeMATTIA:  Thank you.
 7    BY MR. DeMATTIA:
 8         Q    Dr. Perez, did you have occasion to become
 9    involved in an autopsy of a person by the name of
10    Timothy Phillips?
11    A    Yes.
12         Q    And with regard to the autopsy did you, in
13    fact, then construct reports or compile an autopsy
14    report and related paperwork?
15    A    Yes, I had.
16         MR. DeMATTIA:  Your Honor, I'd like to
17    approach Dr. Perez with S-17 for identification and S-
18    18, S-17 being purportedly being the autopsy report and
19    S-18 being diagrams.  If Dr. Perez could take a look at
20    that.
21         THE WITNESS:  Yes.
22    BY MR. DeMATTIA:
23         Q    Starting with the autopsy report, whose
24    number is S-17, do you recognize that?
25    A    S-17 is the autopsy report that I prepared on
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005

Perez - Direct                                                    20

```
 1   Timothy Phillips that includes the microscopic
 2   examination, the toxicology report and the report of
 3   the medical investigator.
 4        Q    Does that have an identification number?
 5   A    Yes, it's 07012324.
 6        Q    With regard to S-18 can you identify that for
 7   The Court?
 8   A    This is a diagram of the body that I prepare,
 9   front, back and side, also with the identifying number
10   07012324.
11        Q    And, Doctor, prior to entering the room I
12   displayed for you what's behind you at this time, S-18A
13   and S-18B.  What are they?
14   A    This is an enlarged copy of the diagram that I
15   prepared during the autopsy.
16        Q    Which you just described as S-18.
17   A    Yes.
18        Q    Okay.  Doctor, can you tell the jury what an
19   autopsy is?
20   A    An autopsy consists of an external and internal
21   examination.  By external examination I do note and
22   document injuries, identifying the scars, tatoos and
23   appearance of the body.  Internal examination is done
24   after you open the head, the chest and the abdomen to
25   document and identify the lesions, disease, and to
```

Perez - Direct                                                    21

```
 1   determine the cause and manner of death.
 2        Q    And during the course of an autopsy if there
 3   is any evidence present what do you do?
 4   A    If during the autopsy I recover evidence such as
 5   bullet or knife or other objects it is given to the
 6   Prosecutor's Office investigator.
 7        Q    Did you, in fact, perform during your autopsy
 8   both an external examination and then an internal
 9   examination upon the remains of Mr. Phillips?
10   A    Yes, I did.
11        Q    With regard to the external examination,
12   Doctor, was there any findings of significance that you
13   would like to report to the jury?
14   A    Yes, the body was approximately 69-1/2-inches
15   tall, had a weight of 172 pounds.  He had marked
16   treatment.  He was taken to the hospital, and he had
17   several gunshot wounds on the shoulder, on the back, on
18   the face and on the hand.
19        Q    Okay.  And then from there did you conduct an
20   internal examination?
21   A    Yes.  The internal examination showed that the
22   bullets went through the body, especially along the
23   aorta, that is large blood vessel that runs through the
24   body, the musculature of the shoulder, the clavicle,
25   and caused hemorrhage, an internal hemorrhage, internal
```

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

SHEET 12

Perez - Direct                                        22

```
 1    bleeding.
 2         Q      And as a result of your internal examination
 3    did you document or number your significant findings?
 4    A     Yes, on the perforations produced by bullets were
 5    number 1 through 8.
 6         Q      Which would indicate a total of eight gunshot
 7    wounds?
 8    A     Yes.
 9         Q      Okay.  Doctor, however you're more
10    comfortable, if you would like to stand and -- and talk
11    at the same time, but I would like you to detail your
12    significant findings with the -- with regard to the
13    eight wounds that you said you found.
14    A     Yes.  I will get up and will go over the wounds.
15         Q      Please, with regard to I guess Wound No. 1.
16    A     Wound No. 1 was located on the left upper arm.  It
17    was round, did not have any stippling, no smoke, no gun
18    powder residue around the wound, entered the muscle of
19    the arm and fractured the bone of the arm that is
20    called the humorous, then travels backwards into the
21    escapula, the backbone on the arm, and fragmented.
22    Those fragments we recovered are consistent of a
23    bullet, lead bullet, and also jacket fragments.  The
24    direction of this track was front to back downwards and
25    towards the right.
```

Perez - Direct                                        23

```
 1         Q      With regard to Wound No. 2.
 2    A     Wound No. 2 was located lateral to the nipple.  It
 3    went through the chest cavity, fractured the inferior
 4    border of the third rib, went through the lung, the
 5    left upper lobe of the lung, through the aorta and exit
 6    in the back, on the mid-line of the back.  I'm sorry.
 7    It was recovered on the back.  That bullet that was
 8    recovered on the back was a fully-jacketed large-
 9    caliber bullet.
10         Q      All right, Doctor.  And with regard to Wound
11    No. 1 and Wound No. 2, in fact, they were the only
12    wounds where you recovered any type of ballistics
13    evidence from.
14    A     Correct.
15         Q      I'll show that to you in a few minutes.  With
16    regard to Wound No. 3?
17    A     Wound No. 3 was an elongated wound that involves
18    only the skin and superficial subcutaneous tissue, was
19    very superficial and did not cause any fracture of the
20    nose, and could not be determined the direction.
21         Q      Is that what is considered a graze wound?
22    A     This is considered a graze wound.
23         Q      With regard to Wound No. 4, if -- if it's
24    indicated on that diagram, Doctor.  If not we can
25    change it.
```

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

SHEET 13

Perez - Direct                                    24

1   A      Okay.
2          Q      Wound No. 4?  I'll -- I'll help you, Doctor.
3   A      Wound No. 4 was in the back of the neck, at the
4   mid-line of the neck.  It went through and through of
5   the cervical spine, between the first and second
6   cervical spine, and caused hemorrhage of the base of
7   the brain.  It exit on the front of the cervical spine
8   and went through the throat, through the esophagus, and
9   fractured this -- the right side of the mandible.
10  There was a small fragment recovered there and there
11  was no bullet recovered.  So the direction of this
12  bullet was back to front and then downwards.
13         Q      With regard to Wound No. 5.
14  A      Wound No. 5 is also considered a graze wound like
15  Wound No. 3, meaning that it did not go into the body,
16  it just incised the skin and subcutaneous tissue, and I
17  could determine the direction being from above
18  downwards, from up below.
19         Q      Consistent with a graze wound, once again?
20  A      Yes.
21         Q      All right.  With regard to Wound No. 5.  Now
22  Wound No. 6, Doctor.
23  A      Wound No. 6 was located on the back of the right
24  shoulder.  As you can see there are pinpoint dots
25  around the hole of entrance.  That represents

Perez - Direct                                    25

1   stippling.  Stippling is gun powder residue.  The
2   bullet went through and through the trapezius muscle,
3   that this is the muscle, and fractured the distal part,
4   or the end of the right clavicle.  So this wound was
5   from front -- excuse me -- back to front and no bullet
6   was recovered.
7          Q      Doctor, you mentioned so far this is the only
8   wound with regard to stippling or gun powder.  Could
9   you tell the jury what that means and what that is an
10  indication of?
11  A      The significance of the presence of gun powder
12  residue is that the gun was fired at close range.
13         Q      And by close range can you actually say what
14  type of range we're talking about?
15  A      A few -- up to -- up to 1 foot you can see, you
16  know, a stippling, 18 inches -- 12 to 18 inches you may
17  see the -- the residue.
18         Q      Once it starts passing like 18 inches from
19  the target do you typically get any stippling?
20  A      Typically not, but that will depend on the type of
21  weapon and also the type of ammunition.
22         Q      With regard to wound --  Would you like a
23  glass of water, Doctor?
24  A      Yes.
25         Q      I thought so.  With regard to -- If you can

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

SHEET 14

Perez - Direct                                                    26

1   proceed?  Would you like to proceed?
2   A    Yes.
3        Q    Okay.  With regard to Wound No. 7.
4   A    Would No. 7 was in the region of the cheek and was
5   elongated.  There was no stippling, no smoke, and went
6   underneath the skin and exit on the lip and caused
7   lacerations of the upper and lower lip on the right
8   side, so it was in and out and no bullet was recovered.
9        Q    Finally, Doctor, the final wound, which was
10  Wound No. 8.
11  A    Would No. 8 was located on the left hand at the
12  base of the third finger and caused an irregular
13  abrasion, marginal abrasion, no stippling, no smoke, no
14  soot.  It went upwards and exit at the base of the left
15  thumb and also caused an L-shaped wound and fractured
16  the finger.
17       Q    Is that type of wound on the hands, can that
18  be referred to as any particular type of wound?
19  A    It could be called defensive wounds if the person
20  raised the hand to fend the assailant, yes.
21       Q    I think you can have a seat now, Doctor.
22  A    Thanks.
23       Q    Now, in preparation for your testimony,
24  Doctor, were you shown photographs of recovered
25  ballistics evidence?

Perez - Direct                                                    27

1   A    Yes, I did.
2        Q    S-15 and S-16 for identification, if the
3   doctor can take a look at that.
4   A    S-16 is the photograph of an envelope.  The
5   envelope has an addressograph that includes the name of
6   the deceased, the case number, my initials, and the
7   date of the autopsy.  Handwritten by me it says
8   projectile from back.  And the photo also shows a
9   jacketed bullet that I recovered from the back of the
10  deceased.
11       Q    And that is what you refer to in the
12  description of one of the wounds.
13  A    Yes.
14       Q    Okay.  Next photograph, Doctor, was labeled
15  S-15 for identification.  Do you recognize that?
16  A    Yes.  This is the photograph of an envelope with
17  the same information with the name, the case number,
18  and handwritten says fragments from left shoulder,
19  ankles and see the picture with jacket -- fragments of
20  jackets and also a formed piece of lead bullet.
21       Q    And, once again, this was recovered by you
22  during the course of the autopsy as you described
23  previously and from one of the wounds.
24  A    Yes.
25       Q    Doctor, were they any further significant

## STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005

— SHEET 15 —

Perez - Direct / Cross                                    28

1  internal observations that you'd like to point out to
2  the jury?
3  A    Besides the injuries that I described during the
4  autopsy there were no other significant disease or any
5  other type of injuries in the rest of the body.
6  Q    Then, Doctor, within a reasonable degree of
7  medical certainty were you able to arrive at a cause of
8  death for Mr. Phillips?
9  A    Yes.
10  Q    And what was that?
11  A    The cause of death was multiple gunshot wounds.
12  Q    And the manner of death.
13  A    The manner of death I classified it as a homicide.
14          MR. DeMATTIA:  Judge, I have no further
15  questions of Dr. Perez.  Thank you.
16          THE COURT:  Cross-examine.
17          MR. GORDON:  Thank you, Your Honor.
18  CROSS-EXAMINATION BY MR. GORDON:
19  Q    Good morning, Doctor.
20  A    Good morning.
21  Q    Doctor, you have no way to know in this case
22  what the sequential order was of each of these wounds
23  being received by the decedent, is that correct?
24  A    That's correct.
25          MR. GORDON:  Thank you.  I have nothing

Colloquy                                    29

1  further, Your Honor.
2          THE COURT:  Anything else?  Thank you very
3  much, Doctor.  You're excused.
4          THE WITNESS:  Thank you.
5          THE COURT:  Do we need to take another break?
6          MR. DeMATTIA:  Probably that would be
7  advisable, yes.
8          THE COURT:  All right.  We're going take
9  another break, ladies and gentlemen, between witnesses
10  in order to assure the availability of a witness.
11  We'll take another 10-minute break.
12          (Recess)
13          THE COURT:  We're going to continue.  Call
14  your next witness, please, Mr. DeMattia.
15          MR. DeMATTIA:  Stacy Davis.
16          THE COURT:  Stacy Davis to the stand, please.
17          COURT OFFICER:  Remain standing for a minute.
18  Okay?
19  S T A C Y   D A V I S,  STATE'S WITNESS, SWORN
20          COURT OFFICER:  State your full name for the
21  record.
22          THE WITNESS:  Stacy Davis.
23          COURT OFFICER:  Be seated.
24          THE COURT:  Good morning, Mr. Davis.
25          THE WITNESS:  Good morning.

# STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005

SHEET 16

Davis - Direct                                                    30

```
 1              THE COURT:  Mr. DeMattia?
 2              MR. DeMATTIA:  Thank you, Judge.
 3     DIRECT EXAMINATION BY MR. DeMATTIA:
 4         Q    Sir, can you please tell us your full name?
 5     A    Stacy Davis.
 6         Q    And how old are you?
 7     A    38.
 8         Q    All right.  Mr. Davis, I'm going to ask to
 9     keep your voice up loud enough so that the people at
10     the end of the jury can hear what you have to say.  All
11     right, sir?
12              Now, Mr. Davis, I want to take your attention
13     back to December 16th of 2001, the early morning hours
14     thereof.  Do you recall what location you were at?
15     A    I was on Bergen Street.
16         Q    Do you happen to know the type of place you
17     were at on Bergen Street?
18     A    I was at a bar.
19         Q    Do you remember the name of the bar?
20     A    Roland's.
21         Q    You knew it as Roland's.  Had you ever been
22     there before?
23     A    No.
24         Q    That was your very first time?
25     A    Yes.
```

Davis - Direct                                                    31

```
 1         Q    And who had you gone there with, if anybody?
 2     A    I went by myself.
 3         Q    Do you recall around what time you had gotten
 4     there?
 5     A    Not really.
 6         Q    Okay.  Do you recall if you met anybody, or
 7     what did you do while you were at that place?
 8     A    I talked to Les Johnson.
 9         Q    And was he a patron or a worker there?
10     A    He was working the door.
11         Q    As a bouncer, security?
12     A    Security.
13         Q    And how long would you say you were in his
14     company at the bar?
15     A    I was there for maybe 10 minutes.
16         Q    Did you have anything to drink at that bar?
17     A    Yes.
18         Q    What did you have?
19     A    I had a beer.
20         Q    And while you were drinking it in whose
21     company were you were -- were you at?
22     A    With Les.
23         Q    Just Les?
24     A    Yes.
25         Q    Okay.  During the course of the evening -- I
```

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

SHEET 17

```
                        Davis - Direct                   32
 1    want to take your attention to maybe around the closing
 2    hours, which would put us after 2 o'clock, maybe 2:30,
 3    something like that -- do you know if there was
 4    anything that occurred inside the tavern there?
 5    A    There was a fight in there.
 6         Q    Did you have anything to do with that fight?
 7    A    No.
 8         Q    As a matter of fact, where was this fight, at
 9    what portion of the tavern?
10    A    In the front.
11         Q    And where were you staying basically the time
12    you were there?
13    A    At the back door.
14         Q    Did you have any idea who was involved in
15    this fight?
16    A    No.
17         Q    And once again, did you participate in this
18    fight?
19    A    No.
20         Q    Was the place closing at around that time or
21    did it close after that time?
22    A    It closed like right after that.
23         Q    When it was closing what did you do?
24    A    I was trying to leave.  They started pushing
25    everybody outside.
```

```
                        Davis - Direct                   33
 1         Q    And what was --  Why did they start pushing?
 2    What was that a result of?
 3    A    Because of the fight.
 4         Q    Now, when you said you tried to leave, what
 5    door did you try to leave out of, sir?
 6    A    The front door.
 7         Q    And when you open that front door what --
 8    what street are you on?
 9    A    I'm on Bergen Street.
10         Q    So take us to the point where I guess you
11    come outside.
12    A    I step outside, I see some dudes in the street
13    arguing or whatever, I look over there, I seen my man,
14    he's arguing with this kid.
15         Q    Does he have a name, this person?
16    A    Tim.
17         Q    Timothy Phillips?
18    A    Yes.
19         Q    Is he the person who eventually got shot?
20    A    Yes.
21         Q    Did you know him?
22    A    Of course I did.
23         Q    About how long?
24    A    All of life.
25         Q    Was he a friend of yours?
```

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

Davis - Direct                                    34

```
 1    A      Yes.
 2           Q      Now, I'm sorry to interrupt you, but please
 3    describe what happened.
 4    A      I saw them arguing and I started to leave.  I got
 5    about three steps down and fell on the ground.
 6           Q      All right.  When you say you fell on the
 7    ground what do you mean?  What happened?
 8    A      I fell on the ground.
 9           Q      Anything in particular make you fall down?
10    A      Yes, I was shot.
11           Q      And were you still in front of the tavern at
12    all?
13    A      I was like maybe, you know, a couple of feet away
14    from the door.
15           Q      Did you hear anything prior to falling down
16    to the ground and being shot?
17    A      You know, just the regular.
18           Q      What was the regular?
19    A      You know, people arguing, bunch of noise -- you
20    know, the regular.
21           Q      Did you hear any gunshots?
22    A      Actually no.
23           Q      Let me ask you, did you expect any gunshots
24    at that time?
25    A      No.
```

Davis - Direct                                    35

```
 1           Q      Okay.  So when you say you fell down to the
 2    ground what did you feel?
 3    A      At first I didn't feel nothing.  I just looked
 4    around and that's when I realized I was shot and I
 5    crawled behind the car.
 6           Q      There was a car parked at the curb there?
 7    A      Yes.
 8           Q      All right.  What did you do from there?  What
 9    happened?
10    A      There was nothing I could do, just laid there.
11           Q      Well, did you then hear or see anything?
12    A      Yes, I got behind the car and I looked over to see
13    what -- you know, who was shooting and where it came
14    from.
15           Q      What did you see?
16    A      I saw a dude shoot my man Tim.
17           Q      Where was Tim at the time?
18    A      Standing in the street.
19           Q      All right.  And when you say you saw him
20    shoot can you describe briefly what this shooter looked
21    like?
22    A      Yes, skinny dude, you know, like the rest of them
23    young kids -- skinny dude, long dreads.
24           Q      All right.  And was he holding anything in
25    particular?
```

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

— SHEET 19 —

Davis - Direct                                    36

1   A    Yes, a gun.
2        Q    All right.  Do you know like what type of gun
3   it looked like?
4   A    Big black gun.  I don't know exactly what it was,
5   whatever -- big black gun.
6        Q    And what was this, as you said, skinny dude
7   with the dreadlocks, what was he doing with that gun?
8   A    Shooting Tim.
9        Q    All right.  When he shot Tim did Tim do
10  anything?
11  A    He couldn't do nothing.
12       Q    Did he fall to the ground?
13  A    He was already on the ground.
14       Q    When was the first time that you saw this
15  individual with the gun?
16  A    The first time I saw him?
17       Q    Yes, where were you located?
18  A    On the ground.
19       Q    Behind the car?
20  A    Yes.
21       Q    All right.  And you peaked over the car?
22  A    Kind of around the fender.
23       Q    Okay.  Now, when Tim is on the ground how
24  many times do you see this individual firing at him, if
25  -- if you can recall, sir?

Davis - Direct                                    37

1   A    I don't know, at least three or four times.
2        Q    Did you ever get an opportunity to look at
3   this individual in his face that was shooting at --
4   A    I looked at the dude dead in the face.
5        Q    I'm sorry.  Say that again?
6   A    Yes, I looked him dead in the face.
7        Q    About how far would you say you were from him
8   at the time?
9   A    I don't know.
10       Q    From -- from where you're sitting to?
11  A    Maybe about here to that green chair.
12       Q    Okay.  And putting Tim at that green chair,
13  as you say, Judge, for the record, if you --
14            THE COURT:  Which green chair is that?
15            MR. DeMATTIA:  You mean this green chair
16  right here, sir?
17            THE WITNESS:  Right there.
18            MR. DeMATTIA:  Right there.
19            THE COURT:  Twenty-seven feet.
20  BY MR. DeMATTIA:
21       Q    Did that put Timothy Phillips and the shooter
22  somewhere in the street vicinity?
23  A    Yes.
24       Q    Okay.  So you say you looked at him.  Did you
25  have an opportunity to remember his face?

## STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005

SHEET 20

```
                         Davis - Direct                    38
 1   A      Yes.
 2          Q    Okay.  What were the lighting conditions out
 3   at the time that you were able to see?
 4   A      It was the middle of the night.  I mean, they were
 5   standing in the street, I was on the sidewalk with the
 6   curb, behind the car.
 7          Q    Were there any street lamps on on Bergen
 8   Street right there?
 9   A      Yes.
10          Q    Okay.  Did you have enough light to make a
11   good visual picture of this individual?
12   A      I know what I saw.
13          Q    You know what you saw?
14   A      Yes.
15          Q    Did you have any narcotic substance or
16   alcohol to interfere with this perception?
17   A      No.
18          Q    In you?
19   A      No.
20          Q    All right.  How many beers did you have at
21   the place?
22   A      One.
23          Q    Okay.  Well, is there a time when this
24   individual stopped shooting his gun at Tim, the victim?
25   A      Yes, when he got ready to run.
```

```
                         Davis - Direct                    39
 1          Q    Okay.  Well, describe what he did from that
 2   point on, sir?  You said he ran.
 3   A      He stopped shooting, looked at me, took off and
 4   ran.
 5          Q    Okay.  Which direction did he run in?
 6   A      Towards what's that, Scheerer Avenue, one of them
 7   blocks.  He looked at me and ran that way.
 8          Q    Okay.  When he was running was he carrying
 9   anything?
10   A      The gun.
11          Q    Did you see where he ran off to?
12   A      No.
13          Q    Okay.  There came a time when you lost sight
14   of him at that point?
15   A      Yes.  I was behind the car.
16          Q    Okay.  Now, what happened to your leg?  Can
17   you describe for us what happened to your leg?
18   A      I got shot.
19          Q    Okay.  Anything broken inside your leg?
20   A      Shattered.
21          Q    What was shattered, if you recall?
22   A      My tendon.
23          Q    Okay.  I want to show you what's been marked
24   S-25 for identification.  I want you to take a look at
25   S-25 for identification, sir, and see if you could
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005

```
                        Davis - Direct                    40
1    recognize what that photograph is?
2    A     It's my leg.
3          Q     And the condition of your leg is shot?
4    A     Yes.
5          Q     Did you experience any pain?
6    A     Severely.
7          Q     Where were you taken, if anywhere, from in
8    front of the bar?  Did you go anywhere?
9    A     University Hospital.
10         Q     How did you get there?
11   A     Ambulance.
12         Q     When you got to University Hospital did you
13   receive any treatment?
14   A     Yes, I had surgery.
15         Q     All right.  Because we weren't there, sir.
16   A     Yes, I had surgery.
17         Q     You had surgery?  Immediately?
18   A     I believe so.
19         Q     And the surgery was for what purpose?
20   A     They had to put rods in my leg.
21         Q     Did you have an extended stay in the
22   hospital?
23   A     I guess you could say that, yes.
24         Q     Okay.  Do you recall exactly how many days
25   you were in there?  If you don't, fine, but just if you
```

```
                        Davis - Direct                    41
1    recall.
2    A     I think I got out like March.
3          Q     Okay.  Were there any complications due to
4    the wound that you received?
5    A     Yes.
6          Q     Like what?
7    A     My leg is -- it's infected.
8          Q     At the present time.
9    A     Yes.
10         Q     It's infected?
11   A     Yes.
12         Q     Okay.  Is there anything scheduled for
13   further treatment at the present time for your leg?
14   A     I was supposed to have surgery on the 18th.
15         Q     18th of this month?
16   A     Yes.
17         Q     And why didn't you have surgery?
18   A     Because I had to come here.
19         Q     Okay.  When you go back what's going to
20   happen?
21   A     I'm going to have surgery.
22         Q     That shooting was obviously, simple
23   mathematics, four years ago, or close to it, but you're
24   still experiencing symptoms from that gunshot wound?
25   A     Yes.
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005

SHEET 22

Davis - Direct
42

1  Q    That individual that you saw do the shooting,
2  had you ever seen him before in your life?
3  A    No, I don't know that kid.
4  Q    Well, did there come a time when the police
5  officers attempted -- police officers, whether they
6  were from my office, investigators, or detectives from
7  Newark Police, did in fact talk to you in order to take
8  a statement?
9  A    Sure, when I was in the hospital.
10  Q    And you were still in the hospital.  The date
11  of December 21st, 2001?
12  A    Yes.
13  Q    Which would be approximately five days after
14  this incident you cooperated with these individuals?
15  A    Yes, I answered the questions.
16  Q    All right.  And did they formalize it in a
17  statement?
18  A    Yes.
19  Q    And you reviewed that statement and you
20  signed the statement?
21  A    Yes.
22  Q    Okay.  Did one of the detectives show you a
23  photographic display?
24  A    They showed me a bunch of pictures.
25  Q    Okay.  And to see if you recognized anyone in

Davis - Direct
43

1  that photograph array?
2  A    Yes.
3       MR. DeMATTIA:  Your Honor, an envelope
4  previously marked S-21 for identification and its
5  contents, which are six photographs.
6  BY MR. DeMATTIA:
7  Q    An envelope has been marked S-21 containing
8  six photographs, sir.  I'd like to turn them over for
9  you, if I can.  No. 1, No. 2 -- if I could go all
10  through them -- No. 3, No. 4, No. 5 and No. 6.  And
11  during the course -- Well, while you were at that
12  hospital on that date do you recall being shown six
13  photographs?
14  A    Yes.
15  Q    And were you asked to see if you recognized
16  anyone in these photographs?
17  A    Yes.
18  Q    Did you, in fact, recognize at least one of
19  the photographs?
20  A    I recognized two of them.
21  Q    All right.  Let's start with the first one,
22  photograph marked No. 3 in this array, did you
23  recognize that photograph?
24  A    Yes.
25  Q    And that is a photograph of which individual?

**Elite Transcripts, Inc.**

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

Davis - Direct                                                    44

```
1    A      That's the dude I saw outside of the bar.
2           Q      Doing what?
3    A      With the gun.
4           Q      Doing the shooting?
5    A      That's the dude I saw with the gun.
6           Q      Okay.  Did you do anything in the back of
7    that particular photograph?
8    A      I signed it.
9           Q      Is that your name Stacy Davis?
10   A      Yes, it is.
11          Q      And the date is December 21st of 2001.
12   A      Yes.
13          Q      Do you see that person in court today?
14   A      No.
15          Q      Does that picture look different than the
16   individual in court today?
17   A      That can't be him right there.
18          Q      I'm sorry?
19   A      That can't be him right there.
20          Q      And why couldn't it be him?
21   A      Look at him.
22          Q      Does it look different?
23   A      That can't be him right there.
24          Q      That doesn't look like the same individual?
25   A      No, not at all.
```

Davis - Direct                                                    45

```
1           Q      Is there anything different about him?
2    A      Yes, he don't look, you know --
3           Q      Well, what's different?
4    A      -- crazy with the dirty dreads and all that.
5           Q      He doesn't have the dreads?  What else is
6    different?
7    A      He just --  He don't look the same.
8           Q      He don't look the same?
9    A      No.
10          Q      Did you ever know the name of this
11   individual?
12   A      Well, I don't know the kid.
13          Q      You never had seen him before.  Did he have a
14   beard, like the individual in court today?
15   A      No.
16          Q      Did he have close-cropped hair, like the
17   individual in court today?
18   A      No.
19          Q      Take a look at the face in this photograph.
20   Are you taking a look at the face in the photograph?
21   A      (No verbal response)
22          Q      Take a look at the face of that individual.
23   A      They don't look the same.
24          Q      You don't think they look the same?
25   A      No.
```

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

SHEET 24

```
                        Davis - Direct                    46
1           Q     Okay.  But definitely the hair is different,
2    the beard is different?
3    A     Yes.
4           Q     And you did not know the name.
5    A     No, I did not know the kid.
6           Q     But this is the individual that you saw
7    outside the bar.
8    A     Yes.
9           Q     Okay.  With regard to you said a second
10   photograph, Photograph No. 4, do you see a signature on
11   the back of that?
12   A     Yes.
13          Q     And whose signature is that?
14   A     Mine.
15          Q     What date?
16   A     12-21-01.
17          Q     I'm turning it over.  You picked out that
18   photograph, also.
19   A     Yes.
20          Q     Why did you pick out that photograph?
21   A     Because I saw him out there.
22          Q     You saw him out there that night?
23   A     Yes.
24          Q     So it just so happens that this photograph
25   was in there, too.
```

```
                   Davis - Direct / Sidebar               47
1    A     Right.
2           Q     You didn't plan it that way, did you?
3    A     No.
4           Q     Okay.  And you didn't recognize any of the
5    other photographs.
6    A     No.
7           Q     Now, on May 9th did you appear before an
8    Essex County Grand Jury -- of 2003, sir?
9    A     Yes.
10          MR. GORDON:  I'm going to object at this
11   point, Your Honor.
12          THE WITNESS:  I believe so, yes.
13          THE COURT:  Hang on.
14          MR. GORDON:  Ask to be heard at sidebar.
15          (Sidebar)
16          MR. GORDON:  Judge, I object if the witness
17   is going to be asked about that he appeared later at
18   the Essex County Grand Jury.  It's not relevant, it's
19   not impeachment.  The prosecutor is not impeaching his
20   own witness.  There's no implied charge of recent
21   fabrication such that he has to bully the witness with
22   extrinsic evidence of some later statement.  In fact,
23   we know that at the grand jury what occurred was that
24   Mr. Davis did what he did on December 21st, he
25   acknowledged that he signed the back of the photo, the
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005

Sidebar                                                    48

1   same photo that he's been presented with at court. I
2   don't know why now it would be proper on direct to ask
3   him about his testimony in front of the Essex County
4   Grand Jury.
5          MR. DeMATTIA:  Well, he hasn't made an in-
6   court identification.  Of course, he's been unable to
7   identify him because of the change in appearance.  I
8   think I'm entitled to show once again on as many pages
9   as possible that he identified this picture and went
10  over it, what he said about it, because this is not a
11  dive, because he's being truthful as to the change of
12  appearance, but I believe I should be afforded an
13  opportunity to reinforce his identification not only at
14  the time he made it with the police officers, but at
15  the time he reaffirmed it in front of the grand jury.
16  What's improper about that?
17         MR. GORDON:  Judge, at this point to say that
18  he reaffirmed the testimony when he's already indicated
19  very clearly that he signed the photograph, and so that
20  evidence is going to come before this jury.  Why now
21  would it be appropriate to buttress his testimony with
22  extrinsic evidence or something else?  That's like
23  saying let's pull out the statement and go over that
24  with him, too.
25         THE COURT:  Well, that's like saying that why

Sidebar                                                    49

1   should we let a police identification procedure be
2   admitted when a -- when a witness can identify somebody
3   in the courtroom?  Well, the answer is you can because
4   every time there's -- especially when identification is
5   an issue, every time that a witness is able to
6   identify, or in the past has indicated they were able
7   to identify the individual as a -- as a -- as the
8   perpetrator, it was an appropriate inquiry.
9          MR. GORDON:  Well, Judge, are we going to go
10  in and ask him what his testimony was, or are we just
11  going to ask him if on one occasion did he testify
12  before the grand jury under oath and was he shown that
13  photograph and did he identify that photograph then?
14  If that's the limit then I think the question should be
15  -- the question should be tailored for that or
16  rephrased at this point, however, but I don't think we
17  should just let him talk about all of the testimony
18  that he gave at the grand jury.  As long as it's
19  tailored then my objection would be withdrawn if the
20  question was tailored.  I don't think you can just go
21  into the details of his testimony.
22         MR. DeMATTIA:  Well, I intend to go into the
23  details of his testimony, Your Honor.  I have to prove
24  the case.  I have the burden of proving the case.
25         THE COURT:  Well, but it is hearsay.

## STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005

SHEET 26

Sidebar                                                                  50

1    MR. DeMATTIA:  The declarant's here in court
2    before you.
3         THE COURT:  That doesn't make it any less
4    hearsay.
5         MR. DeMATTIA:  I'm completely at a loss.
6         MR. GORDON:  It's not -- I'm sorry.
7         THE COURT:  Any out-of-court statement
8    offered for the proof of the matter asserted is
9    hearsay, whether or not the declarant is on the stand
10   or not.  Now, because it's the out-of-court statement
11   that you're offering, not the in-court statement, so
12   unless there's an exception like this was a prior
13   identification of the -- of the -- of the perpetrator
14   at another occasion, which I will allow.  I'm working
15   in a vacuum now but there's got to be some exception to
16   the hearsay rule.
17        MR. DeMATTIA:  Well, one of the exceptions is
18   also in his statement he said that he did not see the
19   shooting and in front of the grand jury he did say that
20   he saw the shooting, in addition to him standing over
21   the body.  I'm going to explore that and ask him why he
22   said additional information at the grand jury.
23        THE COURT:  All right.  I'll allow that.
24   That -- that has the effect of -- of --  It gets a
25   little confusing there in terms of what is impeachment

Sidebar                                                                  51

1    versus what is --
2         MR. DeMATTIA:  Is it proper?  Can I go into
3    that?
4         THE COURT:  I think it's proper because it
5    helps to -- helps the jury understand.  But I mean the
6    danger there is that they might not know what the hell
7    to believe.  That's probably what the defense is hoping
8    for, so --
9         MR. GORDON:  But, Judge, if I may, isn't that
10   -- that's part of really what the basis of the
11   objection has been.  It's not just that all this grand
12   jury testimony is now admissible.  If the prosecutor
13   can show a prior -- another identification which
14   occurred subsequent to the initial identification but
15   prior to an in-court identification -- I'm assuming
16   that's what the prosecutor is saying he wants to do,
17   but he wants to do it --
18        THE COURT:  Well, he's also saying, I gather,
19   that he's surprised by the fact that the witness is
20   saying now that he didn't see the shooting, or implied
21   that he didn't see the shooting, when he had said so
22   previously.  Under the circumstances he's allowed to do
23   that.
24        MR. GORDON:  But two things.  No. 1, he just
25   testified that he did see the shooting.  And No. 2, I'm

### Elite Transcripts, Inc.
14 Boonton Avenue, Butler, New Jersey  07405
973-283-0196     FAX 973-492-2927

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

SHEET 27

```
                            Sidebar                          52
 1   not sure where in the statement there's anything that
 2   says he did not see the shooting.  He wasn't asked
 3   questions specific about it to the degree that he was
 4   in front of the grand jury, but he never said in his
 5   sworn statement that he did not see him shoot him.  I
 6   think The Court would have to review that statement
 7   first.
 8             THE COURT:  Okay.  Well, it would have to be
 9   something inconsistent.
10             MR. DeMATTIA:  Okay.
11             MR. GORDON:  Well, that's my point.  And so
12   what I'm asserting now is that the grand jury testimony
13   is not inconsistent.  This is Mr. DeMattia's witness.
14   I think he's trying to say now he's surprised because
15   there has been no in-court I.D., but it's not --
16             MR. DeMATTIA:  I'm not surprised because of
17   no in-court I.D., Your Honor.  There's no --
18             THE COURT:  You're now trying to explain why
19   there was no in-court I.D. and I'm going to allow that.
20             MR. GORDON:  But my point is how does
21   anything that happened at the grand jury explain that?
22   There's nothing in the grand jury testimony that's
23   going to explain that.
24             THE COURT:  I don't know.  I wasn't there.
25             MR. GORDON:  My point is there's not an
```

```
                            Sidebar                          53
 1   inconsistency between the sworn statement and the grand
 2   jury testimony.  There's nothing in the sworn statement
 3   that said that he --
 4             THE COURT:  That's not what is at issue.  Is
 5   there anything inconsistent between the testimony here
 6   and what's in the grand jury?
 7             MR. GORDON:  I don't think so, because all
 8   that happened in front of the grand jury was that the
 9   witness identified the photograph, said this was the
10   person I saw doing the shooting, said he saw the
11   shooting, and that's exactly what he testified to here.
12             MR. DeMATTIA:  Well, that's what I would like
13   to get out at a minimum, Judge.
14             THE COURT:  Okay.
15             MR. GORDON:  But I think that's my point,
16   Judge.  If the witness has been inconsistent is my
17   point.  There's no inconsistency.  If there were an
18   inconsistency I can understand how the prosecutor now
19   would want to point out to the jury that on a previous
20   occasion there had been something different, but that's
21   not what happened here.
22             THE COURT:  I think the fact that the
23   defendant changed his appearance is what -- what
24   created a difference and created a relevance for that
25   additional testimony, to explain that even if it was
```

**Elite Transcripts, Inc.**
14 Boonton Avenue, Butler, New Jersey  07405
973-283-0196    FAX 973-492-2927

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

SHEET 28

Sidebar / Davis - Direct                                      54

1   consistent it's still admissible on the issue of
2   identity, and I think that that is relevant.
3            MR. GORDON:  But didn't we just hear that
4   information?  In other words, the prosecutor just asked
5   this witness several questions saying, well, does the
6   witness in court appear to look different and the
7   witness said yes.  So, how is it that bringing in an
8   identification that occurred of the photograph that the
9   witness has just identified in court, that
10  identification at grand jury, how does that even touch
11  upon the issue of whether the defendant looks different
12  today?  He came here and he said that this person looks
13  different.
14           THE COURT:  Just on the issue of whether or
15  not your client did the crime.
16           MR. GORDON:  Right.
17           THE COURT:  That identification and then
18  magnification is an exception.
19           MR. DeMATTIA:  Let's go.
20               (Sidebar concluded)
21           THE COURT:  All right.  The objection is
22  overruled.  Mr. DeMattia, please continue.
23           MR. DeMATTIA:  Thank you, Your Honor.
24  BY MR. DAVIS:
25      Q    Mr. Davis, I was asking you, do you recall on

Davis - Direct                                               55

1   May 9th of 2003 you were before an Essex County Grand
2   Jury testifying about the events of today?
3   A    Yes, I do.
4       Q    As a matter of fact, we had a pre-trial
5   conference where I met with you at the place you're at
6   now where we discussed your statement and the grand
7   jury testimony, correct?
8   A    Yes.
9       Q    Okay.  During the grand jury testimony do you
10  recall that I was the assistant prosecutor there?
11  A    Yes.
12      Q    If you recall.  If you don't --
13  A    Yes.
14      Q    Okay.  And during the course of the
15  proceeding at the grand jury I had shown you a
16  photograph, as a matter of fact, or asked you if you
17  would be able to identify the photograph of the person
18  you saw outside the bar that evening, correct?
19  A    Yes.
20      Q    Were you able to do that for the Essex County
21  Grand Jury at that time?
22  A    Yes, I was.
23      Q    Yes, and it was the same photograph that I
24  showed you before, was it not, with the distinctive
25  features of that particular individual at that time.

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

SHEET 29

```
                              Davis - Direct                    56
 1    A      Right.
 2           Q      Same photograph.  And you did agree, did you
 3    not, in front of the grand jury that that was the
 4    individual?
 5    A      Right.
 6           Q      Once again, the individual in court today
 7    does not look anything like that picture to you?
 8    A      Not at all.
 9           Q      Okay.  Did you see anyone else outside that
10    tavern that evening with a handgun?  You have to answer
11    for the --
12    A      No, no.
13           Q      Okay.  Mr.  Davis, presently where are you
14    staying?
15    A      In prison.
16           Q      At Northern State Prison?
17    A      Yes.
18           Q      And as a result of some charges that were
19    against you you hired yourself an attorney?
20    A      Yes.
21           Q      Who was that attorney?
22    A      Tom Ashley.
23           Q      As a matter of fact, Mr. Davis, there has
24    been instances before in your past dating back to 1994
25    when you were involved with the criminal justice
```

```
                              Davis - Direct                    57
 1    system?
 2    A      Yes.
 3           Q      With regard to May 6th of 1994 there was a
 4    time when you were convicted of the unlawful possession
 5    of a weapon where you received probation for five years
 6    with the service of 180 days in the Essex County Jail?
 7    A      Yes.
 8           Q      Do you recall that?  That was back in May of
 9    1994 out of this courthouse, the Essex County
10    Courthouse?
11    A      Yes.
12           Q      With regard to the Union County Courthouse a
13    year later, back in December of 1995, you were
14    convicted, or had pled guilty, actually, to a robbery
15    where you were sentenced to 15 years, five of which you
16    would be ineligible for parole.
17    A      Yes.
18           Q      And did you hire an attorney for that?
19    A      Of course.
20           Q      In 1996 there was possession of a controlled
21    dangerous substance out of the Essex County Court --
22    this court system again -- where you had pled guilty
23    and you received three years?
24    A      Yes.
25           Q      And that three years, and even the first
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005

SHEET 30

Davis – Direct                                                58

1    conviction of robbery ran concurrent, you served at the
2    same time?
3    A    Right.
4        Q    And finally in the most recent one, which had
5    you incarcerated at Northern State Prison, the
6    Department of Corrections, these are the charges that
7    you hired Mr. Thomas Ashley for?
8    A    Yes.
9        Q    Okay.  And they were indictments where you
10   pled guilty for a plea that Mr. Ashley was able to get
11   you?
12   A    Yes.
13       Q    With regard to one indictment you had pled
14   guilty to possession of a CDS with the intent to
15   distribute within 1,000 feet of a school and possession
16   of CDS, where you were sentenced on June 18th of 2004
17   to four years, 18 months?
18   A    Yes.
19       Q    That's the sentence you're presently doing?
20   A    Yes.
21       Q    And, also, another indictment was taken care
22   of by Mr. Ashley at that same time?
23   A    Yes.
24       Q    A second indictment charging you with another
25   count of possession of CDS with the intent to

Davis – Direct                                                59

1    distribute within 1,000 feet of a school, that also was
2    four years, 18 months?  So both these indictments you
3    pled guilty to through a plea bargain?
4    A    Yes.
5        Q    Who arranged that plea bargain for you?
6    A    Tom Ashley.
7        Q    Okay.  That was on June -- June 18th of 2004.
8    Now, was there any deal made between the State of New
9    Jersey and Mr. Ashley for your testimony or your
10   cooperation?
11   A    With this?
12       Q    Yes.
13   A    No.
14       Q    Okay.
15   A    Not at all.
16       Q    Not at all.
17   A    No.
18       Q    You're familiar with the process.  We would
19   have had to disclose that to you, if it was.
20   A    Yes.
21       Q    Correct?
22   A    Yes, you would have.  You would have had to come
23   with a lot better deal than that.
24       Q    Right, and we didn't offer you anything.
25   A    No.

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

SHEET 31

```
                        Davis - Direct                    60
 1          Q     As a matter of fact, when this incident
 2   occurred on December 16th of 2001 and you had given the
 3   statement of December 21st of 2001 and made the
 4   identification, were there any charges that we made a
 5   deal with you about?
 6   A     No.
 7          Q     You -- you hadn't even been arrested --
 8   A     No.
 9          Q     -- on these charges that Mr. Ashley took care
10   of.
11   A     No.
12          Q     Right?  You didn't get arrested yet on those.
13   And then even in May of 2003, when you testified in
14   front of the grand jury, was -- were you arrested on
15   these charges?
16   A     No.
17          Q     Okay.  So was any deal made with you back on
18   May 9th of 2003 to testify in front of the grand jury?
19   A     No.
20          Q     And -- and, once again, to get you here today
21   why are you testifying today, any deal that we gave
22   you?
23   A     No.
24          Q     Were you the victim of a crime?
25   A     Yes, somebody shot me.
```

```
                   Davis - Direct / Sidebar              61
 1          Q     Is that why you're testifying?
 2   A     Yes.
 3          MR. DeMATTIA:  I have no further questions,
 4   Judge.
 5          THE COURT:  Cross-examine.
 6          MR. GORDON:  Your Honor, in light of the time
 7   would you like to break now or --
 8          THE COURT:  Why don't you step up to sidebar
 9   for a minute.
10                      (Sidebar)
11          THE COURT:  How much time do you think you
12   need?
13          MR. GORDON:  I'm not sure.
14          THE COURT:  More than a half an hour?  Maybe
15   we could be done with him and save the officers the
16   time to, you know, bringing him down, bringing him up,
17   and all that stuff.  But if it was going to go an hour
18   then I wouldn't --
19          MR. GORDON:  Just not sure, Judge.  I don't
20   want to inconvenience anyone, but it's up to you.  I
21   just wanted to give you that opportunity.
22          THE COURT:  I say we continue.
23          MR. DeMATTIA:  As long as no one has any type
24   of medical disability where they've got to eat lunch or
25   anything like that.  That's all, Judge.
```

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

SHEET 32

```
                    Sidebar / Davis - Cross              62
 1          THE COURT:  Well, hopefully they'll tell me
 2   that.  Okay.  We'll continue.
 3          MR. GORDON:  Thank you, Judge.
 4              (Sidebar concluded)
 5          THE COURT:  We'll have our lunch -- unless
 6   somebody has a particular problem, they should tell me
 7   about that right now -- we're going to continue with
 8   this witness in the hopes that we can complete him
 9   before breaking for lunch, which we'll still have the
10   same full hour, it just will not be from 12:30 to 1:30.
11   Okay?  Mr. Gordon, cross-examination.
12          MR. GORDON:  Thank you, Your Honor.
13   CROSS-EXAMINATION BY MR. GORDON:
14      Q      You were shown a photo of a gunshot wound to
15   your leg, right?
16   A    Yes.
17      Q      And you were taken by ambulance to the
18   hospital, right?
19   A    Yes.
20      Q      And you said that was a severe wound that you
21   suffered, right?
22   A    Yes.
23      Q      It was very severe.  The bones in your legs
24   were shattered, right?  A bone in your leg was
25   shattered, right?
```

```
                       Davis - Cross                    63
 1   A    Yes.
 2      Q      And, in fact, you needed surgery to repair
 3   the wound at that time, right?
 4   A    Yes.
 5      Q      By the way, when you went to the hospital did
 6   any police speak to you at the hospital?
 7   A    Yes.
 8      Q      Can you recall the name of any police that
 9   spoke to you?
10   A    Only one of them.
11      Q      A plain clothes detective?
12   A    I suppose.
13      Q      At that time did he mention to you anything
14   about placing you under arrest?
15   A    No.
16      Q      At any time did anybody mention placing you
17   under arrest for any outstanding warrants?
18   A    No, they didn't.
19      Q      When you were in the hospital you said you
20   stated a period of how long, a few months?
21   A    Yes.
22      Q      Got out in March?
23   A    I believe so.
24      Q      Now, after the shooting you were down on the
25   ground, right?
```

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

SHEET 33

Davis - Cross                                    64

```
 1   A    Yes.
 2        Q    You were approximately this far away from the
 3   shooter, right?
 4   A    About.
 5        Q    You said you were peeking around the fender
 6   of a car, right?
 7   A    True.
 8        Q    True.  And were you -- at that point were you
 9   on your knees, were you on your back, were you --
10   A    I was on my side.
11        Q    Side?  Right side or left side?
12   A    My right side.
13        Q    And the car that you were peeking around, was
14   that car parked near the front of the bar?
15   A    Yes, it was.
16        Q    Was it directly in front of the front door,
17   or was it to the side?
18   A    It wasn't.  It was to the side.
19        Q    Was it more down the street to the bus stop?
20   A    Right about there.
21        Q    Right about where the bus stop was?
22   A    Yes.
23        Q    And that's on Bergen Street, right?
24   A    Yes.
25        Q    And so you were peeking around the back
```

Davis - Cross                                    65

```
 1   bumper or the front bumper?
 2   A    Back bumper.
 3        Q    And you indicated that the person you saw
 4   with the gun was young, right?
 5   A    Yes.
 6        Q    And, in fact, I think you said skinny dude,
 7   like the rest of them young kids, right?
 8   A    Yes.
 9        Q    There were some -- some other kids that night
10   that had that look, right, that dreads look?
11   A    Absolutely.
12        Q    That skinny look, right?  True?
13   A    Absolutely.
14        Q    Some of them were at the bar inside and some
15   of them were outside the bar, right?
16   A    Yes.
17        Q    And at the moment that you realized you were
18   shot did you feel any pain then?  Did you feel some
19   pain then?
20   A    Yes.
21        Q    And you said it was middle of the night,
22   right?
23   A    Yes.
24        Q    It was in front of the bar but it was
25   somewhat dark, right?
```

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

SHEET 34

Davis - Cross / Redirect                                    66

1    A    Yes.
2         Q    And when you saw that person holding a gun
3    did you look at the gun?
4    A    Yes.
5         Q    And let's be frank, Mr. Davis, you've been
6    around a little bit.  You took a good look at that gun,
7    didn't you?
8    A    Of course I did.
9         Q    Of course you did because you didn't want
10   that gun to turn and face you again, right?
11   A    No, I didn't.
12        Q    Of course you didn't.  And in fact that's
13   what you were looking at, wasn't it?  You were looking
14   at the gun to make sure that it didn't turn its way
15   toward you, isn't that fair to tell the jury?
16   A    Yes, I suppose.
17             MR. GORDON:  Thank you.  I have nothing
18   further, Your Honor.
19             THE COURT:  Any redirect?
20             MR. DeMATTIA:  Yes, Your Honor.
21   REDIRECT EXAMINATION BY MR. DeMATTIA:
22        Q    Mr. Davis, after you looked at the gun did
23   you look up and look at the individual's face?
24   A    Sure I did.
25        Q    Is that why you were able at that time to

Davis - Redirect / Colloquy                                67

1    identify a photograph of that person?
2    A    Sure it was.
3         Q    And you were sure that that person you
4    identified in that photograph was the same person out
5    there that night?
6    A    Yes.
7             MR. DeMATTIA:  Nothing further, Judge.
8             THE COURT:  Anything, Mr. Gordon?
9             MR. GORDON:  I'm done with him, Your Honor.
10            THE COURT:  Thank you very much, Mr. Davis.
11   You're excused.
12            All right.  It's only 12:35, so we weren't
13   delayed too much from our lunch.  We're going to break
14   for an hour for lunch.  Remember don't discuss the
15   case, not even with each other, and obviously not with
16   anyone else.  Anyone attempts to contact you don't
17   report that to your fellow jurors, make sure you report
18   it to me or my staff immediately.  Enjoy your lunch and
19   we'll see you back here at 1:35.  Thank you very much.
20                 (Luncheon recess)
21            THE COURT:  Okay.  Ladies and gentlemen,
22   we're ready to continue from where we left off.  The
23   State, Mr. DeMattia, will call its next witness.
24            MR. DeMATTIA:  Stanley Rosa.
25            THE COURT:  Stanley Rosa to the stand,

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

SHEET 35

Rosa - Direct                                                                    68

1  please.
2                 COURT OFFICER:  Raise your right hand.
3  S T A N L E Y   R O S A,  STATE'S WITNESS, SWORN
4                 COURT OFFICER:  State your full name for the
5  record.
6                 THE WITNESS:  Stanley Rosa, R-o-s-a.
7                 THE COURT:  Good afternoon, sir.
8                 THE WITNESS:  Good afternoon.
9                 THE COURT:  Mr. DeMattia?
10 DIRECT EXAMINATION BY MR. DeMATTIA:
11           Q     Sir, by whom are you employed?
12 A     Essex County Prosecutor's Office.
13           Q     In what capacity?
14 A     I'm an Investigator in the Homicide Squad.
15           Q     For how long?
16 A     I've been working there for four years.
17           Q     Prior to that assignment?
18 A     I worked in Maplewood for 15 years.
19           Q     As a?
20 A     As a detective, a patrolman, and anti-crime.
21           Q     What are some of your responsibilities with
22 regard to your position in the Homicide Squad of my
23 office?
24 A     To investigate homicides, suspicious shootings and
25 police shootings.

Rosa - Direct                                                                    69

1           Q     As part of your duties is it also fair to say
2  that you attempt to make identifications through
3  photograph arrays?
4  A     Yes.
5           Q     Did you have occasion to work with
6  Investigator Benjamin Powell of our office with regard
7  to a shooting that occurred on December 16th, 2001 at
8  Toby's Lounge, 966 Bergen Street, City of Newark?
9  A     Yes.
10          Q     Did you accompany him anywhere on December
11 21st, 2001?
12 A     To University Hospital, Newark.
13          Q     Is there anybody in particular that you saw
14 at University Hospital?
15 A     I saw Mr. Stacy Davis.
16          Q     And while you were at that hospital location
17 with Stacy Davis did you bring with you photographs?
18 A     Yes.
19          Q     I want to show you an envelope which has
20 previously been marked S-21 for identification,
21 containing six photographs, which one also has another
22 identification mark.  The reason of your visit to Mr.
23 Stacy Davis at University Hospital?
24 A     Was to show him this photo display, to identify
25 anyone that was involved in the shooting.

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

SHEET 36

```
                          Rosa - Direct                      70
 1            Q     If he could.
 2      A     If he could, yes.
 3            Q     What was his condition at the time, if you
 4      recall?
 5      A     I believe he was in pain.  He had just been shot.
 6            Q     Did you present the photographic display to
 7      him?
 8      A     Yes, I did.
 9            Q     How did you present it?
10      A     I read him a preamble that comes with the form and
11      then I showed him the photos one at a time.
12            Q     We'll get to the preamble in a minute.  When
13      you showed him the photographs one at a time did
14      anything occur during that presentation?
15      A     Yes, he saw one photo which he identified as the
16      individual that shot him in the case that Investigator
17      Powell was investigating.
18            Q     All right.  What photograph was that?
19      A     Photograph No. 3.
20            Q     And on the back of it what was he told to do
21      to that photograph?
22      A     He was told to sign his name and date it.
23            Q     Did you witness his signature?
24      A     Yes, I did.
25            Q     And what was the date?
```

```
                          Rosa - Direct                      71
 1      A     The date on it is December 21st, 2001.
 2            Q     Are you aware of the name of the individual
 3      depicted in Photograph No. 3?
 4      A     I just -- Miller.
 5            Q     Last name Miller?
 6      A     Yes.  Naeem Miller.
 7            Q     Thank you.  And that was the name of the
 8      individual in Photograph No. 3 that Mr. Davis picked
 9      out?
10      A     Yes, it was.
11            Q     As being involved in the shooting at that
12      location on December 16th, 2001?
13      A     That's correct.
14            Q     Do you see Mr. Miller in court today?
15      A     Yes, he's sitting at the table right there.  He
16      looks a little different from the photograph, but
17      that's the individual.
18            Q     In what way does he look different?
19      A     His hair style and the facial hair.
20            Q     Are different than?
21      A     From the photograph that was shown to Mr. Davis.
22            Q     Now, I want to show you what's been marked S-
23      26 for identification.  I don't know if Mr. Gordon has
24      seen this before.  This is an exhibit provided in
25      discovery.
```

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

```
                            Rosa - Direct                    72
 1              MR. GORDON:  Yes, thank you.
 2    BY MR. DeMATTIA:
 3         Q      When you talk about preamble of certain
 4    instructions, can you look at a three-page exhibit, S-
 5    26 for identification?  Do you recognize that?
 6    A    Yes, I do.
 7         Q      What is the first page?
 8    A    It's a photo display instructions.
 9         Q      You instructed Mr. Davis as to how to
10    proceed?
11    A    Yes, I did.
12         Q      You signed off on that page?
13    A    Yes, I did.
14         Q      What is the second page?
15    A    It's a photo display report.
16         Q      And at the bottom of the second page is there
17    an area for comment about demeanor of the witness?
18    A    Yes.
19         Q      Did you yourself write something there?
20    A    Yes.
21         Q      What did you say?
22    A    It says the individual showed signs of anger and
23    deep emotion after identifying Photograph No. 3.  He
24    was crying and showing display of disgust.
25         Q      That was your notation?
```

```
                            Rosa - Direct                    73
 1    A    Yes.
 2         Q      And you signed that off?
 3    A    Yes, I did.
 4         Q      And who was that describing?
 5    A    That was describing Mr. Miller.
 6         Q      All right.  And the final page is Mr. Davis's
 7    what?
 8    A    His statement as to what he did when he saw the
 9    photos.
10         Q      And it was Photograph No. 3 that he picked
11    out?
12    A    Yes.
13         Q      Did you confer with Investigator Ben Powell
14    after that, after it was shown?
15    A    Yes.
16         Q      Was Investigator Powell there?
17    A    No, he was not.
18         Q      But did he accompany you to --
19    A    Yes, he accompanied me to the hospital, but he
20    wasn't present when I showed this display to --
21         Q      Did you know anything about this case before
22    and during the presentation of the photographs to Mr.
23    Stacy Davis?
24    A    No, I did not.
25         Q      And why is that?
```

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

SHEET 38

Rosa – Direct                                      74

```
 1   A     We're not supposed to --  Anyone that's showing a
 2   photo display is not supposed to have any knowledge of
 3   the case.  It's supposed to be an independent person.
 4        Q    For what reason?
 5   A    Just not to show any I guess favoritism or
 6   anything to help along with the case, just be an
 7   independent witness.
 8             MR. DeMATTIA:  I have no further questions of
 9   Investigator Rosa.
10             THE COURT:  Cross-examine?
11             MR. GORDON:  Thank you, Judge.  No questions
12   of the witness.
13             THE COURT:  Thank you, Investigator Rosa.
14   You're excused.  Mr. DeMattia?
15             MR. DeMATTIA:  Kyle Kemp.
16             THE COURT:  Kyle Kemp to the stand, please.
17             COURT OFFICER:  Raise your right hand.
18   K Y L E    K E M P,  STATE'S WITNESS, SWORN
19             COURT OFFICER:  State your full name for the
20   record.
21             THE WITNESS:  Kyle R. Kemp.
22             THE COURT:  Please be seated.  Good
23   afternoon.
24             THE WITNESS:  Good afternoon, sir.
25             THE COURT:  Mr. DeMattia?
```

Kemp – Direct                                      75

```
 1   DIRECT EXAMINATION BY MR. DeMATTIA:
 2        Q    Sir, by whom are you employed?
 3   A    Scranton Police Department.
 4        Q    In what capacity?
 5   A    As a police officer.
 6        Q    For how long?
 7   A    Three years.  Approximately three years with
 8   Scranton.
 9        Q    I want to take your attention back to May 8th
10   of 2004.  Did you come into contact with a person by
11   the name of Naeem Miller?
12   A    Yes.
13        Q    When you came into contact with that person
14   by the name of Naeem Miller did he use the name Naeem
15   Miller?
16   A    No, he did not.
17        Q    What name did he use?
18   A    Steven Wheeler.
19        Q    Do you see the person who used the name
20   Steven -- what did you say, Wheeler?
21   A    Wheeler.
22        Q    -- in court today?
23   A    Yes, I do.
24        Q    Can you please point to him and describe what
25   he's wearing?
```

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

SHEET 39

```
                    Kemp - Direct / Charles - Direct          76
 1   A     He's sitting right there with a white striped
 2   shirt on with a goatee.  He looks a little bit
 3   different than he does when I --
 4              THE COURT:  Indicating the defendant.
 5   BY MR. DeMATTIA:
 6       Q     You stole my next question.  Does he look
 7   like he was back on May 8th of 2004 today?
 8   A     No, he has changed his appearance today.
 9              MR. DeMATTIA:  No further questions.
10              THE COURT:  Cross-examine?
11              MR. GORDON:  Your Honor, nothing of this
12   witness.
13              THE COURT:  Thank you very much, Officer.
14   You're excused.
15              MR. DeMATTIA:  Tim Charles, Your Honor.
16              THE COURT:  Tim Charles to the stand, please.
17              COURT OFFICER:  Raise your right hand.
18   T I M O T H Y   C H A R L E S,  STATE'S WITNESS, SWORN
19              COURT OFFICER:  State your full name for the
20   record.
21              THE WITNESS:  Timothy Charles.
22              THE COURT:  Please be seated, sir.  Good
23   afternoon.  Mr. DeMattia?
24   DIRECT EXAMINATION BY MR. DeMATTIA:
25       Q     Sir, by whom are you employed?
```

```
                         Charles - Direct               77
 1   A     Scranton Police.
 2       Q     In what capacity?
 3   A     I'm a police officer.
 4       Q     For how long?
 5   A     I've been a police officer for three years.
 6       Q     Officer Charles, on May 8th, 2004 did you
 7   come into contact with a Naeem Miller in the City of
 8   Scranton, Pennsylvania?
 9   A     Yes, I did.
10       Q     When you came into contact with him did he
11   use the name Naeem Miller?
12   A     He did not.
13       Q     On the first occasion what name did he use?
14   A     Steven Cruz.
15       Q     And how did he spell that?
16   A     The last name is spelled C-r-u-z-z.
17       Q     Did you approach him and come into contact
18   with him on a second occasion?
19   A     Yes.
20       Q     And did he use --  What name did he use at
21   that time?
22   A     Steven Cruz again.  He spelled the last name
23   differently the second time.  He spelled it with one
24   "z" instead of two.
25       Q     Okay.  And when you came in contact with him
```

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

SHEET 40

```
                         Charles - Direct                78
 1    did you have an opportunity to take a photograph of
 2    him?
 3    A    Yes, I did.
 4         Q    S-27 for identification.  I want to show you
 5    what's been marked S-27 for identification.  Do you
 6    recognize that?
 7    A    Yes.
 8         Q    What is that?
 9    A    It's a picture of Naeem Miller.
10         Q    And that you took personally on May 8th of
11    2004?
12    A    Yes.
13         Q    Did there come a time when you were talking
14    to him that you asked him again what his name was?
15    A    Yes.
16         Q    And what name did he give you finally at that
17    time?
18    A    At that point he gave me Naeem Miller.
19         Q    And do you see the person that had given you
20    Steven Cruz one spelling, and then Steven Cruz a second
21    spelling, and finally Naeem Miller today in the
22    courtroom?
23    A    Yes, I do.
24         Q    Can you please point to him and describe what
25    he's wearing?
```

```
                         Charles - Direct                79
 1    A    He's over there in a striped button-up shirt.  He
 2    has short hair a -- a beard.
 3         THE COURT:  Indicating the defendant.
 4    BY MR. DeMATTIA:
 5         Q    Does he look anything like the picture you
 6    have in front of you, which was taken on May 8th of
 7    2004, like he appears today?
 8    A    No, he changed his hair and his face, the hair on
 9    his face.
10         Q    When you found out he was Naeem Miller, did
11    you also find out at that time that there was an arrest
12    warrant for murder homicide out of Newark, New Jersey?
13    A    Yes, I did.
14         Q    Was he placed under arrest at that time?
15    A    Yes, he was.
16         Q    Approximately how far is Scranton,
17    Pennsylvania from Newark, New Jersey?
18    A    Roughly about an hour and a half.
19         Q    Mileages is, do you know?
20    A    I don't know.
21         MR. DeMATTIA:  Okay.  No further questions,
22    sir.
23         THE COURT:  Cross-examine.
24         MR. GORDON:  No questions of this witness,
25    Your Honor.  I would like to be heard at sidebar.
```

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

SHEET 41

```
                          Sidebar                    80
1        THE COURT:  Thank you, Officer.  You're
2    excused.
3                    (Sidebar)
4        MR. GORDON:  Judge, I object to the
5    prosecutor asking questions of these witnesses about
6    the photograph of Mr. Miller on how he looks now versus
7    how he looks then, and I think it's wholly
8    inappropriate for the prosecutor to represent to this
9    court during the motion in limine that these witnesses
10   were to be called for a limited purpose.  And I think
11   The Court agreed to admit their testimony only for a
12   limited purpose, and that limited purpose was
13   exclusively to support the State's theory of flight in
14   this case, and as a result it was my impression that
15   the testimony would be limited to flight.  Now it
16   appears what's occurred is that the State, in
17   attempting to repair the damage done by Mr. Davis's
18   failure to make an in-court identification is
19   attempting to use these officers to compare Mr.
20   Miller's appearance in May of 2004 to his appearance in
21   court today, and I don't see how there's any relevance
22   to flight in that attempt by the State.  In fact, it's
23   really going directly out of bounds of what this
24   testimony was for, and as a result now I assume the
25   State's going to offer that photograph into evidence,
```

```
                          Sidebar                    81
1    and unless the State is arguing that that photograph
2    appears different than the photograph identified by
3    Stacy Davis in December of 2001 I can't imagine how it
4    would be probative on the issue of flight.  It's only
5    probative on the issue of Mr. Davis's failure to make
6    an identification in court.  And so my motion is for
7    The Court to strike that testimony and advise the jury
8    to disregard it because it's prejudicial in the sense
9    that it's outside the bounds that The Court itself set
10   up for the testimony.
11       THE COURT:  It's highly probative not for
12   many purposes, but highly probative on the issue of
13   flight and it's entirely probative on the issue of
14   flight because it's clearly at issue whether or not
15   this is the guy who actually fled.  Okay?
16       MR. DeMATTIA:  I would just like to also say
17   that he termed it damage done by Stacy Davis.  He
18   shouldn't draw conclusions at this particular time as
19   far as he's talking with me with regard to my case.
20       THE COURT:  Well, he can draw any conclusion
21   he wants.  It's not -- Well, okay.  Then that's --
22   Whatever he thinks is whatever he thinks, but clearly
23   the evidence is --
24       MR. DeMATTIA:  Is probative.
25       THE COURT:  It's probative.
```

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

SHEET 42

```
                              Sidebar                        82
 1              MR. DeMATTIA:  Sure, Judge.  I have no
 2    further witnesses.
 3              THE COURT:  Even on the issue -- even on the
 4    issue of flight.  Okay?
 5              MR. DeMATTIA:  I have no further witnesses.
 6    Do you want me to rest now or do you want me to
 7    formally rest tomorrow just in case --
 8              THE COURT:  No, rest now so the jury knows
 9    that that's done.  What about moving items into
10    evidence?
11              MR. DeMATTIA:  Yes.  I thought you would like
12    to do that off the record so we could argue as to
13    what's --
14              THE COURT:  I don't know, is there stuff to
15    argue?
16              MR. DeMATTIA:  I'm sure he would want some
17    things to object to.
18              THE COURT:  Okay.  Well then rest subject to
19    moving items into evidence, we'll talk about what those
20    items are, and then in the morning you could move them
21    into evidence.
22              MR. DeMATTIA:  If you want to do it now.
23    Whatever your schedule is.
24              THE COURT:  Well, no, do you want the jury to
25    hang around so you can --
```

```
                         Sidebar / Colloquy                  83
 1              MR. DeMATTIA:  No, no, not at all.
 2              THE COURT:  We'll do it right after I excuse
 3    the jury.
 4              MR. GORDON:  And then we'll bring them back
 5    tomorrow?
 6                      (Sidebar concluded)
 7              THE COURT:  Okay.  Mr. DeMattia?
 8              MR. DeMATTIA:  Your Honor, subject to the
 9    proffer of certain exhibits the State has no further
10    witnesses.  We would rest.
11              THE COURT:  Thank you, Mr. DeMattia.  What
12    happens now we've moved quite expeditiously.  What
13    happens now is there are a number of things that have
14    to take place prior to taking any further steps with
15    regard to what occurs in your presence, including
16    talking about what the charge to the jury will be, what
17    evidence gets -- what material, tangible things, get --
18    become part of the evidentiary record, get taken with
19    you in the jury room.  We also provide an opportunity
20    -- and we're going to talk about that outside your
21    presence -- to give the -- to provide an opportunity,
22    should the defendant desire to produce any evidence
23    before you to do that, but we don't know whether that's
24    going to be the case until we have some other matters
25    to do outside of your presence.  So that means you get
```

**Elite Transcripts, Inc.**
14 Boonton Avenue, Butler, New Jersey  07405
973-283-0196      FAX 973-492-2927

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

SHEET 43

Colloquy                                                        84

1   to go home a little early today, and I'm sure that has
2   you all broken up, but you still get your full $40,
3   even though you got to go home early.  But don't forget
4   to get your parking thing validated and  you won't have
5   to pay $10 out of that big $40 check in order to pay
6   for your parking.
7              We're going to -- I anticipate some of that
8   being done this afternoon outside your presence, and
9   there is also some that may have to be done tomorrow
10  morning before you arrive.  Add to that the fact that
11  somehow or another I managed to get assigned the job of
12  orienting the jury -- the new jurors that are coming in
13  tomorrow morning, so I might not be able to start at 9
14  o'clock either -- I'll be down there.  So I'm going to
15  excuse you now for the day and ask you to please return
16  tomorrow morning at 10 o'clock and we'll be -- we'll be
17  on the home stretch.  Okay?  Thank you.  Please don't
18  discuss the case among yourselves or with anybody else.
19  While the State has rested its case there's still much
20  more for you to hear before you can begin the process
21  of deliberation.  Don't visit the scene, do your own
22  investigation, don't talk to anybody about the case.
23  If anybody attempts to talk to you about the case,
24  report that to me, not to your fellow jurors.  Have a
25  good evening.  We'll see you tomorrow morning at 10

Colloquy                                                        85

1   a.m.
2                    (Jury excused)
3          (Off the record.  Back on the record.)
4          THE COURT:  Back on the record outside the
5   presence of the jury.  Mr. DeMattia, you have items you
6   want to move into evidence.
7          MR. DeMATTIA:  Yes, Your Honor.  I believe
8   both yourself and Mr. Gordon should have an accurate --
9   maybe one or two errors -- but an accurate catalog of
10  the evidence.  Starting with S-4, Your Honor, subject
11  to -- I'm sorry -- S-3, subject to certain language
12  being redacted, I would move the wanted poster of Naeem
13  Miller that was distributed in the neighborhood into
14  evidence.  There is some objectionable language in
15  here.  The objectionable language is the suspect
16  possibly is a member of the Blood Street Gang.  He is
17  also wanted by East Cleveland, Ohio P.D. for murder.
18  The suspect is considered armed and dangerous.  That's
19  my position.  Everything else I believe is acceptable
20  subject to naturally argument.
21          MR. GORDON:  Judge, I think there should be a
22  redaction.  The redaction, I don't know -- Your Honor
23  doesn't have this in front of you, I know.
24          THE COURT:  Okay.
25          MR. GORDON:  I -- I would -- I would agree

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

SHEET 44

```
                              Colloquy                    86
 1    that this item can be moved into evidence subject to
 2    redaction.  I would -- I would just indicate I think
 3    the redaction should end after the sentence "Another
 4    individual was shot once in the leg."  It then goes on
 5    to say "Suspect frequents the areas of Bergen Street,
 6    Hunterdon Terrace, Hunterdon Street, Renner Avenue and
 7    Goodwin Avenue in Newark."  We don't know the source of
 8    any of that information, Judge, and so I think -- I
 9    think, to be on the safe side, what should be redacted
10    is everything beginning with the words "the suspect
11    frequents" down to the bottom of the paragraph.
12              MR. DeMATTIA:  Your Honor, I'll give it to
13    you now so that you could see, but I would argue
14    against that type of redaction because I had witnesses
15    that established his residence through Felicia Wright,
16    established his, what did she say, thousands of times
17    in that area that she had seen him.  We mentioned the
18    streets specifically, and if I have to prove flight,
19    Your Honor, I have to prove where we went in to go find
20    him where he would obviously be frequenting.
21              THE COURT:  S-3 is in evidence with the
22    redaction as proposed by Mr. DeMattia.  Okay.  What
23    else?
24              MR. DeMATTIA:  Your Honor, S-4 and S-4A, 4 is
25    the small photograph of the front, S-4A is the big
```

```
                              Colloquy                    87
 1    blowup of the front of 966 Bergen Street.
 2              MR. GORDON:  No objection.
 3              THE COURT:  S-4 and S-4A in evidence.
 4              MR. DeMATTIA:  Your Honor, then S-7 through
 5    14 -- 15 -- actually 16, S-7 through 16, 7 through 14
 6    specifically being a photograph of each shell casing
 7    recovered, and S-15 and 16 being the bullets recovered
 8    from the body, as described by Dr. Lila Perez.
 9              MR. GORDON:  No objection.
10              THE COURT:  S-7 through 16 in evidence.
11              MR. DeMATTIA:  Your Honor, only for the -- I
12    don't believe we need the blowup of -- I'm referring to
13    S-18, S-18 being the two pages of the injuries to the
14    victim testified to by Dr. Perez.  I don't believe we
15    need the blowup of those two injuries -- of those
16    several injuries.  I would move that into evidence.
17              MR. GORDON:  No objection.
18              THE COURT:  S-18 in evidence.
19              MR. DeMATTIA:  Your Honor, S-20 is a
20    photograph of defendant identified by Felicia Wright,
21    subject to, I guess, me sanitizing this, the bottom
22    portion of the photograph where it says Essex County
23    Sheriff's Office VCI, language to that effect.  I think
24    that's fair.
25              MR. GORDON:  Judge, I would just ask that all
```

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

SHEET 45

Colloquy                                                              88

1    typed material on this exhibit be redacted.
2             THE COURT:  All typed?
3             MR. DeMATTIA:  All printed, yes, Judge.
4             THE COURT:  Okay.  S-20 in evidence, as
5    redacted.
6             MR. DeMATTIA:  Okay.  S-21 and 21A,
7    photographs identified by Stacy Davis, the envelope and
8    the six photographs, I guess likewise with the bottoms
9    of all the photographs cut off indicating photos
10   Sheriff's Office.
11            MR. GORDON:  Judge, no objection, conditioned
12   on the redaction of any typed or printed material under
13   the photos.
14            THE COURT:  S-21 and S-21A, as redacted, in
15   evidence.
16            MR. DeMATTIA:  Your Honor, S-22 has been
17   previously marked, the gun permit search for the
18   indices of gun permits in the County of Essex, Naeem
19   Miller.
20            THE COURT:  Mr. Gordon?
21            MR. GORDON:  Your Honor, I'm assuming that
22   the State is offering that pursuant to The Court
23   recognizing it as an official document.  With that
24   condition then no objection.
25            MR. DeMATTIA:  It's a self-authenticating

Colloquy                                                              89

1    document, Judge.
2             THE COURT:  S-22 in evidence.
3             MR. DeMATTIA:  S-25, a photograph of Stacy
4    Davis's ankle.
5             THE COURT:  Any objection?
6             MR. GORDON:  One second, Your Honor.  No,  no
7    objection to S-25.
8             THE COURT:  S-25 in evidence.
9             MR. DeMATTIA:  And finally, Your Honor, S-27,
10   the photograph by the Scranton Police Department with
11   all the print deleted through, I guess, the scissors,
12   as identified by one of the Scranton police officers,
13   which I think it was Officer Charles.
14            THE COURT:  Mr. Gordon?
15            MR. GORDON:  Again, Judge, I'll be brief.  I
16   know The Court had heard me on this issue at sidebar,
17   but just to clarify it for the record.  I think that in
18   light of the fact that these officers were only
19   permitted to testify as to flight evidence I don't
20   believe this is relevant to flight or probative of
21   flight.  If the State is -- is not asserting, I don't
22   believe, that the picture that was identified by Stacy
23   Davis on December 21st of 2001 and the photo of Mr.
24   Miller taken by the Scranton Police on May 8th of 2004,
25   is substantially different.  I don't think the State is

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

SHEET 46

Colloquy                    90

1   alleging that Mr. Miller changed his appearance between
2   the date of the identification and the date of his
3   arrest, and so I don't think the time period from the
4   date of the arrest until today is the relevant time
5   period as to flight, and so I don't think it's
6   probative as to flight.   That's the limited purpose for
7   which this testimony from Scranton, Pennsylvania was
8   put in and, therefore, I don't believe that it's
9   probative of flight and I would object to it on that
10  basis.
11          THE COURT:  Well, I don't know, and it's not
12  necessary for me to reach the issue as to whether it's
13  probative of anything else and, if so, is it not
14  admissible because of the -- the nature and extent of
15  the initial ruling as a result of the motion in limine.
16  I don't have to answer that really because from what I
17  can see it's clearly probative as to the issue of
18  flight.  I mean, nothing could be more probative than
19  -- than evidence that substantiates the claim by the
20  State via these officers that this defendant as he
21  appears now is, in fact, the individual who had contact
22  with the Scranton police officers that date in May.
23  And I think the picture goes to that question and,
24  therefore, S-27 is in evidence.
25          MR. GORDON:  Judge, could I just ask for one

Colloquy                    91

1   point of clarification for the record?
2           THE COURT:  Okay?
3           MR. GORDON:  The Court recognized, and
4   obviously the witnesses identified the defendant in
5   court as being the person in court as being the person
6   that they arrested in May of 2004.  Is The Court's
7   ruling that the photograph is necessary evidence or
8   probative evidence of that fact over and above the
9   actual in-court identification?
10          THE COURT:  Yes.
11          MR. GORDON:  In other words, that the State
12  could establish it by way of what they have already
13  established it by that this person is the person they
14  arrested, not -- with no connection to the photo at the
15  time.
16          THE COURT:  Yes, the State is entitled to
17  meet their burden of proof as to identity, or attempt
18  to meet their burden of proof as to identity not only
19  with in-court identifications, but with admissible out-
20  of-court identifications.
21          Anything else, Mr. DeMattia?
22          MR. DeMATTIA:  I believe, Your Honor, that's
23  it.
24          THE COURT:  Okay.  That's the State's case.
25  Mr. Gordon, do you wish to be heard?

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

Argument - Gordon                                    92

1   MR. GORDON:  Judge, I'm moving for a judgment
2  of acquittal for Naeem Miller on each and every count
3  of this indictment pursuant to STATE VS. REYES -- R-e-
4  y-e-s, and applicable court rules.  Your Honor, it's my
5  understanding that the standard that The Court must
6  utilize in this matter for the purposes of this motion
7  is to give the State the benefit of all the favorable
8  testimony, all inferences that could be drawn from that
9  testimony I respectfully submit that no reasonable jury
10 could find Naeem Miller guilty of the crime of knowing
11 and intentional murder in this case.  Based upon the
12 facts that have been elicited, it appears that there
13 are only two alleged eyewitnesses to the actual
14 shooting, although I guess Mr. Phillips is a
15 possibility, although Mr. Phillips indicated clearly
16 that he did not see the shooter, didn't even really
17 give a very detailed description of the shooter.  The
18 witness Ms. Felicia Wright indicated that she saw Naeem
19 Miller with a gun.  I submit to Your Honor that based
20 upon her statements under oath the testimony that was
21 elicited from her, it was clear that she was not able
22 to make a firm identification.  Although she did make
23 an out-of-court identification, it appeared that the
24 testimony indicated that she was not sure of that
25 identification and that I think her words were words

Argument - Gordon / DeMattia / Decision        93

1  from the street or other things may have contributed to
2  what she said was an identification.  Mr. Davis clearly
3  today indicated that he could not identify Naeem Miller
4  as the person that he saw with the gun on that date.
5  As a result of that I respectfully submit that a
6  judgment of acquittal is appropriate and I would submit
7  to Your Honor.
8      THE COURT:  Mr. DeMattia?
9      MR. DeMATTIA:  Your Honor, there have been
10 identifications of this defendant Naeem Miller as he
11 appeared on the day in question.  There is no question
12 that the witnesses have indicated that it is him
13 despite a change in appearance, whether intentional or
14 unintentional.  I could argue whatever I deem
15 appropriate at the time of my summation.  But besides
16 identity we have the autopsy report, the testimony from
17 Dr. Perez.  The reasonable inferences to give the State
18 at this particular time with regard to the testimony
19 certainly I think the State is entitled for it to go
20 forward into the next phase.
21     THE COURT:  Thank you.  Clearly based upon
22 the testimony of the individuals who were offered here
23 today, and in its totality, giving all appropriate
24 inferences to the benefit of the State, a reasonable
25 jury could very well find that the defendant Naeem

## STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005

SHEET 48

### Decision / Colloquy 94

1  Miller is, in fact, the individual who committed the
2  crimes charged and, as such, the defendant's motion is
3  denied.
4         Mr. Gordon, is it premature or -- it's
5  entirely up to you -- do you want to wait until the
6  morning to voir dire Mr. Miller about his testimony?
7         MR. GORDON: Your Honor, respectfully I
8  believe tomorrow morning would be more appropriate.
9         THE COURT: All right. Similarly, can we at
10 least preliminarily or, ordinarily we don't do this
11 until the close in its entirety or in its formal phase,
12 but it is my practice to discuss potential charges
13 right from even prior to the jury selection, which I
14 believe you have, in fact, done. You've discussed it
15 with Ms. Lawson as well as with me. Perhaps we can do
16 it on a more formal basis now and then put the last
17 finishing touches on it at the end of the -- at the end
18 of the introduction of evidence. Any objection?
19        MR. DeMATTIA: I would like to try to do it
20 now, Your Honor.
21        MR. GORDON: We can do it now, Your Honor.
22 Do you want to do it on the record at this point or
23 speak informally first?
24        THE COURT: Let's do it on the record now
25 and, you know, we'll do it once more very briefly on

### Charge Conference 95

1  the record at the close of the evidence.
2         Non-2C charges that I see is prior conviction
3  of a witness, flight, expert testimony, in- and out-of-
4  court I.D., photo I.D. Any other non-2C charges?
5         MR. GORDON: Your Honor, false-in-one/false-
6  in-all.
7         THE COURT: Well, that's sort of part of the
8  regular charge anyway, but --
9         MR. DeMATTIA: It's part of --
10        THE COURT: Excuse me?
11        MR. DeMATTIA: -- part of the generic charge.
12        THE COURT: Yes.
13        MR. GORDON: Also, Judge, just with regard to
14 the photos, clearly we know that the testimony from the
15 Scranton Police is that they took the photo upon
16 arresting Naeem Miller, but the earlier photo I think
17 the jury should be instructed, as always, with regard
18 to the mug shot -- the mug shot instruction.
19        THE COURT: Yes, that's photo I.D. is that
20 instruction.
21        MR. GORDON: That's -- that's fine.
22        THE COURT: Okay? Nothing else? All right.
23 You'll see more final versions of those charges before
24 you sum up. As to 2C charges I don't see anything
25 remarkable. Is anybody requesting lesser includeds on

**STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005**

SHEET 49

Charge Conference                                          96

1    any of the charges?
2              MR. DeMATTIA:  Your Honor, I don't believe as
3    far as the murder charge is concerned that there is any
4    evidence which you could logically base a lesser
5    included offense of aggravated manslaughter, reckless
6    manslaughter, passion provocation manslaughter.
7    However, with regard to the aggravated assault charge
8    -- I mean with regard to the injury I just throw it out
9    that you may possibly have serious bodily injury for
10   the second degree, serious bodily injury -- I'm sorry
11   -- serious bodily injury, then reckless bodily injury
12   -- that's, I believe, a third degree.  You might want
13   to consider some form of lesser for the aggravated
14   assault.
15             MR. GORDON:  I concur with that, Your Honor.
16             THE COURT:  Okay.  To what --  How far do you
17   suggest we go with that?
18             MR. DeMATTIA:  I -- I can't really see simple
19   assault, Your Honor.  I could see recklessly causing
20   bodily injury for a possible third degree -- a second
21   degree aggravated assault, a third degree aggravated
22   assault, and that's my contribution.  If Mr. Gordon
23   would like it to go further than that --
24             MR. GORDON:  I -- I can't see it going
25   further than that either, in all candor, Your Honor.  I

Charge Conference                                          97

1    think the nature of the testimony, if it's accepted,
2    involving recklessness with a deadly weapon and all
3    that, I think that simple assault probably is not
4    indicated as a lesser included.
5              THE COURT:  Thank you.  All right.  I agree.
6    No lesser includeds as to murder and the one lesser
7    included, the -- on the aggravated assault.  You can
8    also anticipate having an opportunity to view the
9    Powerpoint slides prior to your closing statements.
10   I'll ask you to please make any comments with regard to
11   those slides as soon as you've had an opportunity to
12   look at them.  So you know, if you don't already know,
13   my practice is to fully develop the Powerpoint
14   presentation, give you an opportunity to view the
15   slides prior to closing so you know what it is not only
16   what the jury is going to be hearing but what it is
17   they're going to be looking at before you make your
18   closing statement.  It is also my practice to give the
19   jury a binder which contains the actual written charge,
20   and during the course of the charge I explain to them
21   that the actual written charge that I read to them is
22   in fact the charge to the jury and any other items,
23   including the Powerpoint presentation, is a means to
24   aid them, a system, but the actual charge is the actual
25   charge.

## STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005

SHEET 50

```
                        Charge Conference                98
 1              If anybody has any comments about that, any
 2     objections to that, now is the time to be heard.  Of
 3     course you'll be heard again if there are specific
 4     problems with any specific item after you've had an
 5     opportunity to view it.  Does anybody have anything?
 6              MR. GORDON:  No, Your Honor.
 7              THE COURT:  Anybody have anything that I
 8     haven't already talked about?
 9              MR. GORDON:  No, Your Honor.
10              THE COURT:  Okay.  So we'll -- unless
11     something changes I'll ask you once again to concur
12     with regard to the proposed charge and jury verdict
13     sheet before you sum up and then obviously once again
14     before it goes into the jury.  We'll talk to Mr. Miller
15     tomorrow about whether or not he's going to testify.
16     We will also want to know from you, Mr. Gordon, if Mr.
17     Miller doesn't testify whether you are requesting the
18     charge relative to the right of the defendant not to
19     testify.  Okay?
20              MR. GORDON:  Yes, Your Honor.
21              THE COURT:  Anybody have anything else?
22              MR. GORDON:  No, Your Honor.
23              THE COURT:  All right.  So we'll see you at
24     about 9:30 tomorrow so we can make sure we have
25     everything else wrapped up and ready to go so we know
```

```
                        Charge Conference                99
 1     where we're going at 10 o'clock when the jury shows up.
 2     Okay?
 3              MR. GORDON:  Thank you, Your Honor.
 4              THE COURT:  Thank you very much.  Have a good
 5     evening, everyone.
 6                    (Proceedings concluded)
```

## STATE OF NEW JERSEY v NAEEM MILLER -- March 29, 2005

SHEET 51

CERTIFICATION

I, Catherine J. Weigel, the assigned transcriber, do hereby certify that the foregoing transcript of proceedings in the Essex County Superior Court, on March 29, 2005, Tape No. 2, Index No. 10:12:53 - 14:51:29, is prepared in full compliance with the current transcript format for judicial proceedings and is a true and accurate compressed transcript of the proceedings as recorded to the best of my knowledge and ability.

Catherine Weigel        AOC#490
ELITE TRANSCRIPTS, INC.                September 12, 2005
BUTLER, NEW JERSEY  07405

**Elite Transcripts, Inc.**
14 Boonton Avenue, Butler, New Jersey  07405
973-283-0196      FAX 973-492-2927